UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of | Case No. 21-_____ |
| KINGSTOWN PARTNERS MASTER LTD, | |
| Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | |

**MEMORANDUM OF LAW IN SUPPORT OF THE APPLICATION FOR AN ORDER
OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782**

OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
*Attorneys for Petitioner*

5955385-4

Table of Contents

Page

PRELIMINARY STATEMENT ........................................................................... 1

FACTUAL BACKGROUND ............................................................................... 5

    A.    The Relevant Parties ...................................................................... 5

    B.    The Merger ..................................................................................... 7

    C.    The Conflicts of Interest at Play in the Merger ............................ 8

    D.    The Cayman Islands Appraisal Proceeding ................................. 10

    E.    Discovery in the Cayman Islands Appraisal Proceeding ............ 11

    F.    The Discovery Sought From Blackstone, MVB, and CC Capital ........ 12

ARGUMENT .................................................................................................... 13

    I.    Petitioner Satisfies the Three Statutory Requirements of 28 U.S.C. § 1782 ......... 14

        A.    The Respondents Are Found in this District ............................. 15

        B.    The Discovery Sought Is "For Use" In a Foreign Proceeding ............. 15

        C.    Petitioner is an "Interested Person" ........................................ 17

    II.    The Discretionary Intel Factors Weigh Strongly in Favor of Permitting Discovery ........................................................................... 17

        A.    Respondents are Not Parties to the Appraisal Proceeding ........ 18

        B.    The Cayman Court Will be Receptive to the Evidence Sought ............. 18

        C.    Petitioner Is Not Circumventing Foreign Restrictions on Evidence ......... 20

        D.    The Subpoenas Are Limited In Scope ....................................... 21

        E.    Expedited Review of Petitioner's Application Is Warranted ............ 22

CONCLUSION .................................................................................................. 22

Table of Authorities

Page

CASES

*Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*,
785 F. Supp. 2d 434 (S.D.N.Y. 2011) ..................................................................... 19

*Australia and New Zealand Banking Group Limited v. APR Energy Holding Limited*,
17-MC-00216 (VEC), 2017 WL 3841874 (S.D.N.Y. Sept. 1, 2017) ...................... 15

*Brandi-Dohrn v. IKB Deutsche Industriebank AG*,
673 F.3d 76 (2d Cir. 2012) ........................................................................... 14, 20

*Dietrich v. Bauer*,
198 F.R.D. 397 (S.D.N.Y. 2001) .......................................................................... 13

*Euromepa, S.A. v. R. Esmerian, Inc.*,
51 F.3d 1095 (2d Cir. 1995) .......................................................................... 18, 22

*First Am. Corp. v. Price Waterhouse LLP*,
154 F.3d 16 (2d Cir. 1998) ................................................................................... 21

*Gucci America, Inc. v. Weixing Li*,
768 F.3d 122 (2d Cir. 2014) ................................................................................ 15

*Gushlak v. Gushlak*,
486 Fed. App'x 215 (2d Cir. 2012) ...................................................................... 19

*In re Accent Delight Int'l Ltd.*,
791 F. App'x 247 (2d Cir. 2019) .......................................................................... 18

*In re Accent Delight Int'l Ltd.*,
869 F.3d 121 (2d Cir. 2017) ........................................................................... 14, 16

*In re Appl. for an Order Permitting Metallgesellschaft AG to take discovery*,
121 F.3d 77 (2d Cir. 1997) ................................................................................... 20

*In re Appl. of Auto–Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*,
No. 12 MC 221 (RPP), 2012 WL 4841945 (S.D.N.Y. Oct. 10, 2012) .............. 18, 22

*In re Appl. of Chevron Corp.*,
709 F.Supp.2d 283 (S.D.N.Y. 2010) .................................................................... 17

*In re Appl. of Grupo Qumma*,
No. M 8-85, 2005 WL 937486 (S.D.N.Y. Apr. 22, 2005) ...................................... 16

ii

Table of Authorities
(continued)

Page

*In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding,*
No. M 10-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009) ........................................ 19

*In re Application of Okean B.V. & Logistic Sol. Int'l,*
60 F. Supp. 3d 419 (S.D.N.Y. 2014) ..................................................................................... 20

*In re Bayer AG,*
146 F.3d 188 (3d Cir. 1998) .................................................................................................... 3

*In re del Valle Ruiz,*
939 F.3d 520 (2d Cir. 2019) .................................................................................................. 15

*In re Microsoft Corp.,*
428 F. Supp. 2d 188 (S.D.N.Y. 2006) ................................................................................... 20

*In re Penner,*
Civil Action No. 17-cv-12136-IT, 2017 WL 5632658 (D. Mass. Nov. 22, 2017) .................................................................................................................................... 19

*In re Petrobras Securities Litigation,*
393 F.Supp.3d 376 (S.D.N.Y. 2019) ..................................................................................... 15

*In re Platinum Partners Value Arbitrage Fund L.P.,*
583 B.R. 803 (Bankr. S.D.N.Y. 2018) .................................................................................. 19

*Intel Corp. v. Advanced Micro Devices, Inc.,*
542 U.S. 241, 124 S. Ct. 2466, 159 L. Ed. 2d 355 (2004) ............................................. passim

*Investment Vehicles v. KPMG, L.L.P.,*
798 F.3d 113 (2d Cir. 2015) ............................................................................................ 15, 17

*Marubeni Am. Corp. v. LBA Y.K.,*
08-3282-CV, 335 Fed. App'x 95 (2d Cir. June 17, 2009) ..................................................... 17

*Mees v. Buiter,*
793 F.3d 291 (2d Cir. 2015) ........................................................................................ 16, 17, 21

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP,*
376 F.3d 79 (2d Cir. 2004) .................................................................................................... 14

STATUTES

28 U.S.C. § 1782 ................................................................................................................ passim

## PRELIMINARY STATEMENT

Petitioner Kingstown Partners Master Ltd (**"Petitioner"**) respectfully makes this application pursuant to 28 U.S.C. § 1782 (the **"Application"**) to take limited discovery from three companies found in this District for use in connection with an appraisal proceeding pending in the Cayman Islands (the **"Appraisal Proceeding"**). The Appraisal Proceeding was filed in the Grand Court of the Cayman Islands (the **"Cayman Court"**) on August 17, 2020, and is scheduled for trial in March 2022. The information Petitioner seeks from the four targets of this Application— Blackstone Inc. (**"Blackstone"**), MVB Management, LLC (**"MVB"**), CC Capital Partners, LLC ("CC Capital Partners") and CC Capital Management LLC (**"CCCM,"** and together with CC Capital Partners, **"CC Capital"**) (collectively, the **"Respondents"**) — bears directly on the issues that will be determined in the Appraisal Proceeding.

Petitioner, along with several other minority shareholders (the **"Dissenters"**), was previously a shareholder of FGL Holdings (**"FGL"** or the "**Company"**), a publicly-traded Cayman Islands insurance company. FGL was traded on the New York Stock Exchange before it was de-listed following a going-private merger that closed on June 1, 2020. Through the going-private merger (the **"Merger"**), Fidelity National Financial, Inc. (**"FNF"**) acquired FGL and provided its common shareholders with either $12.50 per share or 0.2558 shares of FNF in exchange for their stock. Following the transaction, FGL became a wholly-owned subsidiary of FNF.

The Company's proxy statement, dated April 27, 2020 (the **"Proxy"**),[1] reveals that conflicted Company insiders negotiated the Merger. For example, William Foley, the Co-

---

[1] A copy of the Proxy is available at
https://www.sec.gov/Archives/edgar/data/0001668428/000104746920002608/a2241487zdefm14a.htm.

Chairman of FGL, also served as the Chairman of FNF.  And he participated in negotiations on behalf of FNF concerning the Merger, despite his declared conflicts.

The other Co-Chairman of FGL, Chinh E. Chu, was Mr. Foley's longtime business partner and a co-owner with Mr. Foley of MVB, a business that served as a "sub-advisor" to Blackstone, FGL's longtime investment manager.  Blackstone—FGL's investment manager since 2017 and the holder of 20.4% of the Company's shares—negotiated a five-year extension of its investment management agreement and, at the same time, entered into a voting agreement to support the Merger.  According to the Proxy, Blackstone initially contracted with MVB to be a "sub-advisor" in 2017.  And in connection with the execution of the Merger, MVB negotiated a "Participation Fee Agreement and related side letter agreements" with Blackstone ISG-I Advisors L.L.C. and FNF, allowing MVB to continue to receive substantial fees from Blackstone.

In addition, Mr. Chu served as the lead negotiator on behalf of FGL's Special Committee; FGL's Special Committee, in turn, hired a firm Mr. Chu controls, CC Capital Partners, as a "transaction advisor" to the Special Committee and set the firm up to receive a $3.75 million fee for its work, the majority of which was contingent upon the closing of the Merger.

Furthermore, voting agreements entered into by Blackstone, Foley, and others, combined with the fact that Company insiders—including Blackstone, CCCM, Mr. Chu, Mr. Foley, and the Company's other directors and officers— together with FNF collectively controlled in excess of 40% of the Company's common shares, made a vote in favor of the Merger highly likely.

Accordingly, Petitioner exercised its statutory appraisal rights pursuant to section 238 of the Companies Law (**"Section 238"** or **"s.238"**) to obtain a judicial determination of the fair value of the Dissenters' shares of FGL, and to require the Company to pay the determined fair value instead of the Merger price. Fair value will be assessed at an appraisal hearing, currently scheduled

2

for March 2022, at which the Dissenters intend to prove that the Merger consideration significantly undervalued the Company's shares.

The Respondents possess important information about the facts underlying the Appraisal Proceeding, including analysis and opinions concerning the fairness of the Merger price and the process through which that price was negotiated. For example, Blackstone—a major FGL shareholder—had discussions in November and December 2019 with Mr. Chu, the Chairman of FGL's Special Committee, about potentially buying the Company, but decided instead to negotiate to extend its investment management agreement for five years. Similarly, Mr. Chu's companies, CCCM and CC Capital Partners, likely possess opinions, analysis, and internal communications concerning the value of the Company and communications concerning the negotiation of CC Capital Partners' $3.75 million fee. And MVB—which is jointly owned by the two persons (Mr. Foley and Mr. Chu) who initiated the idea of entering into the Merger—will possess communications detailing MVB's negotiations to continue receiving fees from Blackstone under Blackstone's Amended and Restated Investment Management Agreements.

Section 1782 authorizes this Court to order discovery from any person or entity that resides or is found in this District to assist with pending or contemplated proceedings before foreign tribunals. Section 1782's broad applicability and "modest prima facie elements" reflect "Congress's goal of providing equitable and efficacious discovery procedures." *In re Bayer AG*, 146 F.3d 188, 195 (3d Cir. 1998).

As described below, Petitioner's Application meets all of the statutory requirements of Section 1782: (i) all Respondents are "found" in the Southern District of New York because they maintain their principal places of business in New York City; (ii) the requested discovery is "for

use" in a foreign proceeding, namely the Appraisal Proceeding; and (iii) Petitioner is a party to the Appraisal Proceeding in the Cayman Islands.

In addition, each of the Supreme Court's *Intel* factors that guide this Court's exercise of discretion under Section 1782 tip decisively in favor of granting Petitioner's Application. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264, 124 S. Ct. 2466, 2482, 159 L. Ed. 2d 355 (2004) ("***Intel***").

*First*, none of the Respondents are "participants" in the foreign action.

*Second*, Petitioner has shown that the Cayman Court will be receptive to Section 1782 assistance.  As discussed in the Declaration of Guy Dilliway-Parry, sworn to on August 31, 2021 (the **"Dilliway-Parry Declaration"**) the Cayman Court has consistently demonstrated itself to be receptive to the consideration of evidence gathered under Section 1782 at appraisal hearings to determine the fair value of a dissenter's shares.

*Third,* the Application does not circumvent any foreign discovery restrictions in the Cayman Islands. There is no prohibition on obtaining nonparty discovery through Section 1782 in aid of appraisal proceedings or other civil cases in the Cayman Islands.

*Fourth*, the proposed discovery requests are not overly burdensome.  Rather, the subpoenas are narrowly tailored to seek information directly relevant to the critical issues in the Appraisal Proceeding—namely, evidence addressing (1) the true value of Petitioner's FGL shares and (2) the negotiation process that led to the Merger and the privatization of FGL.

Finally, as described in the Dilliway-Parry Declaration, Petitioner requests Respondents' compliance without delay, as expert disclosures must be exchanged in the Cayman Islands on October 18, 2021, and the Appraisal Proceeding has been scheduled for trial in March 2022. Expedition of this Application will permit sufficient time for (a) this Court's resolution of

Petitioner's Section 1782 Application and any objections to the requested discovery; (b) Respondents' collection, review, and production of responsive documents; (c) Petitioner's counsel's review of documents produced by Respondents prior to the requested deposition of Respondents; and (d) Petitioner's timely submission of relevant documents to the court.

Accordingly, in the event the Court grants Petitioner's Application, Petitioner respectfully asks the Court to direct the Respondents to produce responsive documents within fourteen (14) days after entry of the Proposed Order submitted herewith, and submit to depositions on mutually beneficial dates within a reasonable time after Respondents' confirmation of final production of documents.

## FACTUAL BACKGROUND

### A.     The Relevant Parties

Petitioner is a fund that invested in FGL and owned FGL shares immediately before the effective date of the Merger that is the subject of the Appraisal Proceeding.  Dilliway-Parry Decl. ¶ 5.

FGL is an insurance company that provides life insurance and annuity products in the United States.  FGL was originally incorporated in the Cayman Islands in 2016 as CF Corporation, a SPAC formed by Mr. Chu and Mr. Foley.  On November 30, 2017, CF Corporation acquired Fidelity & Guaranty Life, Inc., a Delaware corporation, changed its name to FGL Holdings and continued as a Cayman Island company.  Prior to the Merger, the Company's common stock was listed on the New York Stock Exchange under the symbol "FG."  *Id.* ¶ 11.

FNF is an insurance company that provides title insurance, escrow, and transaction services to the real estate and mortgage industries in the United States.  FNF held shares and warrants in CF Corporation prior to its acquisition of Fidelity & Guaranty Life, Inc.  FNF's common stock is listed on the NYSE under the symbol "FNF." *Id.* ¶ 12.

Chinh E. Chu served as Co-Executive Chairman of FGL beginning in 2016.  He is also the founder and managing partner of CC Capital, formed in 2015. Before founding CC Capital, Chu was a Senior Managing Director and Co-Head of Private Equity at Blackstone, where he spent 25 years in senior leadership roles. *Id.* ¶ 13.

William Foley is the founder of FNF and has served as its Chairman since 1984. Foley served as FNF's CEO from 1984 to May 2007 and as FNF's President from 1984 to December 1994. Before the consummation of the Merger, Foley also served as Co-Executive Chairman of FGL with Mr. Chu. *Id.* ¶ 14.

Blackstone is a private equity firm incorporated in Delaware and with its headquarters in New York City.  Funds advised by subsidiaries and affiliates of Blackstone were among the initial investors in the Company's predecessor, CF Corporation, and obtained shares in the Company in connection with the financing of CF Corporation's acquisition of Fidelity & Guaranty.  Prior to the Merger, Blackstone, through its subsidiaries and affiliates, held approximately 20.4% of FGL's ordinary shares, and all of the Company's Series A preferred shares. *Id.* ¶ 15.

Blackstone has served as an investment manager of FGL through its subsidiary, Blackstone ISG-I Advisors L.L.C., since 2017. Under its investment management agreements with FGL, Blackstone has had discretionary authority to manage the investments and reinvestments of the funds and assets of FGL.  In exchange for these services, Blackstone was paid a yearly investment management fee based on a percentage of the total assets under management.  *Id*. ¶ 16.

MVB is a New York-based investment management firm founded and owned 50-50 by Messrs. Foley and Chu.  MVB was founded in 2017—the same year FGL was founded through an acquisition by CF Corporation.  MVB serves as a "sub-adviser" to Blackstone under FGL's investment management agreement with Blackstone.  *Id.* ¶ 18.

CC Capital Partners served as a "transaction advisor" to FGL's Special Committee of the board of directors in relation to the Merger and received a $3.75 million fee for its services. CC Capital Partners is controlled by Mr. Chu, who was as noted, Co-Chairman of FGL's Board of Directors prior to the Merger. CCCM is a shareholder in FGL and is controlled by Mr. Chu, who is its managing member. Employees of CCCM, including designates Mr. Douglas Newton and Richard DiBlasi, were appointed by the FGL Special Committee to act as advisors to the FGL Special Committee and to assist the FGL Special Committee regarding its review of the proposal received by FNF as well as other potential strategic alternatives available to FGL. *Id.* ¶ 19.

## B.   <u>The Merger</u>

In July, 2019, Mr. Foley and Mr. Chu (the Co-Chairman of FGL's board) began having general discussions about executing a potential business combination between FNF and FGL. Between July 2019 and February 2020, representatives of FNF and FGL, along with their respective advisors, negotiated the terms of the proposed Merger between FNF and FGL. FGL also had discussions with Blackstone about (1) whether Blackstone would be interested in making an offer to acquire FGL, (2) extending Blackstone's tenure as FGL's investment manager, and (3) entering into a voting agreement to support the Merger. *See* Proxy, at pp. 79-82.

On February 7, 2020, FNF and FGL announced that they had entered into a merger agreement (the "**Merger Agreement**"), pursuant to which FNF would acquire FGL, and FGL would emerge as a wholly-owned subsidiary of FNF. *See* Dilliway-Parry Decl. ¶ 22. At the effective time of the Merger, the Company's ordinary shares (other than those owned by the Company, FNF or the Merger Subs or any subsidiary thereof) would be canceled and converted automatically into the right to receive (i) $12.50 in cash or (ii) 0.2558 shares of FNF common stock, at the election of the holder of the shares, subject to the allocation and proration provisions of the Merger Agreement (the "**Merger Consideration**"). *Id.* ¶ 23.

The consummation of the Merger was subject to a "Go Shop" provision, during which the Company was authorized to solicit additional proposals to acquire the Company between February 7, 2020, and March 18, 2020. *Id.* ¶ 24. During the Go Shop period, which coincided with the outbreak of the COVID pandemic, FGL solicited 42 potential acquirers, and one potential acquirer entered into a confidentiality agreement with FGL. However, the Company did not receive any additional acquisition offers during the Go Shop period. *Id.* ¶ 25.

The Merger was approved during an extraordinary general meeting of the Company held on May 29, 2020, and it closed on June 1, 2020. Upon consummating the Merger, the Company was renamed "FGL Holdings" and is the Company (as defined above) that is a party to the Appraisal Proceeding. As a result of the Merger, FGL is now a subsidiary of FNF. *Id.* ¶¶ 26-27.

## C.     The Conflicts of Interest at Play in the Merger

Although the Cayman Court will ultimately be tasked with determining whether the persons who approved the Merger were conflicted, the Proxy details the following facts.

Two of the directors of FGL—Co-Chairman William Foley and Richard Massey[2]—sat on both the boards of directors for FNF and FGL, yet they directly participated in negotiations with respect to the Merger. *Id.* ¶ 29. For example, the initial offer to purchase FGL originated with Mr. Foley, who named the initial price and directed FNF's Special Committee to make an offer for FGL. Mr. Foley continued to participate in negotiations despite agreeing to recuse himself. *Id.*

The lead negotiator for FGL was Mr. Chu, FGL's other Co-Chairman of the Board, and the Chairman of FGL's Special Committee. Mr. Chu is Mr. Foley's longtime business partner and together they co-own MVB. *Id.* ¶¶ 7, 13, 30. FGL's Special Committee hired a firm Mr. Chu controls, CC Capital Partners, as a "transaction advisor" to FGL's Special Committee of the board

---

[2] Richard N. Massey has served as a director of FNF since 2006 and serves as Chairman of FNF's Compensation Committee. Mr. Massey served on the board of FGL since May 2016.

of directors.  *Id.* ¶ 30.  And CC Capital Partners stood to earn $3.75 million in that role, $3.5 million of which was contingent on closing the Merger.  *Id.*

In addition to its significant shareholding in FGL, Blackstone, through its subsidiary Blackstone ISG-I Advisors L.L.C. ("**BIS**"), also served as investment manager of the Company. *Id.* ¶ 31.  While the Merger agreement was being negotiated, the Company was also in ongoing negotiations with BIS regarding an extension of the term of the investment management agreement in connection with an acquisition by FNF.  *Id.*

Concurrently with the execution and delivery of the Merger Agreement, the Company announced that it had entered into Amended and Restated Investment Management Agreements with BIS.  These Amended and Restated Investment Management Agreements, among other things, extended the initial term of the agreements to five years, amended the management fees payable by FGL and its affiliates, and re-defined the scope of the assets to be managed on an exclusive basis by BIS.  Dilliway-Parry Decl. ¶ 32.  Blackstone also entered into an amended participation fee agreement and side letter with MVB, allowing MVB to receive fees from Blackstone under the Amended and Restated Investment Management Agreements. *Id.* ¶ 33.  This meant that investment management fees would continue to be paid to MVB, which is controlled by Mr. Foley and Mr. Chu.  *Id.*

Several persons and entities also entered into voting agreements with FGL and FNF pursuant to which they agreed to vote in favor of the Merger.  These persons and entities included:

(a) Blackstone, which through its affiliates held 20.4% of FGL's common stock and all of the Company's Series A preferred shares;

(b) Three subsidiaries of FNF (Chicago Title Insurance Company, Fidelity National Title Insurance Company, and Commonwealth Land Title Insurance Company), which together held approximately 7.6% of FGL's common shares and all of FGL's outstanding Series B preferred shares; and

9

(c)    Foley and BilCar LLC (an entity controlled by Foley), which together held 6.7% of FGL's common stock.

*Id.* ¶ 34.   These voting agreements, combined with the fact that Company insiders—including Blackstone, CCCM, Mr. Chu, Mr. Foley, and the Company's other directors and officers—together with FNF collectively controlled in excess of 40% of the Company's common shares, making a vote in favor of the Merger by common shareholders highly likely.  *Id.* ¶ 35.

The voting agreements did not prevent FNF and Blackstone from vetoing any alternative transaction that could have provided more value for FGL's shareholders.  However, because an alternative deal required approval by a majority of the issued and outstanding Series A and Series B preferred shares, *both Blackstone and FNF had the ability to block any alternative acquisition transaction.  Id.* ¶ 36.

In addition to their roles at FGL and FNF, Mr. Foley is a board member of QOMPLX, Inc. ("**QOMPLX**") and serves as Chairman of the board of directors of Cannae Holdings, Inc.; Mr. Massey serves as CEO and a director of Cannae Holdings, Inc.  FGL retained QOMPLX, which is minority-owned by Cannae Holdings, Inc., to address supposed cybersecurity issues between the signing and closing.  No other firms were considered or retained, according to the Proxy.  Dilliway-Parry Decl. ¶ 37.

Based on the evidence, the Dissenters intend to prove that the Merger consideration significantly undervalued the Company's shares.

## D.    The Cayman Islands Appraisal Proceeding

Under section 238 of the Companies Law, the Cayman Court in the Appraisal Proceeding will be under a statutory obligation to decide the fair value of the dissenting shareholders' shares. As described in the Dilliway-Parry Declaration, the parties to the Appraisal Proceeding—the

10

Dissenters and FGL—will submit evidence, expert testimony, and legal briefs to the Cayman Court, which will weigh the evidence and decide on the fair value of the Dissenters' shares.

As set forth in the Dilliway-Parry Declaration, in assessing fair value in a Cayman Islands Appraisal Proceeding, the Cayman Court will examine the fairness (or lack thereof) of the process that led FGL's board to approve the Merger.  In doing so, the court will consider the fairness of the Merger to FGL's minority stockholders and will likely focus on, among other things, (i) the process by which the FGL board and/or Special Committee negotiated and approved the Merger price with the Buyer Group, and (ii) objective valuations of the Company calculated by those involved in negotiating the transaction.  *Id.* ¶ 43.

Under Cayman law, the Company filed the Appraisal Proceeding on August 17, 2020.  On December 18, 2020, the Cayman Court issued a Directions Order, which provides scheduling information for the matter.  Under the Directions Order, the parties exchanged discovery materials relevant to the determination of the fair value of the shares in the Company between January and March 2021.  *Id.* ¶¶ 41-47. The parties' respective valuation experts will exchange their separate valuation reports on October 18, 2021 and the Cayman Court has scheduled the Appraisal Proceeding for trial on March 28, 2022. *Id.* ¶¶ 48-51.  Applications for third party discovery were provided for in the Directions Order.  *Id.* ¶ 66.

### E.    Discovery in the Cayman Islands Appraisal Proceeding

There is no automatic discovery in Section 238 proceedings similar to the U.S.-style pre-trial discovery.  Instead, the Court may order any party to the proceeding to provide discovery of "documents which are in their possession, custody or power relating to any matter in question between them in the action." (Grand Court Rules ("GCR") Order 24 rule 3).  Dilliway-Parry Decl. ¶ 44.  The Cayman Court, however, has no power to order nonparties outside of the Court's jurisdiction to produce evidence.  *Id.* ¶ 58.  Because all of the Respondents are outside the

11

jurisdiction of the Courts of the Cayman Islands,[3] the Cayman Court will not have the power to order them to provide evidence in the Appraisal Proceeding. *Id.* ¶¶ 58-60.

Nevertheless, Cayman courts have affirmatively held that 28 U.S.C. § 1782 can be used to gather discovery in connection with Cayman Islands proceedings. Moreover, the Cayman Court in *In the Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017, recently relied upon evidence gathered in the U.S. pursuant to Section 1782 in determining fair value in an Appraisal Proceeding. *Id.* ¶ 65, and Ex. 14.

**F.    The Discovery Sought From Blackstone, MVB, and CC Capital**

Here, Petitioner seeks limited discovery from Blackstone, MVB, CC Capital Partners and CCCM targeted squarely at issues central to the Appraisal Proceeding. As set forth below, each entity played a unique role in negotiating the terms of the Merger. Blackstone, for example, was the Company's Investment Manager, and had a key seat at the table during the negotiations of the Merger. *Id.* ¶¶ 7, 16, 21. Blackstone, moreover, was offered the opportunity to buy FGL but instead chose to enter into a voting agreement to support the Merger and then negotiated a five-year extension of its investment management agreement. *Id.* ¶ 21.[4]

---

[3] Petitioner intends to serve narrowly tailored trial subpoenas (the "Trial Subpoenas") on CFS Holdings II (Cayman), L.P. and CFS Holdings (Cayman), L.P. (together, "CFS Holdings"), two Blackstone affiliated funds which held a majority of the shares that were controlled by Blackstone, in the Cayman Islands. To the extent that any documents responsive to the Trial Subpoenas are held directly by CFS Holdings and will be produced pursuant to the Trial Subpoenas, Petitioner will not seek production of such documents from Blackstone in this Application.

[4] Of note, Blackstone Inc., a publicly-traded parent company, is the appropriate Section 1782 respondent here because it controls all documents held by its subsidiaries and affiliates, which either served as FGL's investment manager, or held shares of FGL. *See* Declaration of Lori Marks-Esterman, dated August 31, 2021 (the "Marks-Esterman Decl."), ¶¶ 7, 9. Indeed, there are at least five Blackstone entities likely possess relevant documents and communications concerning the Merger: (i) Blackstone ISG-I Advisors L.L.C. (**"BIS"**), FGL's investment manager; (ii) Blackstone Tactical Opportunities Advisors L.L.C. (**"Blackstone Tactical"**), which advised two Blackstone funds that held 17.6% of FGL's common stock; (iii) CFS Holdings (Cayman), L.P. (**"CFS 1"**) and (iv) CFS Holdings II (Cayman), L.P. (**"CFS 2"**), the two funds advised by

CCCM is an entity founded and controlled by Mr. Chu, FGL's Co-Chairman of the Board and the Chairman of FGL's Special Committee.  CCCM, moreover owned 6.7% of FGL's ordinary shares.  CC Capital Partners, another entity controlled by Mr. Chu, was hired as a "transaction advisor" to the Special Committee to be paid $3.75 million, most of which was contingent on closing the Merger.  And MVB is an entity co-owned by Mr. Foley and Mr. Chu, the two men who decided to pursue the Merger in the first place, which was (and is) paid fees by Blackstone as a "sub-advisor."  *See, e.g.*, Dilliway-Parry Decl. ¶¶ 7, 11-19, 34.  Information from these entities will be objectively very useful to the Cayman Court in determining fair value.

Petitioner's Section 1782 Application, seeks narrowly tailored discovery from the Respondents concerning: (i) the fairness of the Merger price and the process to reach the Merger price; (ii) FGL's valuation, including documents concerning any forecasts of the Company's future performance; and (iii) the conflicts of interest detailed in the Proxy (the "**Requested Discovery**").

The Requested Discovery will significantly help the Cayman Court evaluate the Merger and come to an informed determination of the fair value of the FGL shares subject to the Merger.

## ARGUMENT

Under 28 U.S.C. § 1782, Congress empowered District Courts to grant discovery for use in a pending foreign proceeding or a foreign proceeding that is within reasonable contemplation. *Intel*, 542 U.S. at 243. Section 1782's broad applicability reflects Congress's goal of providing

---

Blackstone Tactical; and (v) GSO Capital Partners LP (**"GSO"**), another Blackstone entity that owned 2.8% of FGL's common shares and all of its Series A Preferred shares.  *Id*. ¶ 10.

As discussed in the Marks-Esterman Declaration, each of these Blackstone entities is listed directly or indirectly as a subsidiary of Blackstone on Blackstone's publicly filed Form 10-K, and each maintains its principal places of business at 345 Park Avenue, the same address listed on public filings as the headquarters of The Blackstone Group, Inc.  *Id*. n. 1, p. 3.  Blackstone, therefore, has custody and control over all the documents held by these entities.  *See, e.g.*, *Dietrich v. Bauer*, 198 F.R.D. 397, 401 (S.D.N.Y. 2001) (noting "the requisite control by a parent corporation over documents held by its subsidiary").

"equitable and efficacious discovery procedures." *Brandi-Dohrn v. IKB Deutsche Industriebank AG*, 673 F.3d 76, 80 (2d Cir. 2012) (internal quotes omitted).

An application made pursuant to Section 1782 must satisfy three statutory requirements: (1) the discovery is sought from someone who resides or is found within the District; (2) the discovery is for use before a foreign tribunal; and (3) the applicant is an "interested person." *In re Accent Delight Int'l Ltd.*, 869 F.3d 121, 128 (2d Cir. 2017).  If these statutory requirements are met, the Court then considers four discretionary factors: (1) whether the person from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 264-65. In considering these factors, the Court is required to keep in mind "the twin aims of Section 1782: providing efficient assistance to participants in international litigation, and encouraging foreign countries by example to provide similar assistance to our courts." *Id.* at 264; *see also Schmitz v. Bernstein Liebhard & Lifshitz, LLP,* 376 F.3d 79, 84 (2d Cir. 2004).

As detailed below, Petitioner satisfies each of the three statutory requirements, and each of the *Intel* factors weighs heavily in favor of granting Petitioner's Application.

## I.   Petitioner Satisfies the Three Statutory Requirements of 28 U.S.C. § 1782

Petitioner satisfies the three threshold statutory requirements of Section 1782: (1) Blackstone, MVB, and CC Capital are all "found" in this District because they maintain their principal places of business in New York City; (2) the requested documents are for use in a foreign proceeding; and (3) as a claimant, Petitioner is an "interested person" in the foreign proceeding.

14

A. **The Respondents Are Found in this District**

The Second Circuit has concluded that for purposes of Section 1782, whether a person or entity is "found" in a district is coextensive with whether a district court has general *personal jurisdiction* over that person or entity. *See In re del Valle Ruiz*, 939 F.3d 520, 528 (2d Cir. 2019) ("We hold, accordingly, that § 1782's 'resides or is found' language extends to the limits of personal jurisdiction consistent with due process"); *see also In re Petrobras Securities Litigation*, 393 F.Supp.3d 376, 382 (S.D.N.Y. 2019) (concluding that the Court "should apply a personal jurisdiction analysis to determine whether [a corporation] is "found" in the District for the purposes of the § 1782 motion" and that "[a] corporation is subject to the general personal jurisdiction of the courts in the states of its incorporation and its principal place of business."); *Gucci America, Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014) ("[A] corporation is at home (and thus subject to general jurisdiction, consistent with due process) only in a state that is the company's formal place of incorporation or its principal place of business."); *Australia and New Zealand Banking Group Limited v. APR Energy Holding Limited*, 17-MC-00216 (VEC), 2017 WL 3841874, at *3-4 (S.D.N.Y. Sept. 1, 2017).

Here, Blackstone, MVB, CC Capital Partners and CCCM all maintain their principal places of business in New York City.  These entities are, therefore, "found" in this District for purposes of Section 1782. *See* Marks-Esterman Decl., ¶ 6.

B. **The Discovery Sought Is "For Use" In a Foreign Proceeding**

Second, the discovery sought must be intended for use in the foreign proceeding.  *See Intel*, 542 U.S. at 258.  The "for use" requirement is satisfied by showing that the requested discovery can be submitted and "rel[ied] on" by the foreign tribunal. *Certain Funds, Accounts and/or Investment Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 118 (2d Cir. 2015).  To meet this element, Petitioner must merely show that it has the procedural right to submit the requested documents to

15

the foreign tribunal.  *See In re Accent Delight*, 869 F.3d at 132.  Significantly, a Section 1782 petitioner is not required to demonstrate that the information sought would be discoverable or admissible in the foreign proceedings. *Intel*, 542 U.S. at 243; *In re Appl. of Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005). Instead, the District Court considers "the *practical ability* of an applicant to place a beneficial document—or the information it contains— before a foreign tribunal." *In re Accent Delight*, 869 F.3d at 131 (emphasis in original).  The Application, thus, merely needs to seek materials that can "be employed with some advantage or serve some use in the proceeding."  *Mees v. Buiter*, 793 F.3d 291, 298 (2d Cir. 2015).

Here, as discussed in the Dilliway-Parry Declaration, Cayman courts have specifically held that civil litigants can make use of Section 1782 evidence in civil proceedings in the Cayman Islands, including in appraisal proceedings pending before the Cayman Court. Indeed, there are many examples of Section 1782 evidence being used in such proceedings.  *See, e.g., Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* 2009 CILR 553 (Dilliway-Parry Decl., ¶ 62 and Ex. 12) (allowing a party to use Section 1782 evidence and holding that, *prima facie,* a party who could invoke a legitimate right under foreign law would be entitled to do so unless it was acting oppressively by trying to rely upon it); *Nord Anglia Education, Inc.* (unreported, 18 April 2019) (*Id*. ¶¶ 63-64 and Ex. 13) (finding that parties are free in appropriate circumstances to pursue Section 1782 evidence and expressly referring to evidence obtained under Section 1782 proceeding in rendering a decision on fair value in an appraisal proceeding).

Further, there are no restrictions imposed by or any policies under Cayman law limiting the ability of parties in the Appraisal Proceeding to submit relevant documentary or testimonial evidence obtained pursuant to Section 1782.  *Id.* ¶¶ 61-66.

16

### C.   Petitioner is an "Interested Person"

Section 1782 also requires persons seeking discovery to show that they possess a reasonable interest in the foreign proceedings. While Section 1782 broadly covers those with the right to participate and submit evidence in foreign proceedings, (*see Certain Funds, Accounts &/or Inv. Vehicles v. KPMG, L.L.P.*, 798 F.3d 113, 120 (2d Cir. 2015)), there is "[n]o doubt litigants are included among, and may be the most common example of, the 'interested person[s]' who may invoke § 1782." *Intel*, 542 U.S. at 256; *In re Appl. of Chevron Corp.*, 709 F.Supp.2d 283, 291 (S.D.N.Y. 2010) (noting that petitioner "is an 'interested person' because it is a party to the" foreign litigation).

Because Petitioner is a party to the Appraisal Proceeding, the third statutory element is satisfied.

## II.   The Discretionary *Intel* Factors Weigh Strongly in Favor of Permitting Discovery

Once Section 1782's threshold statutory requirements are met, a District Court looks to the four discretionary "*Intel* factors." *See Intel*, 542 U.S. at 264. These factors are: (1) whether the person from whom discovery is sought is a "nonparticipant in the matter arising abroad"; (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the request "conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the request is "unduly intrusive or burdensome." *Id.* at 264-65; *see also Mees*, 793 F.3d at 298.  Each factor should be given equal weight, and no one factor is dispositive.  *Marubeni Am. Corp. v. LBA Y.K.*, 08-3282-CV, 335 Fed. App'x 95, 97 (2d Cir. June 17, 2009).

### A. Respondents are Not Parties to the Appraisal Proceeding

None of the Respondents are parties to the Appraisal Proceeding, and thus neither Blackstone, MVB, CC Capital Partners nor CCCM will be subject to party discovery in the Appraisal Proceeding. *Id.* ¶¶ 44, 59. Further, because all of the Respondents reside in the United States, the Cayman Court will not have jurisdiction to compel discovery from them.[5] *Id.* ¶¶ 58-60. Thus, although evidence from the Respondents will significantly aid the fair resolution of the Appraisal Proceeding, Petitioner will not be able to gain access to their testimony or documents through the discovery process in the Appraisal Proceeding itself.

Accordingly, the first *Intel* factor strongly weighs in favor of granting the Application. *See In re Accent Delight Int'l Ltd.*, 791 F. App'x 247, 251 (2d Cir. 2019) ("The district court correctly found that Sotheby's is not a party to the Monaco proceeding . . . [and] it was thus within its discretion to find that Petitioners satisfied the first Intel factor.")

### B. The Cayman Court Will be Receptive to the Evidence Sought

The second *Intel* factor requires courts to consider whether the nature, attitude, and procedures of the foreign tribunal indicate that it is receptive to Section 1782 assistance. *Intel*, 542 U.S. at 244. There is a strong presumption that foreign tribunals will be receptive to evidence, and thus the burden is placed on the party opposing discovery to show the foreign tribunal would actually reject the evidence obtained under the statute. *See Euromepa, S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995); *In re Appl. of Auto–Guadeloupe Investissement S.A., for an Order to Take Discovery Pursuant to 28 U.S.C. Section 1782*, No. 12 MC 221 (RPP), 2012 WL 4841945, at *6 (S.D.N.Y. Oct. 10, 2012). Absent proof that the foreign tribunal would reject

---

[5] While Petitioner intends to serve narrowly tailored Trial Subpoenas on CFS Holdings, Petitioner will not seek documents from Blackstone that will be produced by CFS Holdings pursuant to the Trial Subpoenas.

evidence obtained through Section 1782, courts find this factor weighs heavily in favor of the Application. *See In re Appl. of OOO Promnefstroy for an Order to Conduct Discovery for Use in a Foreign Proceeding*, No. M 10-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009).

Here, Petitioner has demonstrated that the Cayman Court will consider any evidence that has a bearing on determining the fair value of a company's shares. Indeed, Cayman Courts have specifically approved the use of Section 1782 applications to obtain discovery for use in Cayman Islands proceedings. *See* Dilliway-Parry Decl. ¶¶ 52-57, 66. Moreover, as Mr. Dilliway-Parry attests, the Cayman Court will be receptive to considering the Requested Discovery sought in this 1782 application because of its significance in determining the fair value of FGL's shares. *Id.* ¶ 8, 71.

Multiple United States courts have also recognized that Cayman courts are receptive to evidence obtained through Section 1782. *See In re Platinum Partners Value Arbitrage Fund L.P.*, 583 B.R. 803, 816 (Bankr. S.D.N.Y. 2018) ("In support of this assertion, the Liquidators present unrebutted evidence that, far from being hostile to Cayman litigants seeking evidence under U.S. law, Cayman courts are in fact receptive to evidence obtained through U.S. discovery procedures, even if such evidence may not be discoverable under Cayman law."); *Gushlak v. Gushlak*, 486 Fed. App'x 215, 218 (2d Cir. 2012) (affirming use of Section 1782 applications in connection with Cayman divorce proceedings); *Ahmad Hamad Algosaibi & Bros. Co. v. Standard Chartered Int'l (USA) Ltd.*, 785 F. Supp. 2d 434, 439 (S.D.N.Y. 2011) (granting Section 1782 applications seeking documents for use in Cayman proceedings); *In re Penner*, Civil Action No. 17-cv-12136-IT, 2017 WL 5632658, at *3 (D. Mass. Nov. 22, 2017) (finding that the Cayman court was "open to receiving § 1782 discovery").

Thus, the second *Intel* factor strongly weighs in favor of granting the Application.

### C.     Petitioner Is Not Circumventing Foreign Restrictions on Evidence

The third *Intel* factor looks to "whether the § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265.  In *Intel*, the Supreme Court expressly rejected the notion that Section 1782 requires that the evidence be discoverable in the foreign proceeding itself.  *Intel*, 542 U.S. at 261 ("A foreign nation may limit discovery within its domain for reasons peculiar to its own legal practices, culture, or traditions—reasons that do not necessarily signal objection to aid from United States federal courts.")  The Second Circuit has added that the specific documents or testimony discovered pursuant to Section 1782 need not be admissible abroad.  *See Brandi-Dohrn*, 673 F.3d at 82 ("While *Intel* concerned the discoverability of evidence in the foreign proceeding, we see no reason why it should not extend to the admissibility of evidence in the foreign proceeding. As in *Intel*, there is no statutory basis for any admissibility requirement.").  Nor is there any requirement to exhaust one's remedies in the foreign court first; "a 'quasi-exhaustion requirement,'" the Second Circuit has held, "finds no support in the plain language of the statute and runs counter to its express purposes." *In re Appl. for an Order Permitting Metallgesellschaft AG to take discovery*, 121 F.3d 77, 79 (2d Cir. 1997).

Rather, this factor looks primarily to whether the discovery sought seriously offends the public policy of the forum state or the United States, and is satisfied unless the foreign court actively prohibits the Petitioner from gathering the information sought. *See, e.g.*, *In re Application of Okean B.V. & Logistic Sol. Int'l*, 60 F. Supp. 3d 419, 428–30 (S.D.N.Y. 2014) (rejecting discovery of "attorney-client communications protected under Russian and Ukrainian client confidentiality and personal data privacy laws" because "it would offend core tenets of our legal system (and those of Russia and Ukraine)"); *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 195

20

(S.D.N.Y. 2006) (rejecting Microsoft's request for discovery of IBM's communications as a confidential informant in antitrust proceedings before the European Commission).

Here, the discovery sought does not attempt to circumvent any proof-gathering restrictions applicable to the Appraisal Proceeding.  There is no prohibition on obtaining nonparty discovery in aid of appraisal proceedings under Section 238 or for use in other civil actions under Cayman law.  To the contrary, as Mr. Dilliway-Parry explains, Cayman courts are receptive to foreign discovery, and have specifically relied upon Section 1782 discovery in Cayman appraisal proceedings.  *Id.* ¶¶ 61-66.

### D.     The Subpoenas Are Limited In Scope

The final *Intel* factor examines whether the discovery sought is not "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. The standard is substantially the same as in ordinary domestic civil litigation under the Federal Rules of Civil Procedure. *Mees*, 793 F.3d at 302 ("[A] district court evaluating a § 1782 discovery request should assess whether the discovery sought is overbroad or unduly burdensome by applying the familiar standards of Rule 26[.]").

Here, though Petitioner could seek the full scope of discovery authorized under Rule 45, the subpoenas are instead narrowly tailored and seeks only documents and information directly relevant to critical issues in the Appraisal Proceeding.  The requested discovery focuses exclusively on (i) the fairness of the Merger price and the process to reach the Merger price; (ii) FGL's valuation, including documents concerning any forecasts of the Company's future performance; and (iii) the conflicts of interest detailed in the Proxy.  Moreover, Petitioner has explicitly crafted the subpoenas to expressly exclude any discovery already provided in the underlying Appraisal Proceeding. *See, e.g.*, *First Am. Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 23 (2d Cir. 1998) (finding reasonableness of subpoena that only sought documents which concern "the precise subject matter of the underlying [proceedings]").

21

To the extent that the Court believes any request is overly broad, granting the Application will not preclude the Respondents from bringing motions to quash or modify the discovery sought. *In re Auto–Guadeloupe*, 2012 WL 4841945, at *9-10 (modifying discovery requests). Moreover, if the Court finds any merit to such objections, "it is far preferable for a district court to reconcile whatever misgivings it may have about the impact of its participation in the foreign litigation by issuing a closely tailored discovery order rather than by simply denying relief outright." *Euromepa, S.A.*, 51 F.3d at 1101.  In sum, the fourth *Intel* factor favors granting Petitioner's Application.

###    E.    Expedited Review of Petitioner's Application Is Warranted

In the event the Court grants Petitioner's Application, Petitioner respectfully requests that the Court direct Respondents to produce responsive documents within 14 days of this Court's Order granting the Application and submit to a deposition on a mutually beneficial date within a reasonable time after Respondents' confirmation of final production of documents. Petitioner requests Respondents' compliance without delay so that the documents can be incorporated into the Cayman Appraisal Proceeding sufficiently in advance of trial in March 2022.  Expedition of this Application and Respondents' time to comply with the subpoena will permit sufficient time for (a) this Court's resolution of Petitioner's Section 1782 Application and any objections to the Subpoenas; (b) Respondents' collection, review, and production of responsive documents; (c) Petitioner's counsel's review of documents produced by Respondents; and (d) Petitioner's timely submission of relevant documents to the court.

## <u>CONCLUSION</u>

For the foregoing reasons, Petitioner respectfully requests that the Court grant its Application for an order pursuant to 28 U.S.C. § 1782.

Dated: New York, New York
      August 31, 2021

OLSHAN FROME WOLOSKY LLP


By:   */s/ Lori Marks-Esterman*
      Lori Marks-Esterman
      Theodore J. Hawkins
      Kerrin T. Klein
      1325 Avenue of the Americas
      New York, New York 10019
      (212) 451-2300

      *Attorneys for Petitioner*

23