UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Application of<br><br>KINGSTOWN PARTNERS MASTER LTD,<br><br>Petitioner, for an Order Pursuant to 28 U.S.C. § 1782 to Conduct Discovery for Use in a Foreign Proceeding. | Case No. 21-_____ |

## DECLARATION OF GUY DILLIWAY-PARRY IN SUPPORT OF PETITIONER'S APPLICATION FOR AN ORDER OF JUDICIAL ASSISTANCE PURSUANT TO 28 U.S.C. § 1782

I, GUY DILLIWAY-PARRY, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1. I am an attorney licensed to practice law in the Cayman Islands and admitted to practice before the Cayman Islands' courts. I am a partner and the head of the Litigation and Dispute Resolution department with the law firm of Priestleys.

2. I was called to the bar in the Cayman Islands in 2012 and in England and Wales in 2002. I have substantial knowledge of Cayman Islands law governing corporate and cross border shareholder disputes before Cayman Islands courts.

3. I have been retained by Petitioner Kingstown Partners Master Ltd, ("**Petitioner**") and its affiliated funds (the "**Dissenters**") as independent counsel in connection with this application for an order of judicial assistance pursuant to 28 U.S.C. § 1782 to obtain limited discovery in the United States (the "**Application**"). The Application is made in connection with and for use in an appraisal proceeding pending before the Grand Court of the Cayman Islands with cause number FSD 184 of 2020 (RPJ) (the "**Appraisal Proceeding**").

4. The underlying Appraisal Proceeding is to determine the fair value of the Dissenters' shares of FGL Holdings (**"FGL"** or the **"Company"**).

5. Petitioner and the other Dissenters in the Appraisal Proceeding were shareholders of the Company prior to the Company completing its going-private merger on June 1, 2020 (the **"Merger"**).

6. Each of the Dissenters held shares in the Company as of the date of the Company's extraordinary general meeting called in connection with the Merger, as described below, and complied with the statutory requirements under section 238 of the Cayman Islands' Companies Act (2021 Revision) (**"Section 238"**) for dissenting from a Merger and claiming payment of fair value for their shares.

7. I submit this declaration in support of Petitioner's Application seeking an order pursuant to 28 U.S.C. § 1782 to obtain limited discovery in the United States from the following persons and entities (together, the **"Respondents"**) believed to possess important evidence concerning the facts underlying the Appraisal Proceeding:

(a) **Blackstone Inc. ("Blackstone"):** Blackstone, through certain of its subsidiaries and affiliates, served as the Company's investment manager and collectively owned approximately 20.4% of FGL's stock prior to the Merger. Based upon publicly available information, these entities include:

  (i) Blackstone ISG-I Advisors L.L.C served as the Company's investment manager both prior to and after the Merger;

  (ii) Blackstone Tactical Opportunities Advisors L.L.C., a Blackstone investment company, that was the entity designated by Blackstone to receive securities pursuant to the Merger; and Blackstone Tactical Opportunities LR Associates B (Cayman) Ltd., which served as managing member to CFS Holdings (Cayman) Manager L.L.C. , the general partner of both CFS Holdings II (Cayman), L.P. and CFS Holdings (Cayman), L.P., two Blackstone affiliated funds which together held 17.6% of FGL's shares prior to the Merger;

  (iii) CFS Holdings II (Cayman), L.P. and CFS Holdings (Cayman), L.P., two Blackstone affiliated funds which held a majority of the shares that were controlled by Blackstone; and

  (iv) GSO Capital Partners LP, another Blackstone affiliate, which held 2.8% of the Company's common shares prior to the Merger and all of the Company's Series A preferential shares.

(b) **MVB Management, LLC ("MVB")**: MVB served as a sub-advisor to Blackstone ISG-I Advisors L.L.C and is 50% owned by each of William Foley, Chairman of the FNF board and Co-chairman of the Company's board prior to the Merger, and Chinh E. Chu, Co-chairman of FGL's Board of Directors prior to the Merger). MVB received fees through Blackstone's investment advisory agreements with the Company both before and after the Merger.

(c) **CC Capital Partners, LLC ("CC Capital Partners")**: CC Capital Partners served as a "transaction advisor" to FGL's Special Committee of the board of directors in relation to the Merger and received a $3.75 million fee for its services. CC Capital Partners is controlled by Mr. Chu, who was as noted, Co-chairman of FGL's Board of Directors prior to the Merger.

(d) **CC Capital Management LLC ("CCCM" and together with CC Capital Partners, "CC Capital")**: CCCM is a shareholder in FGL and is controlled by Mr Chu, who is its managing member. Employees of CCCM, including designates Mr. Douglas Newton and Richard DiBlasi, were appointed by the FGL Special Committee to act as advisors to the FGL Special Committee and to assist the FGL Special Committee regarding its review of the proposal received by FNF as well as other potential strategic alternatives available to FGL.[1]

8. As described further below, the Petitioner seeks in this Application narrowly-tailored discovery relating to the valuation of the Company and the process undertaken to approve the Merger. The information sought in this Application will assist the Grand Court of the Cayman Islands in determining the fair value of the Dissenters' shares.

9. This declaration, *inter alia*, (1) provides the factual background of the Appraisal Proceeding and the relief sought therein, and (2) describes the nature of a statutory appraisal

---

[1] As set forth in the accompanying Declaration of Lori Marks-Esterman, sworn to on August 31, 2021 (the "Marks-Esterman Decl."), Blackstone, MVB, CC Capital Partners and CCCM each maintains its principal place of business in New York, New York.

proceeding under Cayman Islands law, as well as certain evidentiary matters related to such proceedings.

10. To the extent that the contents of this declaration are within my personal knowledge, they are accurate and correct. Insofar as they are not within my personal knowledge, they are true to the best of my knowledge, information, and belief.

I.   Background

   A.   The Relevant Parties and Players

11. FGL is an insurance company that provides life insurance and annuity products in the United States. FGL was originally incorporated in the Cayman Islands in 2016 as CF Corporation, a SPAC formed by Mr. Chu and Mr. Foley. On November 30, 2017, CF Corporation acquired Fidelity & Guaranty Life, Inc., a Delaware corporation, and changed its name to FGL Holdings. Prior to the Merger, the Company's common stock was listed on the New York Stock Exchange under the symbol "FG."

12. Fidelity National Financial, Inc. (**"FNF"**), a Delaware corporation, is an insurance company that provides title insurance, escrow, and transaction services to the real estate and mortgage industries in the United States. FNF held shares and warrants in CF Corporation prior to its acquisition of Fidelity & Guaranty Life, Inc. FNF's common stock is listed on the NYSE under the symbol "FNF."

13. Chinh E. Chu served as Co-Executive Chairman of FGL since 2016. He is also the founder and managing partner of CC Capital, formed in 2015. According to his Biography on CC Capital's website, before founding CC Capital, Chu was a Senior Managing Director and Co-Head of Private Equity at Blackstone, where he spent 25 years in senior leadership roles. Mr. Chu held 6.7% of the ordinary shares of FGL.

14. William Foley is the founder of FNF and has served as its Chairman or Executive Chairman since 1984. Foley served as FNF's CEO from 1984 to May 2007 and as FNF's President from 1984 to December 1994. Before the consummation of the Merger, Foley also served as Co-Executive Chairman of FGL with Mr. Chu. Together with BilCar, LLC an entity which Foley controls, Mr. Foley held 6.7% of the ordinary shares of FGL.

15. Blackstone is a private equity firm incorporated in Delaware and with its headquarters in New York City. Funds advised by subsidiaries and affiliates of Blackstone were among the initial investors in the Company's predecessor, CF Corporation, and obtained shares in the Company in connection with the financing of CF Corporation's acquisition of Fidelity & Guaranty. *See* Definitive Proxy Statement of the Company (the "Proxy") at 76, SEC, April 27, 2020.[2] Prior to the Merger, Blackstone, through its subsidiaries and affiliates, held approximately 20.4% of FGL's shares. Proxy at 77, 194.

16. Blackstone has served as an investment manager of FGL through its subsidiary, Blackstone ISG-I Advisors L.L.C., since 2017. Under an investment management agreement, Blackstone has had discretionary authority to manage the investments and reinvestments of the funds and assets of FGL. In exchange for these services, Blackstone was paid a yearly investment management fee based on a percentage of the total assets under management.

17. Prior to the Merger, GSO Capital Partners LP ("**GSO**"), another affiliate of Blackstone, held approximately 2.8% of the Company's ordinary shares and all of the issued and outstanding Series A preferred shares of the Company (321,084 Series A preferred shares with a liquidation value of $321,084,000, plus accrued and unpaid dividends). Proxy at 77.

---

[2] A copy of the proxy is available at https://www.sec.gov/Archives/edgar/data/0001668428/000104746920002608/a2241487zdefm14a.htm.

18. MVB is a New York-based investment management firm founded in 2017 by Messrs. Foley and Chu, and is jointly owned and controlled by Foley and Chu. MVB serves as a "sub-adviser" to Blackstone under FGL's investment management agreement with Blackstone.

19. CC Capital Partners served as a "transaction advisor" to FGL's Special Committee of the board of directors in relation to the Merger and received a $3.75 million fee for its services. CC Capital Partners is controlled by Mr. Chu, who was as noted, Co-Chairman of FGL's Board of Directors prior to the Merger. CCCM is a shareholder in FGL and is controlled by Mr. Chu, who is its managing member. Employees of CCCM, including designates Messrs. Douglas Newton and Richard DiBlasi, were appointed by the FGL Special Committee to act as advisors to the FGL Special Committee and to assist the FGL Special Committee regarding its review of the proposal received by FNF as well as other potential strategic alternatives available to FGL. Proxy at 80.

**B.     The Merger**

20. According to the Proxy, beginning on July 29, 2019, Mr. Foley and Mr. Chu (the Co-Chairman of FGL's board) began having general discussions about executing a potential business combination between FNF and FGL.

21. Between July 2019 and February 2020, representatives of FNF and FGL, along with their advisors, negotiated the terms of the proposed Merger between FNF and FGL. These discussions included negotiations with Blackstone, which as discussed above, controlled approximately 20.4% of the outstanding shares of FGL and served as the Company's investment manager. Indeed, in November 2019, a discussion was held with a Senior Managing Director of a Blackstone affiliate as to whether Blackstone would be interested in acquiring FGL. According to the Proxy, Blackstone indicated it was not at that time interested in doing so. Proxy at 79.

22. On February 7, 2020, FNF and FGL announced that they had entered into a merger agreement (the "**Merger Agreement**"), pursuant to which FNF would acquire FGL, effective June 1, 2020, as follows:

(a) F I Corp., a Cayman Islands exempted company, and a wholly-owned subsidiary of FNF would merge with and into FGL Holdings, with FGL Holdings surviving the merger (the "**First Merger**"); and

(b) Immediately following the First Merger, FGL Holdings would merge with and into F II Corp., a Cayman Islands exempted company and a direct wholly-owned subsidiary of FNF ("**Merger Sub II**"), with Merger Sub II surviving the second merger and remaining a direct wholly-owned subsidiary of FNF.

23. Subject to the terms and conditions of the Merger Agreement, at the effective time of the First Merger, each of the Company's ordinary shares (other than those owned by the Company, FNF or the Merger Subs or any subsidiary thereof) would be canceled and converted automatically into the right to receive (i) $12.50 in cash or (ii) 0.2558 shares of FNF common stock, at the election of the holder of the shares, subject to the allocation and proration provisions of the Merger Agreement (the "**Merger Consideration**").

24. The consummation of the Merger was subject to a "Go Shop" provision, during which the Company was authorized to solicit additional proposals to acquire the Company between February 7, 2020, and March 18, 2020.

25. During the Go Shop period, which coincided with the outbreak of the COVID pandemic, FGL solicited 42 potential acquirers, and one potential acquirer entered into a confidentiality agreement with FGL. However, the Company did not receive any additional acquisition offers during the Go Shop period.

26. The Merger was approved during an extraordinary general meeting of the Company held on May 29, 2020, and closed on June 1, 2020. A true and correct copy of the press release announcing the closing of the Merger is attached hereto as **Exhibit 1**.

27. On June 1, 2020, FNF announced that it had completed its Merger transaction with FGL. Upon consummating the Merger, the Company was renamed "FGL Holdings" (i.e. Merger Sub II was renamed "FGL Holdings") and is the Company (as defined above) that is a party to the Appraisal Proceeding. As a result of the Merger, FGL is now a subsidiary of FNF.

C. **The Conflicts of Interest at Play in the Merger**

28. Although the Cayman Court will ultimately be tasked with determining whether the persons who approved the Merger were conflicted, the Proxy Statement details the following facts.

29. Two of the directors of FGL—Co-Chairman William Foley and Richard Massey[3]—sat on both the board of directors for FNF and FGL, yet they directly participated in negotiations with respect to the Merger. For example, the initial offer to purchase FGL originated with Mr. Foley, who named the initial price and appears to have directed FNF's Special Committee to make an offer for FGL.[4] Mr. Foley continued to participate in negotiations despite agreeing to recuse himself due to this potential conflict. *See* Proxy at 76-92.

30. The Chairman of FGL's Special Committee and therefore presumably lead negotiator, was Mr. Chu, Mr. Foley's longtime business partner and the co-owner of MVB. Mr. Chu hired his own firm, CC Capital Partners, as "transaction advisor" to FGL's Special Committee

---

[3] Richard N. Massey, like Messrs. Chu and Foley, served on the boards of both FGL and FNF. Mr. Massey has served as a director of FNF since 2006 and serves as Chairman of FNF's Compensation Committee. Mr. Massey has served on the board of FGL since May 2016.

[4] *See* Proxy at p. 78 (Foley "proposed that Mr. Ammerman, on behalf of the FNF special committee, send a written proposal to FGL offering to acquire FGL for $11.00 per FGL ordinary share . . .").

8

of the board of directors. And CC Capital Partners stood to earn $3.75 million in that role, $3.5 million of which was contingent on the consummation of the Merger.

31.     In addition to its significant shareholding in FGL, Blackstone, through its subsidiary Blackstone ISG-I Advisors L.L.C. ("**BIS**"), also served as investment manager of the Company. Proxy at 77. During the period of negotiation of the Merger Agreement, the Company was in ongoing negotiations with BIS regarding an extension of the term of the investment management agreement in connection with an acquisition by FNF. Proxy at 86.

32.     Concurrently with the execution and delivery of the Merger Agreement, the Company announced that it had entered into a Letter Agreement with FNF and BIS pursuant to which, *inter alia*, the Company (and its affiliates) and BIS agreed to enter into an Amended and Restated Investment Management Agreement. These Amended and Restated Investment Management Agreements, among other things, extended the initial term of the agreements, amended the management fees payable by FGL and its affiliates, and re-defined the scope of the assets to be managed on an *exclusive* basis by BIS. Proxy at 158.

33.     Blackstone renegotiated the terms of its previous investment management agreements to five years and entered into an amended "participation fee agreement" and side letter with MVB, allowing MVB to receive fees from Blackstone under the Amended and Restated Investment Management Agreements. *See* Proxy at 125. This meant that investment management fees would continue to be paid to MVB, which is controlled by Foley and Chu.

34.     Several persons and entities also entered into voting agreements with FGL and FNF pursuant to which they agreed to vote in favor of the Merger. These persons and entities included:

    (a)    Affiliates of Blackstone, being CFS Holdings (Cayman) L.P. and CFS Holdings II (Cayman) L.P. and GSO, which through its affiliates held 20.4% of FGL's common stock and all of the Company's Series A preferred shares;

  (b)  Three subsidiaries of FNF (Chicago Title Insurance Company, Fidelity National Title Insurance Company, and Commonwealth Land Title Insurance Company), which together hold approximately 7.6% of FGL's common shares and all of FGL's outstanding Series B preferred shares; and

  (c)  Foley and BilCar LLC (an entity controlled by Foley), which together held 6.7% of FGL's common stock.

  35.  These voting agreements, combined with the fact that Company insiders— including Blackstone, CCCM, Mr. Chu, Mr. Foley, and the Company's other directors and officers— together with FNF collectively controlled in excess of 40% of the Company's common shares, made a vote in favor of the Merger by common shareholders highly likely. Proxy at 194.

  36.  The voting agreements did not prevent FNF and Blackstone from vetoing any alternative transaction that could have provided more value for FGL's shareholders, however, because an alternative deal required approval by a majority of the issued and outstanding Series A and Series B preferred shares, both Blackstone (through its affiliates as holder of all of the Series A preferred shares) and FNF (through its affiliates as holder of all of the Series B preferred shares) had the ability to block any alternative acquisition transaction.

  37.  Finally, in addition to their roles at FGL and FNF, Mr. Foley is a board member of QOMPLX, Inc. ("**QOMPLX**") and serves as Chairman of the board of directors of Cannae Holdings, Inc. Mr. Massey serves as a director of Cannae Holdings, Inc. and is its CEO as well. (Proxy at 89, 159.) FGL retained QOMPLX, which is minority-owned by Cannae Holdings, Inc., to address supposed cybersecurity issues between the signing and closing. It is apparent from the Proxy that no other firms were considered or retained. Proxy at 89.

  38.  Based on the evidence, the Dissenters intend to prove that the Merger consideration significantly undervalued the Company's shares.

10

## II.     The Appraisal Proceeding

39.     Prior to the Merger, the Dissenters collectively held a total of 12,000,000 shares, representing approximately 5.5% of the Company's then-issued and outstanding shares. The Dissenters' shareholding is worth at least approximately $150,000,000, valued at the $12.50 per share price in the Merger Agreement.

40.     The Dissenters have elected to exercise their Section 238 dissenters' rights and delivered written objections to the Mergers pursuant to s.238(5) of the Cayman Islands Companies Act (2021 Revision) to the Company dated June 25, 2020. On giving the s.238(5) notice, the Dissenters lost their status as a member save that the Dissenters could pursue claims to payment of fair value for their shares (s.238(7) of the Companies Act (2021 Revision)).

41.     On August 17, 2020, in accordance with Section 238, the Company filed a petition in the Grand Court of the Cayman Islands to commence the Appraisal Proceeding. A true and correct copy of the petition is attached hereto as **Exhibit 2**.

42.     In Section 238 appraisal proceedings, the Court is under a statutory obligation to determine the fair value of the Dissenters' shares in the Company. The Court is not itself an expert valuation tribunal and is guided in this process by valuation experts instructed by each of the parties. *Qunar Cayman Islands Limited v Maso Capital Investments Limited and Others* (unreported, 20 July 2017) at ¶ 18, attached hereto as **Exhibit 3**.

43.     In assessing fair value in a Cayman Islands Appraisal Proceeding, the Cayman Court's judgment will assess a wide range of factual evidence and will consider all relevant documents and information, not just publicly available information. It is likely that this will include an examination of the fairness of (i) the process by which the FGL board and/or Special Committee negotiated and approved the Merger price with the Buyer Group, and (ii) objective valuations of the Company calculated by those involved in negotiating the transaction.

44. In Section 238 appraisal proceedings, there is no automatic discovery, but the Court may order any party to the proceedings to provide discovery of *"documents which are in their possession, custody or power relating to any matter in question between them in the action"* (Grand Court Rules, Order 24, Rule 3). The parties to the Appraisal Proceeding are the Company and the Dissenters.

45. By order dated December 18, 2020 (the "**Directions Order**"), the Grand Court of the Cayman Islands directed that the Petitioner provide disclosure to the valuation experts and the Dissenters (and their representatives). A true and correct copy of the Directions Order is attached hereto as **Exhibit 4**.

46. The Petitioner was ordered to, within 28 days of the date of the Directions Order, make available all discoverable documents and communications in its possession, custody, or power which are relevant to the determination of the fair value of the shares in the Company as of May 29, 2020 (the "**Valuation Date**") that were made available by the Company to FNF pursuant to the due diligence process (the "**Due Diligence Documents**").

47. The Petitioner was further ordered to, within 70 days of the date of the Directions Order, make available all documents and communications in its possession, custody, or power and which are relevant to the determination of the fair value of the shares in the Company as of the Valuation Date, prepared or created between May 29, 2015, and the Valuation Date. This disclosure included the categories of documents set out in Appendix 1 to the Directions Order.

48. The Dissenters have retained Mr. Scott Davidson of Duff & Phelps as their valuation expert. Mr. Davidson is a managing director at Duff & Phelps with more than 25 years of experience in business valuation, financial advisory services, and expert testimony.

49. The Company has retained Mr. Kenneth Lehn of Compass Lexecon as its valuation expert.

50. The Directions Order also provided for the procedural timetable of the matter through trial. The timetable in the Directions Order was subsequently amended by agreement of the parties by a letter dated June 17, 2021 that was countersigned by both parties. The amended procedural timetable provides that the parties' respective valuation experts will exchange their respective valuation reports on October 18, 2021. A true and correct copy of the countersigned letter is attached hereto as **Exhibit 5**.

51. The Grand Court of the Cayman Islands has listed a trial of the Appraisal Proceeding for March 28, 2022, through April 18, 2022 (these dates have been *"pencilled in the courts diary pending payment and final confirmation by mid-January 2022"*). A true and correct copy of an email from the Acting FSD Registrar of the Grand Court dated June 18, 2021 to this effect is attached hereto as **Exhibit 6**.

### III. The Scope of Discovery Available in Cayman Appraisal Proceedings

52. As noted above, there is no automatic discovery in Section 238 appraisal proceedings, but the Court may order any party to provide discovery of *"documents which are in their possession, custody or power relating to any matter in question between them in the action"* (Grand Court Rules, Order 43, Rule 3). The Courts of the Cayman Islands have consistently required the company subject to a Section 238 appraisal proceeding to disclose all documents relevant to a determination of fair value. *See, e.g.*, *Qunar Cayman Islands Limited v Athos Asia Event Driven Master Fund et al.* (CICA, unreported, April 10, 2018) at ¶ 45, **Exhibit 7**.

53. The phrase *"relating to any matter in question between them in the action"* is given a very wide meaning. The Cayman Islands follows the English "train of inquiry test" which is not limited to documents which would be evidence for or against a party in the action, but includes

13

any document which is likely to contain information which it is reasonable to suppose may, either directly or indirectly, enable a party to either advance his own case or to damage the case of his adversary. *See Algosaibi Bros v Saad Invs* 2013 (1) CILR 202 and *Renova Resources v Gilbertson* 2011 (2) CILR 148, attached as **Exhibits 8** and **9**.

54. Thus, in a Section 238 appraisal proceeding, a company is required to provide documents which enable the dissenters to either advance their own case on valuation or to damage the case of the company on valuation, or which may fairly lead them to a train of inquiry, which may have either of these two consequences.

55. In line with the broad scope of discovery, Cayman Courts have held that discovery in appraisal proceedings will encompass anything that has any bearing on the value of the company or could lead an expert on a 'train of inquiry' regarding an issue relevant to valuation. This has been set forth clearly in numerous Cayman decisions, including by the Court of Appeal in *Shanda Games Limited, (unreported, 25 April 2017),* where Martin JA stated: "it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued" (¶ 22); *see also Qihoo 360 Technology Co., Ltd* (unreported, October 9, 2017 CICA) ("The sole task of the Court is to determine the fair value of the dissenters' shares. To do that, it needs full information." (¶ 19)). A true and correct copy of the Court of Appeal's judgement in *Shanda Games Limited* and in *Qihoo* opinion is annexed hereto as **Exhibits 10 and 11**, respectively.

56. The Court of Appeal further noted this in *Qunar Cayman Islands Limited v Athos Asia Event Driven Master Fund and Others, supra,* making clear that the Court must be exposed to all the relevant materials in order to arrive at a fair valuation. *Qunar Cayman Islands Limited v*

14

*Athos Asia Event Driven Master Fund et al.* (Unreported CICA 10 April 2018), a true and correct copy of which is annexed hereto as **Exhibit 7**.

57.     Documents in the hands of persons other than the company are also highly relevant in this endeavor.  Although the Court in *Qunar* was considering whether the dissenters should provide discovery, the following remarks by Rix JA clearly apply to any third parties who may hold such relevant documents:

> 65. . . . .The company's own documents, however important to the issue of fair value (and no one would doubt that) must be exposed to the arguments which can flow from the findings, analyses, evaluations and factual selections which other sophisticated entrepreneurs, investors and analysts in the market have made or performed. . . .
>
> 74. It remains true, nevertheless, that value, and the market, is for the world, not only the companies concerned, and that often such companies may not understand the world in which they operate as well as outsiders understand it. But whether that is true or not, value depends on a multiplicity of factors, and methodologies, about which sophisticated analysts have different insights, and no one is more relevantly concerned with getting the research and analysis and those insights right than those who are thinking of investing in or have invested in a company. However, "getting it right" is not the point at this stage of the proceedings. **What is needed is for the Court, at the end of the day, to get it right, having been exposed to all the material and all the arguments.**
>
> 75. . . . if dissenters have in their possession, as they are likely to so, **documents, reports, analyses, projections and so on about companies in which they invest, their products, their industries, their markets, their competitors, in other words, documentary material which relates to the value of such companies, then this material is as much a matter for disclosure as any such documents in the hands of the companies; and it matters not whether such material is possessed by the one side or the other, or is simply available as a matter of efficient research.** . . .

**Exhibit 7** (emphasis added).

15

### IV. The Requested Discovery Cannot be Obtained in the Appraisal Proceeding

58. While third-party documents may be highly relevant to the Cayman Court's analysis, the Courts of the Cayman Islands do not have the power to order discovery against a non-party that is outside the Cayman Court's jurisdiction. Further, except in limited circumstances, and by means of a cumbersome procedure, the Cayman Court has no power to even order discovery from non-parties who reside within the jurisdiction of the Court; discovery instead is generally limited to the parties to the proceeding.

59. The narrow exception to this is that the Courts of the Cayman Islands have a limited power to order a non-party within the jurisdiction of the Courts of the Cayman Islands to produce specific documents or provide oral evidence at trial pursuant to Grand Court Rules, Order 38, Rule 14. The subpoena must be served personally within the court's jurisdiction. (Grand Court Rules, Order 38, Rule 17). Since none of the third-party disclosure targets in this Application are within the jurisdiction of the Courts of the Cayman Islands,[5] however, these provisions are not relevant to the present Application.

60. In addition, the Courts of the Cayman Islands have the power under Grand Court Rules, Order 39, Rule 1 to order a deposition to be taken, and may order documents to be produced which it considers necessary for the purpose of the examination. Where the person sought to be deposed is outside of the jurisdiction, an application can be made for a letter of request to the judicial authorities in the country where that person's evidence is to be taken or, if the government

---

[5] Petitioner intends to serve narrowly tailored trial subpoenas (the "Trial Subpoenas") on CFS Holdings II (Cayman), L.P. and CFS Holdings (Cayman), L.P. (together, "CFS Holdings"), two Blackstone affiliated funds which held a majority of the shares that were controlled by Blackstone, in the Cayman Islands. To the extent that any documents responsive to the Trial Subpoenas are held directly by CFS Holdings and will be produced pursuant to the Trial Subpoenas, Petitioner will not seek production of such documents from Blackstone in this Application.

of that country allows a person to be examined before a person appointed by the Court, the Court may appoint a special examiner to take the evidence of that person in that country. Such applications, however, are not common in the Cayman Islands, and, in my experience, it is far more common for litigants to apply for discovery from third parties in the United States of America under 28 U.S.C. § 1782.

## V.  Receptivity to Judicial Assistance and Admissibility of Evidence

61. The Courts of the Cayman Islands have considered the use of 28 U.S.C § 1782 in connection with Cayman Islands proceedings and have held that it is permissible for a litigant to exercise any rights it may have under 28 U.S.C. § 1782 to obtain relevant evidence for use in Cayman Islands proceedings.

62. For example, in *Phoenix Meridian Equity Limited v Lyxor Asset Management S.A. and Scotiabank & Trust (Cayman) Limited* 2009 CILR 553, (**Exhibit 12**), the Court of Appeal upheld the Grand Court's decision to refuse an injunction to prevent a party from exercising its right under US law to seek evidence under 28 U.S.C. § 1782 for use in proceedings in the Cayman Islands. The Court of Appeal held that adequate protection from the risk of oppression was provided by the Federal Rules of Civil Procedure as applied by the U.S. Courts, and that Cayman law is open to parties pursing applications under 28 U.S.C. § 1782.

63. Most recently, in the context of a Section 238 Appraisal Proceeding in *Nord Anglia Education, Inc.* (unreported, 18 April 2019) (**Exhibit 13**), the Grand Court accepted the general proposition that parties are free in appropriate circumstances to pursue § 1782 applications in the US courts (at [21], citing *Lyxor Asset Management S.A. v Phoenix Meridien Equity Limited* 2009 CILR 553).

64. The Grand Court went on to hold that:

> *However, the experience of this case strongly suggests that when this Court fixes a timetable on a Summons for Directions in section 238 cases, the parties have a duty under the Overriding Objective to explicitly address the possibility of section 1782 applications, unless it is common ground that the need to do so does not arise. While this Court cannot in general terms restrain the parties from making such applications (unless they are unconscionable), suitable standard directions should be able to avoid parallel proceedings being commenced within a timeframe which adversely affecting* [sp] *the timetable fixed by this Court.*

65. Indeed, in the *Nord Anglia* Appraisal Proceeding, the Grand Court relied heavily on documents produced through 1782 applications. There, the Cayman Court expressly referred to the 2,900 documents a U.S. financial advisor produced in a Section 1782 proceeding, which "evidenc[ed] the work that [the financial advisor] did," and "which were *obviously relevant* to advancing a reasoned critique of [the financial advisor's] DCF analysis." *In the Matter of Nord Anglia Education, Inc.,* FSD 235 OF 2017 at ¶ 49. Exhibit 14.

66. Applications for third party discovery were provided for in the Directions Order.[6]

## VI. The Dissenters' Request for Discovery in Aid of the Appraisal Proceeding

67. The Company has provided its discovery to the Dissenters and completed its document production by the end of March 2021. I am instructed by the Dissenters that the production set was voluminous and not well-organized, and thus took a significant amount of time to organize and review. Dissenters' valuation expert and his staff have conducted an initial review of the materials which the Company has provided in order to determine the extent of the discovery provided by the Company.

68. The Petitioner now seeks in this Application to obtain additional documents and information from third parties that are relevant to a determination of the fair value of the

---

[6] *See* Directions Order, ¶¶ 19-20 (Exhibit 4).

Dissenters' shares. Such documents and information is sought in order to ensure that the Court's determination of fair value is made on the basis of all relevant information.

69. This Application seeks, *inter alia*, the following documents from the third parties discussed above that were prepared or created between June 30, 2019, and April 27, 2021 (the "**Requests**"):

    a. documents and communications concerning the fair value of the Company;

    b. documents and communications concerning the Merger Consideration;

    c. documents and communications concerning Blackstone's potential acquisition or purchase of the Company;

    d. documents and communications concerning voting agreements, other agreements, the go-shop period, and conflicts of interest or relating to the Merger;

    e. documents and communications concerning Blackstone's (or its related entities or affiliates) investment management agreement and amended investment management agreement with the Company, and MVB's sub-advisory agreement with Blackstone ISG-I Advisors L.L.C;

    f. documents and communications concerning the $3.75 million fee to CC Capital Partners; and

    g. documents and communications exchanged between FNF, Blackstone, CC Capital, and MVB relating to the Merger.

70. In addition, Petitioner seeks deposition testimony concerning the documents produced in response to the Requests.

71. The Requests are narrowly tailored to obtain highly relevant information regarding the value of the Dissenters' shares in the Company for use in the Cayman Islands Appraisal

Proceeding. The Requests are also narrowly tailored so as to specifically exclude and not seek information that was already provided in the Company's discovery in the Appraisal Proceeding.

72. As noted above, the Cayman court ordered the parties to exchange expert disclosures on October 18, 2021 and scheduled the Appraisal Proceeding for trial in March 2022. Expedition of this Application will permit sufficient time for (a) this Court's resolution of Petitioner's Section 1782 Application and any objections to the requested discovery; (b) Respondents' collection, review, and production of responsive documents; (c) Petitioner's counsel's review of documents produced by Respondents prior to the requested deposition of Respondents; and (d) Petitioner's timely submission of relevant documents to the court. I, therefore, urge the Court to expeditiously grant the Petitioner access to the requested discovery as quickly as possible.

73. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on August 31, 2021, at George Town, Grand Cayman, Cayman Islands.

_____
Guy Dilliway-Parry