# EXHIBIT 4



IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 184 OF 2020 (RPJ)

IN THE MATTER OF SECTION 238 OF THE COMPANIES ACT (2020 REVISION)

AND IN THE MATTER OF FGL HOLDINGS

FGL HOLDINGS

<u>Petitioner</u>

AND

1.  KINGSTOWN PARTNERS MASTER LTD

2.  KINGSTOWN PARTNERS II LP

3.  KTOWN LP

4.  KINGFISHERS LP

5.  KINGSTOWN 1740 FUND LP

<u>Respondents</u>

---

## DIRECTIONS ORDER

---

**UPON** the application of **FGL Holdings** (formerly F II Corp.) (the **Petitioner**) by way of Summons for Directions dated 18 August 2020

**AND UPON** reading the Petition presented herein on 18 August 2020 (the **Petition**)

**AND UPON** reading the First Affidavit of Jodi Lynn Hyde sworn 16 October 2020 and Exhibit JLH-1, the First Affidavit of Timothy P. McAnally sworn 16 October 2020 and Exhibit TPM-1, the First Affidavit of Claire Murphy sworn 26 October 2020 and Exhibit CM-1, the First Affidavit of Gwynn David Nevill Hopkins sworn 27 October 2020 and Exhibit GDNH-1, the Second Affidavit of Timothy P. McAnally sworn 2 November 2020, the Second Affidavit of Jodi Lynn Hyde sworn



2 November 2020 and Exhibit JHL-2 and the First Affidavit of Rachael Catherine Baxendale dated 4 November 2020 and Exhibit RCB-1.

**AND UPON** hearing counsel for the Petitioner and leading counsel for the Respondents

## IT IS HEREBY ORDERED THAT:

1.    The Respondents (the **Dissenting Shareholders**) be joined as respondents to the Petition.

### Appointment of Experts

2.    The Petitioner and the Dissenting Shareholders shall have leave to instruct one expert witness each (the Dissenting Shareholders to jointly and severally instruct one expert between them) in the field of valuation in order to opine upon the fair value of the Dissenting Shareholders' shares in FGL Holdings (**Merged Company**), valued as a going concern as at 29 May 2020 (the **Valuation Date**) (each a **Valuation Expert** and together, the **Valuation Experts**).

3.    The Valuation Experts shall be appointed by no later than 40 days from the date of this Order, and on that date the Petitioner and the Dissenting Shareholders shall each advise the other in writing of the identities and email addresses of the respective Valuation Experts so appointed.

4.    The Petitioner and the Dissenting Shareholders shall each have liberty to apply to the Court for leave to instruct one expert witness each (the Dissenting Shareholders to jointly and severally instruct one expert between them), in the field of the insurance industry (each an **Industry Expert** and together, the Industry Experts) and further directions in respect of the instruction of Industry Experts, if so required.

### Petitioner's Disclosure

5.    Within 28 days of the date of this Order, the Petitioner shall make available to the Valuation Experts, the Dissenting Shareholders and their employees, agents, representatives, advisors, consultants and attorneys, including leading counsel:

   a.   all discoverable documents (of whatsoever description, whether electronic, hard copy or in any other format) and communications (whether by email or otherwise) (**Documents**) in its possession, custody or power and which are relevant to the determination of the fair value of the shares in the Merged Company as at the Valuation



Date that were made available by the Merged Company to Fidelity National Financial, Inc (**FNF**) pursuant to the due diligence process (**Due Diligence Documents**); and

b. file and serve on the Dissenting Shareholders a list of documents in accordance with the requirements of O.24, r.5 of the Grand Court Rules. The Petitioner's list of documents shall be updated contemporaneously with any Documents being made subsequently available by the Petitioner.

6.  Within 70 days of the date of this Order, the Petitioner shall make available to the Valuation Experts, the Dissenting Shareholders and their employees, agents, representatives, advisors, consultants and attorneys, including leading counsel:

a. all Documents in its possession, custody or power and which are relevant to the determination of the fair value of the shares in the Merged Company (the **Shares**) as at the Valuation Date (the **Petitioner's Documents**) prepared or created between 29 May 2015 and the Valuation Date. This shall include, for the avoidance of doubt and without limitation, the categories of documents in **Appendix 1** hereto; and

b. file and serve on the Dissenting Shareholders an updated list of documents in accordance with the requirements of O.24, r.5 of the Grand Court Rules. The Petitioner's list of documents shall be updated contemporaneously with any Documents being made subsequently available by the Petitioner.

**Dissenting Shareholders' Disclosure**

7.  Within 70 days of the date of this Order, the Dissenting Shareholders shall make available to the Valuation Experts, the Petitioner and their employees, agents, representatives, advisors, consultants and attorneys, including leading counsel:

a. all Documents which are in the Dissenting Shareholders' possession, custody or power, subject to the overarching limits of relevance to the determination of the fair value of the Petitioner's shares, comprising the categories of documents prepared or created in the period from 1 December 2017 (being the date the Merged Company began trading on the New York Stock Exchange) ending with the Valuation Date and falling within the categories set out in **Appendix 2** hereto (the **Dissenters' Documents**);

b. a schedule (the **Dissenters' Schedule**) detailing the history of its trading in the Merged Company's shares between 1 December 2017 and the Valuation Date (including the



number of shares purchased, the date(s) on which the Shares were purchased, and the price(s) for which the Shares were purchased). If either Valuation Expert requests that the Dissenting Shareholder(s) confirm the schedule or information contained in any part thereof, the Dissenting Shareholder(s) shall verify the schedule or such part to the Valuation Experts by affidavit or by production of documents within 7 days receipt of that request, and paragraph 7a of this Order shall apply to those documents mutatis mutandis; and

c.   file and serve on the Petitioner a list of documents in accordance with the requirements of O.24, r.5 of the Grand Court Rules. The Dissenting Shareholder's list of documents shall be updated contemporaneously with any Documents being made subsequently available by the Dissenting Shareholders.

**Confidentiality Restrictions**

8.   The Petitioner and the Dissenting Shareholders shall have liberty to apply for further directions providing for enhanced confidentiality measures in relation to documents individually identified, or within a specific narrow category of documents, by either party, provided that (i) an application for further directions be made at least 21 days prior to the deadline for the provision of disclosure by the Petitioner and the Dissenting Shareholders in paragraphs 5 to 7 above with supporting evidence (ii) any evidence in response to the application to be filed within a further 7 days; and (iii) any further reply evidence to be filed within 3 days and (iv) the matter be determined on the papers, unless otherwise agreed.

**Translations**

9.   Where the Due Diligence Documents, Petitioner's Documents or the Dissenters' Documents are not in the English language and a party has an English translation thereof, an electronic copy thereof shall be made available by that party to the other party.

10.   In the event that any party wishes to rely on a document which is not in the English language and an agreed English translation is not available, that party shall procure and provide a certified English translation at its own cost, an electronic copy of which shall be provided in accordance with paragraph 9.



**Disclosure Protocol**

11.     The Petitioner and the Dissenting Shareholders will comply with the disclosure protocol at **Appendix 3** hereto when providing their respective disclosure in accordance with paragraphs 5 to 10 above.

**Valuation Experts' Information Requests**

12.     Unless the Court orders otherwise, the Petitioner shall make available any additional documents or information requested by any Valuation Expert for the purposes of preparing his/her own opinion (**Information Requests**).

13.     For the avoidance of doubt, if the Valuation Experts so request, this may include materials produced after the Valuation Date, and such requests may be made from the date of the disclosure of the Petitioner's Documents to the Dissenting Shareholders.  Any such request from or response to a Valuation Expert shall be copied by email to the Valuation Expert for the other party notified in paragraph 2.

14.     The Petitioner shall provide the Dissenting Shareholders with written answers and any other responsive documents to the Information Requests within 14 days of receipt of such an Information Request, unless otherwise agreed or directed by the court.

15.     Unless otherwise agreed or directed by the court, no Information Requests shall be submitted less than 21 days before the date fixed for the exchange of expert reports.

**Management Meeting**

16.     The Petitioner shall procure that appropriate members of its management team be available to meet with the Valuation Experts simultaneously, in person or by telephone or by way of video link in a meeting, such meetings to be scheduled to take place at a mutually convenient place and time for the purpose of providing information and answering queries which are relevant to the preparation of the Valuation Experts' respective Reports (defined below) (the **Management Meetings**).  In addition:

   a.   such meetings shall take place no later than 35 days prior to the exchange of expert reports; and within 21 days of a request by either Valuation Expert unless otherwise agreed or directed by order of the Court;



b.  each Valuation Expert shall prepare a list of questions and/or topics to be addressed at a Management Meeting to be provided to the Petitioner not less than 21 days prior to the Management Meeting at which those questions and topics are to be addressed (**List of Questions**).  However, if either Valuation Expert reasonably wishes to raise a new question or topic not included in the list, the Petitioner must not unreasonably withhold agreement to address it;

c.  if agreement cannot be reached as to the location, time or format of any of the Management Meetings, either party may apply to the Court for directions on not less than 5 working days' notice to the other parties;

d.  the Petitioner shall arrange for the Management Meeting(s) to be recorded and for a transcript of the Management Meeting(s) to be prepared.  The Petitioner may, within 21 days of the Management Meeting(s), correct any errors identified in the transcript and explain them to the Dissenting Shareholders or the Valuation Experts as necessary. The Petitioner shall circulate the final transcript to the parties as soon as reasonably practicable and in any event within 21 days of the Management Meeting(s);

e.  to the extent a Valuation Expert considers it appropriate to do so, a Valuation Expert may refer to information provided in a Management Meeting in his/her Expert Reports (as defined below).  If a Valuation Expert wishes to refer to or rely on any passage or information contained within the Management Meeting transcript in his/her reports, the Valuation Expert shall identify it within 14 days following receipt of the final transcript and give the Petitioner an opportunity to comment on it within a further 7 days;

f.  the cost of recording and transcribing the Management Meetings shall be costs in the Petition.  The parties shall share the costs with the Petitioner responsible for half the costs and the Dissenting Shareholders collectively responsible for the other half;

g.  in the event that a Management Meeting is not required to be held virtually, each of the parties shall be responsible for making their own travel, visa, accommodation and other logistical arrangements for the Management Meeting and these costs will be costs in the cause.



**Factual Affidavits**

17.    Any factual evidence to be relied upon on the hearing of the Petition shall be given by affidavit, with any such affidavit(s) to be filed and served by no later than 169 days from the date of this Order and the deponent(s) of any such affidavit(s) shall attend for cross-examination if notice requiring their attendance is given 14 days before the CMC (as defined below).

18.    The parties shall file and serve any affidavits in response no later than 14 days thereafter.

**Third party disclosure**

19.    Applications (if any) for third party discovery shall be made no later than 6 weeks prior to the date of exchange of expert reports in accordance with paragraph 21 below.

20.    The parties will disclose to the other part(ies) any and all documents received from any third-party or non-party as a result of any applications for third party discovery made in accordance with paragraph 19 above.

**Valuation Expert Reports & Joint Memorandum**

21.    Signed reports of each of the Valuation Experts (the **Reports**):

   a.   shall be confined to the issue of the fair value of the Dissenting Shareholders' shares in the Merged Company as a going concern as at the Valuation Date;

   b.   shall be in accordance with the Rules for Expert Witnesses in the FSD Guide; and

   c.   shall be exchanged simultaneously within 281 days of this Order, unless otherwise agreed by all parties.

22.    The Valuation Experts shall meet at a mutually convenient time, whether in person, by telephone, conference call or video link or howsoever they shall decide (the **Valuation Experts' Meeting**) 17 days following the exchange of Valuation Experts' Reports, to discuss the differences between their respective Reports with a view to narrowing the issues between them and producing the Joint Memorandum required by paragraph 23 below.

23.    A joint memorandum of the Valuation Experts (the **Joint Memorandum**) recording:



a.  the fact that they have met; when and where they met, and that they discussed the Valuation Expert issues;

b.  the issues on which they agree;

c.  the issues on which they disagree; and

d.  a brief summary of the reasons for any such disagreement,

shall be completed and issued to the parties by the Valuation Experts by no later than 21 days following the Experts' Meeting.

24.  Any supplemental Valuation Expert reports (**Supplemental Reports**) shall be exchanged simultaneously by no later than 28 days following the issuance of the Joint Memorandum.

25.  The Petitioner and the Dissenting Shareholders shall each be at liberty to call as expert witnesses at trial their own appointed Valuation Expert whose report(s) have been exchanged pursuant to the provisions of this Order.

26.  The Petitioner be at liberty to cross-examine the Dissenting Shareholders' Valuation Expert on his or her report(s) at trial, and the Dissenting Shareholders be at liberty to cross examine the Petitioner's appointed Valuation Expert on his or her report(s) at trial.

**Case Management Conference**

27.  A Case Management Conference (**CMC**) shall be held on the earliest date convenient to the Court and the parties' counsel after the deadline for exchange of any Supplemental Reports, or in the event that no Supplemental Reports are exchanged, on the earliest date convenient to the Court and the parties' counsel, once it is confirmed that no Supplemental Reports will be exchanged.

28.  The deadlines set out in various paragraphs in this Order are tabulated in a schedule attached to this Order at **Appendix 4** hereto.  Appendix 4 is for the convenience of the parties and the terms of this Order will apply in the event of any inconsistency between dates.

29.  Save as varied by this Order, or further order, the practice and procedures set out in the FSD Guide are to be followed.

30.     Liberty for any party to apply for further directions in respect of the matters addressed in this Order and any other matters prior to the CMC.

31.     The question of what is the fair rate of interest for the purposes of s.238(11) of the Companies Act, (if any) shall be the subject of directions (and if necessary further evidence and a separate hearing) once the Court has ruled on the fair value of the Dissenters' shares.

32.     Costs in the cause.


Dated this 18th day of December 2020

Filed this 24th  day of December 2020


_____

**The Honourable Justice Parker**

**JUDGE OF THE GRAND COURT**

APPROVED AS TO FORM AND CONTENT


*MAples and Calder*

_____

**MAPLES AND CALDER**
Attorneys for the Petitioner


*Mourant Ozannes*

_____

**MOURANT OZANNES**
Attorneys for the Dissenting Shareholders

**Appendix 1**

**Categories of documents to be disclosed by the Petitioner pursuant to paragraph 6a of this Order**

*DCF Valuation*

A. Communications and documents or other materials previously provided to or obtained by FNF and its subsidiaries, financiers or prospective financiers (whether to or from any of the persons mentioned in paragraph P below or passing between such persons) for the purposes of securing finance for the merger transactions (including but not limited to all management forecasts provided to the same).

B. Monthly management accounts relating to the Merged Company.

C. Consolidated quarterly accounts relating to the Merged Company.

D. Monthly financials of the Merged Company including, where available, profit and loss statement, balance sheet, cash flow statement and any accompanying notes or commentary.

E. Internal long-term projections and models relating to the Merged Company and any supporting documentation (including all versions and drafts). Projections and models must include source data sufficient to understand the inputs, assumptions and metrics that drive the projections and models, but does not need to include individual policyholder level data. A Valuation Expert may request information or documents in accordance with the Information Request process at paragraph 14 of the Order in relation to policyholder level data.

F. External projections and reports relating to the Merged Company's long-term plans including any supporting documentation (including all versions and drafts), other than those which are publicly available.

G. Any communications or documents relating to the Merged Company's projections (for the avoidance of doubt including but not limited to those documents and communications previously produced by, or provided to, or communicated between, employees of the Merged Company in the production and calculation of the projections sent to the Houlihan Lokey Capital, Inc. or its affiliates (**Houlihan Lokey**) and any other sets of projections in existence).

H. All communications with and documents provided to or received from Houlihan Lokey, Credit Suisse and CC Capital Partners, LLC in relation to the merger.

I. Agreements or other contractual arrangements (or any amendments thereto), including investment management agreements, with the Merged Company's business partners with an annual value of US$25 million or more; documents and communications relating to the negotiation or renegotiation of those agreements, including drafts; documents and communications containing or evidencing requests for payment pursuant to any such agreements and records of payments made; reports, presentations or analyses provided to the Company by the counterparties to any such agreements, and minutes of meetings with those counterparties, in relation to their subject matter.

J. Communications or documents relating to any significant changes to the business or industry related events having a significant effect on the Merged Company's long-term projections.

K. Communications or documents supporting the values of long-term investments, loans and other receivables and liabilities of the Merged Company.

L. Documentation of any off-balance sheet or non-operating assets and liabilities, including pension liabilities of the Merged Company.

M. Terms and conditions of any outstanding share options of the Merged Company held by directors or shadow directors of the Merged Company or FNF as at 29 May 2020.

N. Advice or analysis relating to corporation tax, withholding or other tax prepared by or for Merged Company's management.

O. The number and class of shares of the Merged Company issued and any changes thereto.

*Deal Process Valuation*

P. Communications and documents (including all versions and drafts) provided to or obtained from the Merged Company's Special Committee financial advisor, Houlihan Lokey in relation to the fair value opinion, including those passing between Houlihan Lokey and:

    a. the independent directors of the Special Committee of the Merged Company;

    b. the Merged Company's other directors, management, employees, counsel and/or advisors; or

    c. Fidelity National Financial, Inc (**FNF**) and/or its subsidiaries.

Q. All communications with and documents produced or received by the Merged Company's Special Committee or its members.

R. All communications with and documents produced or received by FNF's Special Committee or its members.

S. Communications and documents (including all versions and drafts) provided or obtained from FNF's Special Committee's financial advisor, BofA Securities or its affiliates (**BofA**) or Trasimene Capital Management, LLC or its affiliates (**Trasimene**), in relation to the mergers, including those passing between BofA or Trasimene and:

    a. the independent directors of the Special Committee of FNF;

    b. FNF's other directors, managers, employees, counsel and/or advisors; and

    c. the Merged Company and/or its subsidiaries.

T. Communications and documents passing between the Merged Company and any third parties regarding a potential sale of the Merged Company, including but not limited to all documents and communications concerning solicitation of bids and/or negotiation of consideration for the Merged Company.

U. Communications and documents in relation to the go shop process for the Merged Company.

V.  Communications and documents relating to the facts disclosed in the "Background to the Merger" section of the Merged Company's definite proxy statement filed with the SEC on 27 April 2020 (the **Proxy**).

W.  Internal documents relating to any other potential acquisition of the Merged Company considered by Company's management.

X.  Internal documents relating to FGL's acquisition of Fidelity & Guaranty referred to in the Proxy as the "FG Acquisition", including documents relating to the decision to acquire Fidelity & Guaranty and any internal projections, models or other valuation analyses and the due diligence data room from that transaction.

Y.  Board meeting agendas and minutes including any supporting documentation, attendee lists and details of the time, location and duration of board meetings for the Merged Company and FNF.

Z.  Communications and documents relating to Blackstone's (or its related entities or affiliates) interests and incentives in the mergers and any potential or actual conflicts of interest, both directly and through related or affiliated entities.

AA.  Communications and documents relating to the interests and incentives of all directors and executive officers of the Merged Company and/or FNF (including members of either of the Special Committees) in relation to the mergers, including those referred to at page 145 - 158 of the PDF of the Proxy headed "*Interests of certain FGL Persons in the Mergers*" and any potential or actual conflicts of interest, both directly and through related or affiliated entities.

BB.  Communications and documents relating to the interests and incentives of advisors appointed by either of the Special Committees and any potential or actual conflicts of interest, both directly and through related or affiliated entities.

CC.  Communications and documents (including all prior versions and drafts) in relation to the negotiation of the merger agreement.

DD.  [*Intentionally left blank*]

EE.  Communications and documents (including all prior versions and drafts) between Houlihan Lokey and directors or officers of the Merged Company, including in relation to Houlihan Lokey's instructions, work undertaken, interests and incentives any assumptions made in preparing the fairness opinion and any potential or actual conflicts of interest in relation to the mergers.

FF.  Communications and documents (including all prior versions and drafts) between BofA or Trasimene and directors or officers of FNF, including in relation to BoFA/Trasimene's instructions, work undertaken, interests and incentives and any potential or actual conflicts of interest in relation to the mergers.

GG.  Any communications and documents between the Merged Company and its shareholders in relation to the merger transaction, including in relation to the shareholders' interests and incentives, including, without limitation, any communications in relation to the exercise of shareholders' voting rights or voting agreements.' .

HH. [*Intentionally left blank*]

*Market Price Valuation*

II.  Third-party market and industry reports relevant to the markets in which the Merged Company operates, other than those which are publicly available.

JJ.  Any communications or documents relating to market share and commission broken down by business segment where available, other than those which are publicly available.

KK.  Communications or documents relating to significant transactions in the Merged Company's shares.

LL.  Communications or documents relating to material non-public information (**MNPI**) in relation to the value of the Merged Company's shares.

MM. All internal communications or documents in relation to the market price of the Merged Company's shares in the possession of the Merged Company's directors, shadow directors, Chief Operating Officer, Chief Financial Officer, Chief Executive Officer, Chief Investment Officer, employees and contractors of the Corporate Development and Strategy team and predecessor teams from 1 December 2017 until the Valuation Date.

NN.  Analysts' reports valuing the Merged Company.

OO.  Event studies conducted by the Merged Company or third parties.

PP.  The Merged Company's and the Petitioner or FNF's announcements or other public statements regarding the merger transaction, including transcripts of quarterly earnings calls and press statements.

QQ.  Communications and documents relating to the Merged Company's sale of all outstanding common shares of F&G Reinsurance Ltd to Aspida Holdings Ltd, including documents relating to the decision to sell F&G and any internal projections, models or other valuations analyses.

Appendix 2

**Categories of documents to be disclosed by the Dissenting Shareholders pursuant to paragraph 7.a of this Order**

1.  All documents reflecting or relating to any valuations or similar analyses of the Merged Company that the Dissenting Shareholders prepared, reviewed, or considered, including but not limited to:

    (a) all written documents, including Excel files, that set forth, summarise, or otherwise reflect valuation analyses of the Merged Company or the Merged Company shares;

    (b) any internal valuations of the Merged Company or the Merged Company's shares; and

    (c) any valuations of the Merged Company or the Merged Company's stock reviewed or considered by the Dissenting Shareholders in connection with the above.

2.  All documents, information and material created, issued, received or shared between the Dissenting Shareholders', the Dissenting Shareholders' investment manager(s) and/or investment advisor(s) and the Dissenting Shareholders' Investment Committee(s) in relation to the Merged Company's go-private action including file notes of meetings, meeting agendas and all forms of written communications.

## Appendix 3

## Disclosure Protocol pursuant to paragraph 11 of this Order

This protocol is intended to facilitate the efficient, proportionate and cost-effective performance by the parties of their obligations with respect to disclosure.

### Definitions

**Metadata** means data about data. In the case of an electronic document, metadata is typically embedded information about the document that is not readily accessible once the native electronic document has been converted into an electronic image or paper document, for example, the date on which the document was last printed or amended. Metadata may be created automatically by a computer system (system metadata) or may be created manually by a user (application metadata).

**MD5 Hash Value** means the Message Digest algorithm 5 which is used to provide a unique "digital signature" for electronic documents and is generated upon the basis of various items of file metadata; where two or more items have the same MD5 Hash Value they are deemed to be duplicates.

**Native File Format** means an electronic document stored in the original form in which it was created by a computer software program.

**Parent Document** means a document with 1 or more attachment.  For example, an email is a parent document and any documents attached to the email are its attachments.

### Petitioner's Disclosure

1.  The Petitioner accepts that it has possession, custody or power of all documents in the possession, custody or power of the Merged Company at the Valuation Date and will give disclosure on that basis.

### Preservation of Documents

2. The parties will take steps to preserve all potentially discoverable documents, including the metadata of such documents, and to ensure no metadata is altered during the disclosure process.

**De-duplication**

3. Electronic documents with the same MD5 Hash Value will be identified and any duplicates removed, except:

    a. Where duplicates are added to a party's List of Documents (as detailed in this Order at paragraphs 5 to 6 for the Petitioner and at paragraph 7 for the Dissenting Shareholders) because they are family members of other documents which are also disclosed. Duplicates which are part of a family are not to be removed, unless the whole of the family are in fact duplicates.

    b. The parties will not attempt to de-duplicate scanned hard copy documents as there is no accurate or efficient way to achieve this.

4. A deNIST filter will be applied to the documents during processing to identify and remove files that are generally created by operating systems or applications and contain no user-generated information or data. The deNIST culling process identifies files found on the National Institute of Standards and Technology (NIST) list of documents that hold no value for litigation purposes.

**Format**

5. Electronic documents are to be provided in their Native File Format, subject to:

    a. Documents, other than excel spreadsheets, that have been redacted in accordance with this protocol, which documents will be produced in Tagged Image File Format (**TIFF**) with the relevant .opt file and Document ID coding;

    b. Excel spreadsheets, that have been redacted in accordance with this protocol, which documents will be produced in a Native Format or near

Native Format by using a software solution that retains the full functionality of the excel spreadsheet while applying redactions, such as Milyli, Evolver, or Redact Assistant.

6. All PDF and TIFF documents will be provided with OCR search capability.

7. Each party will make reasonable efforts to ensure documents are decrypted, or that passwords are supplied.

8. Unless otherwise agreed or ordered by the Court, Parties should not place any restrictions on documents that prevent opposing parties from accessing them.

9. Family-inclusive documents will be provided with "load files" that allow linking of documents from the same family. Subject to any claim to privilege or irrelevance and confidentiality, all family documents are to be disclosed where only one member of a family document is identified as relevant.

10. The following applies in relation to attachments to emails:

   a. Any document that is attached to or embedded within another document is to be classed as an attachment (unless an excluded document);

   b. Attachments must be listed as separate documents; and

   c. In general, attachments will appear immediately after the Parent Document in the parties' Lists of Documents.

**Document Coding**

11. Parties are required to provide the following metadata or information for each document, where such information is reasonably available:

   a. <u>Document ID</u>: The document ID must be a unique reference and begin with "*FGL*" for the Petitioner and "*KIN*" for the Dissenters.

   b. <u>Parent document ID</u>: If there is no Parent Document, leave this field blank.

c.  Last Modified Date: This should be the date last modified/sent, or the manually coded date in the format DD/MM/YYYY.

d.  Date Created: This should be the original date a file was created and may be the same as the Last Modified Date.

e.  Title/subject/description: This may be the file name or subject line of an email or other descriptor.

f.  Document type: (ie. .pdf, .xls, .msg etc).

g.  Sender/Author: The name of the author of a document or sender of an email.

h.  CC: The name of the recipient(s) of the document in a CC. Use a semi-colon (;) symbol as the multi-value separator.

i.  BCC: The name of the recipient(s) of the document in a BCC. Use a semi-colon (;) symbol as the multi-value separator.

j.  Recipient:  The name of the recipient(s) of the document. Use a semi-colon (;) symbol as the multi-value separator.

k.  MD5 Hash Value: as defined.

l.  Contains Redactions: This will be a binary "Yes/No" code applying where the whole or part of a document has been redacted.

m. Reason for Redaction:  This will identify the reason for the redaction using the following labels, as applicable:

       i.  Litigation privilege;

      ii.  Legal professional privilege;

    iii.  Without prejudice privilege; and

    iv.  Irrelevant and confidential.

**Excluded Documents**

12. Temporary internet files, cookies and irrelevant gif files (ie. company logos) are to be excluded from searches and discovery (to the extent possible).

**Withholding Disclosure – Privilege and Confidentiality**

13. Nothing in this Protocol will prevent a party from withholding documents from production on the basis of any applicable Cayman law.

14. If a claim of Cayman law privilege is asserted over a portion of a document only, that portion will be redacted and the document produced.

15. Each party may redact confidential information that is not relevant to the Petition.

16. The redacted sections of a document are to be identified as such either by being blacked out or by otherwise being marked as having been redacted.

**List of Documents**

17. In their List of Documents, the parties shall provide the following information  to the extent that this information is reasonably available:

    a.   Document ID

    b.   Parent document ID

    c.   Last Modified Date

    d.   Date Created

    e.   Title/subject/description

    f.   Document type: (ie. .pdf, .xls, .msg etc).

    g.   Sender/Author

    h.   Recipient

    i.   Contains Redactions

j.   Reason for Redaction

18. Each party's List of Documents will be ordered by family group, with attachments listed below Parent Documents.

19. The parties lists of documents will be provided in an excel spreadsheet format (.xls).

**Variation**

20. This protocol may be varied by agreement of the parties in writing or by order of the Grand Court of the Cayman Islands.

# Appendix 4

## Schedule of dates

| | Description | Order | Reference | Date |
|---|---|---|---|---|
| 1. | Directions Order issued | - | - | 18 December 2020 |
| 2. | Petitioner to disclose documents pursuant to paragraph 5 of Order | 5 | 28 days from date of Order | 15 January 2021 |
| 3. | Each party to appoint their respective Valuation Experts and to advise the other of the identities and email addresses of the respective Valuation Experts | 3 | 40 days from date of Order | 27 January 2021 |
| 4. | Valuation Experts may start issuing Information Requests to the Company | 13 | From the date each party appoints a Valuation Expert | 27 January 2021 |
| 5. | Petitioner to provide written responses to Valuation Experts' Information Requests | 14 | Within 14 days of receipt of such an Information Request and the Company shall provide the | - |

| | | | written answers and any other responsive documents to the Dissenting Shareholders | |
|---|---|---|---|---|
| 6. | Petitioner to disclose documents pursuant to paragraph 6 of Order | 6 | 70 days from date of Order | 26 February 2021 |
| 7. | Dissenting Shareholders to disclose documents pursuant to paragraph 7 of Order | 7 | 70 days from date of Order | 26 February 2021 |
| 8. | Service/ Exchange of Factual Witness Statements | 17 | 169 days from date of Order | 7 June 2021* |
| 9. | Parties to file and serve affidavits in response | 18 | 14 days after the exchange of factual statements | 21 June 2021 |
| 10. | Valuation Experts to submit their List of Questions to the Petitioner in respect of Management Meeting | 16(b) | 21 days prior to Management Meeting | 2 August 2021 |
| 11. | Cut-off date for third party disclosure applications | 19 | 6 weeks prior to exchange of expert reports | 16 August 2021 |

| 12. | Management Meeting | 16(a) | No later than 35 days prior to the exchange of Reports and within 21 days after a request for the meeting | 23 August 2021 |
|---|---|---|---|---|
| 13. | Cut-off date for Petitioner to identify any errors in the Management Meeting transcript and to provide a copy | 16(d) | Within 21 days of the Management Meeting | 13 September 2021 |
| 14. | Cut-off date for final Information Requests from Valuation Experts to the Petitioner | 15 | 21 days prior to the exchange of Expert Reports | 6 September 2021 |
| 15. | Valuation Experts to identify passages or information in management meeting transcripts to be relied upon in Reports | 16(e) | 14 days following receipt of final transcript of Management Meeting | 27 September 2021 |
| 16. | Experts to exchange their respective Reports | 21(c) | Within 281 days of the Order | 27 September 2021** |
| 17. | Petitioner to comment on transcript passages to be relied upon | 16(e) | 7 days thereafter | 4 October 2021 |

| | | | | |
|---|---|---|---|---|
| 18. | Valuation Experts' Meeting | 22 | 17 days following the exchange of expert reports | 14 October 2021 |
| 19. | Valuation Experts to issue their Joint Memorandum | 23 | Within 21 days following the Experts' Meeting | 4      November 2021 |
| 20. | Valuation Experts to exchange their respective Supplemental Reports (if any) | 24 | Within 28 days of the Joint Memorandum | 2 December 2021 |
| 21. | Cut-off date for notice to be given to any deponent(s) of any such affidavit(s) requiring their attendance to be given upon the hearing of the Petition | 17 | Within 14 days of the Case Management Conference | To be determined |
| 22. | Case Management Conference | 27 | | To be determined |

*The date for the service/ exchange of factual witness statements falls on Saturday 5 June 2021 and has therefore been moved to the following Monday, 7 June 2021.

** The date for the exchange of expert reports falls on Saturday, 25 September 2021 and has therefore been moved to the following Monday, 27 September 2021.