# EXHIBIT 8

52   Having reached these conclusions, I did not consider it necessary to deal with preliminary issue 7.

*Orders accordingly.*

Attorneys: *Higgs & Johnson* for the plaintiffs; *Mourant Ozannes* for the defendant.

---

**[2013 (1) CILR 202]**

## AHMAD HAMAD ALGOSAIBI AND BROTHERS COMPANY v. SAAD INVESTMENTS COMPANY LIMITED and 43 OTHERS

GRAND COURT, FINANCIAL SERVICES DIVISION (Smellie, C.J.):
February 22nd, 2013

*Trusts—tracing actions—breach of fiduciary duty—breach if fiduciary uses funds without authority to establish proprietary base for tracing claim even if authorized to obtain funds for alternative purpose—claimant not to differentiate between funds obtained with or without authorization*

*Trusts—tracing actions—general principles—involves identifying new property claimed as substitute for original—claimant required to show (a) proprietary base for claim (i.e. property belonging to it that was taken); (b) series of transactional links (i.e. property used to acquire another identifiable property); and (c) unbroken chain of substitutes—not entitled to rely on "swollen assets" theory (i.e. that defendant's assets increased by claimant's property without identification of specific assets)*

*Trusts—tracing actions—pleading—claimant not required to show full series of unbroken transactional links before discovery provided it enables links to be shown—pleading not to be struck out if only discloses property of defendant subject to claim if discovery required for full particularization*

The plaintiff ("AHAB") brought an action against the defendants in respect of fraud.

The fraudster was the director of one of AHAB's businesses, the Money Exchange, and caused US$9.2 bn. of loss to AHAB by making unauthorized borrowings and misappropriating funds, including funds paid out

under fraudulent letters of credit. He was alleged to have used US$6.2 bn. to fund the defendant companies, now in liquidation, including SIFCO 5, the GT group and the AWALCO group (together "the companies"). SIFCO 5 was largely funded by external banks, but received some funding from SICL, a company controlled by the fraudster which was funded from multiple sources, including the fraudster. GT was alleged, based on documents obtained from third parties (*e.g.* bank statements), to have received funds misappropriated from AHAB directly from the fraudster, as a capital contribution, and from companies which the fraudster controlled. AWALCO consisted of several special purpose investment vehicles which co-mingled money from various sources, invested it and then distributed the returns to the investors. AWALCO 3 acted solely with funds from AWAL Bank, an entity which was owned in part by the fraudster, from which it was alleged to have received property misappropriated from AHAB.

It had originally been alleged that the borrowings that the fraudster had made were unauthorized, however it emerged that some had been authorized by AHAB under a "new-for-old" policy—whereby the fraudster could take out a loan for the benefit of the Money Exchange so long as it replaced an existing one. AHAB obtained a judgment in default of defence against the fraudster (in proceedings reported at 2012 (1) CILR 335), but could not enforce this until it had amended its pleadings to include the new-for-old policy.

AHAB alleged that the companies had received funds misappropriated by the fraudster and brought tracing actions against them. Before disclosure had been made, the companies applied for the tracing actions to be struck out on the grounds that AHAB had not disclosed a reasonable cause of action and that the claims had not been adequately particularized.

SIFCO 5 submitted that AHAB had not shown a proprietary basis for its tracing claim as it had not identified any of SIFCO 5's property in which AHAB had a proprietary interest. Even if AHAB were able to show which unauthorized loans had been paid to SICL, SICL had received funding from other sources which would have been adequate to cover its contributions to SIFCO 5. As AHAB could not simply rely on the fact that SIFCO 5's assets must have been enlarged due to the receipt of AHAB's property (the "swollen assets" theory) in lieu of pointing to specific assets in which it had an interest, its claim should be struck out.

AHAB submitted in reply that the funds which came through SICL "must have" been derived from the unauthorized loans by virtue of the fraudster's ownership of SICL, and that this inference was so strong that the burden of proof had been passed. SIFCO 5 therefore had to show that the funds from SICL had not been AHAB's property.

GT submitted that, as some of the payments to the fraudster had been authorized under the "new-for-old" policy, and AHAB had not shown in its pleadings that the funds it had received from the fraudster had come from unauthorized borrowings, AHAB had not shown a proprietary basis for the claim. Further, any money which may have belonged to AHAB

would have reached GT through a route which prevented tracing (*e.g.* through an overdrawn bank account) and GT should not be subjected to the cost of disclosure to avoid AHAB's obligations to particularize the claims.

AHAB submitted in reply that it had only authorized the fraudster to borrow money for the benefit of the Money Exchange. Payments away from the Money Exchange, therefore, were not authorized and AHAB still retained a proprietary claim to any money paid to the defendants. Moreover, even if AHAB were prevented from being able to trace the funds, this should be determined after discovery had taken place rather than on GT's assertions. Further, AHAB had particularized its claims to a suitable level as, without discovery, it could not trace the funds within the defendant companies.

AWALCO submitted that it was impossible to trace AHAB's property into the mixed fund and its profits. Although AWALCO 3 had only been funded by AWAL Bank, AHAB could not show an interest in these funds as AWAL Bank itself received funding from multiple parties and, at any rate, the fraudster had ceased to contribute to the Bank at the time AWALCO 3 had received the funds. Further, AWALCO was not in a position to disclose records from the Bank as they had been taken to Saudi Arabia by the fraudster and so were unavailable.

AHAB submitted in reply that, because the fraudster had owned the Bank in part, it should be inferred that he had directly funded it and, as he had had no other assets, must have done so with money misappropriated from AHAB. Further, the fact that contributions had ceased did not mean that property which the Bank had already received, in which AHAB would have a proprietary interest, had not passed to AWALCO 3. As demonstrating this required AWAL Bank's records, which only AWALCO could obtain, it should be ordered to disclose them, notwithstanding that it would have to recover them from Saudi Arabia.

The companies further submitted that (a) AHAB could not base a proprietary tracing claim on the letters of credit as the money which had been paid out had belonged to the bank; (b) it would be inequitable to allow AHAB to obtain judgment against the companies, as alleged accessories to a fraud, as it was no longer suing the fraudster himself; (c) they should be entitled to appeal the default judgment against the fraudster on the grounds that it would lead to inconsistent judgments if the current action failed, that the amount awarded was incorrect and that the court had not been entitled to take into account financial records which had been reproduced in the pleadings but not presented in evidence; and (d) the court had breached its obligations towards fairness and natural justice by allowing AHAB to submit a modified statement of claim without allowing the defendants a chance to contest it.

AHAB submitted in reply that (a) it should be entitled to base a proprietary tracing claim on the letters of credit as the fraudster had obtained the money under them in his role as a fiduciary; (b) it had only ceased to pursue the fraudster after obtaining the judgment in default of

defence against him and so should not be barred from obtaining equitable judgment against the accessories; (c) there was no risk of inconsistent decisions as the ruling was based on a default of defence, the court was entitled to award the amount which it did, the records could be validly considered as they had not been challenged and had been submitted to the court multiple times in the case and that the defendants had no standing to appeal the default judgment; and (d) there was no need for the defendants to object to the amended statement of claim as it did not prejudice their case.

**Held**, allowing the application in part:

(1) There was no prospect that AHAB could successfully establish a proprietary tracing claim against SIFCO 5 and the claim against it would therefore be struck out. As tracing involved the identification of a new thing as the subject-matter of the claim, on the basis that the new thing was a substitute for the original, three elements of the claim had to be established: (a) AHAB had to identify a proprietary base (*i.e.* what property belonging to it had been taken); (b) there should be a series of transactional links (*i.e.* the property must have been used to acquire other identifiable properties); and (c) the chain of substitutes must be unbroken. AHAB was only required, at the interlocutory stage, to show that there was an end product which represented its property, provided that, after discovery had been made, it would be able to establish the other requirements. AHAB had failed, however, to show that SIFCO 5 held an end product which would represent its property. The nature of SIFCO 5's funding meant that AHAB's tracing claim was solely relying on the idea that SIFCO 5's assets must have been increased by virtue of the payment from SICL. As a tracing claim could not simply rely on the "swollen assets" of the defendant, the claim against SIFCO 5 would be struck out (paras. 45–48; paras. 54–56; paras. 86–89; para. 95; para. 108).

(2) AHAB had shown that it had a good, arguable case to establish a proprietary basis for its claims against GT and AWAL. If AHAB could establish that the fraudster had only been entitled to borrow money in line with the new-for-old policy, any funds transferred from the Money Exchange for the purposes of funding the fraudster's companies would have been obtained without authority. Further, it was a valid inference that a proprietary base for the claim existed on the ground that, since the fraudster was AHAB's fiduciary, any money he had misappropriated would be subject to fiduciary duties, and there was a *prima facie* case that he had only been able to obtain the funds which were transferred to the defendants by virtue of this position. The defendants would not be entitled to use the rules of pleading to defeat this claim, as they had an obligation to disclose any documents which were, or had been, in their possession, custody or power and related to any matter in question. Although AHAB's claim required better particularization in relation to the proprietary base, this did not mean that it was "impossible" for the defendants to give discovery, particularly as discovery was required before AHAB would be

able to complete the tracing exercise. Moreover, the defendants' liquidators, as officers of the court in search of the true ownership and proper disposition of the assets under their control, should have considered themselves duty bound to assist the court in the proper resolution of the claim and therefore would be required to assist AHAB by making a full disclosure (para. 35; para. 112; paras. 121–122; para. 137; paras. 158–161).

(3) GT was not entitled to rely on its assertion that the property would have passed through a route which prevented tracing in order to avoid its disclosure obligations. This was particularly as GT had not undertaken any tracing exercise of its own and it would be wrong to assume, for the purposes of a strike-out application, that it was true. Further, it appeared that contributions to GT came from companies which largely derived their funding from the fraudster and there was no evidence to show that money capable of covering the contributions to GT was funded by third parties. The documents which had been removed from the jurisdiction by the fraudster still remained GT's property and, particularly as it was the only party capable of recovering them, they would be included in GT's obligation to obtain and disclose any documents relevant to the claim (paras. 124–126; paras. 134–138).

(4) The court was entitled to infer that, as the fraudster owned AWAL Bank in part, he would have directly funded it. AWAL Bank was also the subject of a criminal investigation for false accounting and for aiding and abetting the destruction and concealment of documents, and the court was entitled to find that it would be premature to strike out a claim that it had received money from AHAB and then passed it on to AWALCO 3. Further, although it had been shown that AWAL Bank could not have received AHAB's money immediately prior to its contributions to AWALCO 3, it had held substantial capital before that date—which it could be inferred came from the fraudster and included property misappropriated from AHAB—which it may have later passed to AWALCO 3. AWALCO were, therefore, obliged to comply with their discovery obligations, notwithstanding that the tracing claim was only likely to succeed against AWALCO 3, particularly as AHAB might be able to succeed in a claim for knowing receipt, dishonest assistance and restitution against the other members of AWALCO (paras. 150–155).

(5) The court would not strike out the claims which relied on the letters of credit to form a proprietary basis. Although the money paid out under a letter of credit belonged to the bank, AHAB might be entitled to assert an interest in it by virtue of the fraudster's role as a fiduciary. As he had obtained the money under the letters of credit by abuse of his position, he might be accountable for these funds under a constructive trust. This would create a proprietary interest in the property which AHAB would be entitled to trace. Further, as this was based on an institutional constructive trust due to the fiduciary's fraud, it would not conflict with the proposition that a remedial constructive trust could not create property rights in an

insolvency to the detriment of creditors (para. 175; para. 188; paras. 197–201).

(6) AHAB was not prevented from bringing a claim against the companies even though it was no longer pursuing a claim against the fraudster. AHAB had only abandoned this claim due to a procedural limitation on the default judgment. It had therefore fully pursued the principal wrongdoer and was not in violation of the principle that it should act fairly when seeking an equitable remedy. Further, an absolute principle that a plaintiff had to pursue the wrongdoer or lose its claim against the accessory could not be accepted as it would leave no cause of action where the wrongdoer was unavailable (*e.g.* because he was permanently beyond the jurisdiction). The application to appeal the default judgment would also be refused. The judgment had been entered in default of defence and there was therefore no risk of conflicting decisions with the present action. The court had appropriately calculated the damages to award, based on the lower bound of damages likely to be ultimately recoverable by AHAB against the fraudster, and had been correct not to take into account a potential counterclaim that had not been made. The court had also been entitled to consider the financial records, as their validity had not actually been challenged and they had previously been presented before the court on multiple occasions. Moreover, the defendants had no legitimate interest in the default judgment and so had no standing to appeal it (paras. 204–205; para. 209).

(7) The application to appeal AHAB's permission to amend its statement of claim would be refused. AHAB was entitled to amend its pleadings, regardless of however negligent or careless the first omission and how late the proposed amendment, provided that there would be no injustice to the defendants, and there would be no injustice if the defendants could be compensated by costs. AHAB's amendments did not prejudice the defendants as they would be entitled to recover any consequential costs and would be entitled to make any consequential amendments to their own pleadings. There was therefore no reason why the court should have entertained an *inter partes* contest and it had not breached its obligations to fairness and natural justice. Further, as the defendants had not argued that they would be prejudiced by the amendments, and had actually insisted that amendments be made, they were not acting mindfully of their obligations under the overriding objectives of the court to assist it in dealing with every cause in a just, expeditious and economical way (paras. 220–226).

**Cases cited:**

(1) *Agip (Africa) Ltd.* v. *Jackson*, [1991] Ch. 547; [1991] 3 W.L.R. 116; [1992] 4 All E.R. 451, considered.
(2) *Aktieselskabet Dansk Skibsfinansiering* v. *Wheelock Marden & Co. Ltd.*, [1994] 2 HKC 264; [1994] HKCA 289, applied.

(3) *Arab Monetary Fund* v. *Hashim (No. 2)*, [1990] 1 All E.R. 673, referred to.

(4) *Att.-Gen. (Hong Kong)* v. *Reid*, [1994] 1 A.C. 324; [1993] 3 W.L.R. 1143; [1994] 1 All E.R. 1, referred to.

(5) *Belmont Fin. Corp. Ltd.* v. *Williams Furniture Ltd.*, [1979] Ch. 250; [1978] 3 W.L.R. 712; [1979] 1 All E.R. 118, applied.

(6) *Bishopsgate Inv. Management Ltd.* v. *Homan*, [1995] Ch. 211; [1994] 3 W.L.R. 1270; [1995] 1 All E.R. 347; [1994] BCC 868, referred to.

(7) *Boardman* v. *Phipps*, [1967] 2 A.C. 46; [1966] 3 W.L.R. 1009; [1966] 3 All E.R. 721, followed.

(8) *Borden (UK) Ltd.* v. *Scottish Timber Prods. Ltd.*, [1981] Ch. 25; [1979] 3 W.L.R. 672; [1979] 3 All E.R. 961; [1980] 1 Lloyd's Rep. 160, followed.

(9) *Cayman Islands News Bureau Ltd.* v. *Cohen*, 1988–89 CILR 542, referred to.

(10) *Clarapede & Co.* v. *Commercial Union Assn.* (1883), 32 W.R. 262, referred to.

(11) *Codelco* v. *Interglobal Inc.*, 2002 CILR 298, referred to.

(12) *Compagnie Fin. & Comm. du Pacifique* v. *Peruvian Guano Co.* (1882), 11 Q.B.D. 55; 52 L.J.Q.B. 181, referred to.

(13) *Contadora Enterprises S.A.* v. *Chile Holdings (Cayman) Ltd.*, 1999 CILR 194, referred to.

(14) *De Bussche* v. *Alt* (1878), 8 Ch. D. 286, referred to.

(15) *F.C. Jones & Son (A Firm)* v. *Jones*, [1997] Ch. 159; [1997] 1 W.L.R. 51; [1996] 3 W.L.R. 703; [1996] 4 All E.R. 721; [1996] BPIR 644, referred to.

(16) *Fortex Group Ltd.* v. *MacIntosh*, [1998] 3 N.Z.L.R. 171, referred to.

(17) *Foskett* v. *McKeown*, [2001] 1 A.C. 102; [2000] 2 W.L.R. 1299; [2000] 3 All E.R. 97; [2000] W.T.L.R. 667, applied.

(18) *Goldcorp Exchange Ltd., In re*, [1995] 1 A.C. 74; [1994] 3 W.L.R. 199; [1994] 2 All E.R. 806; [1994] 2 BCLC 578; [1994] CLC 591, referred to.

(19) *Group Josi Reassur. S.A.* v. *Walbrook Ins. Co. Ltd.*, [1995] 1 W.L.R. 1017; [1994] 4 All E.R. 181; [1995] 1 Lloyd's Rep. 153; [1994] CLC 415; on appeal, [1996] 1 W.L.R. 1152; [1996] 1 All E.R. 791; [1996] 1 Lloyd's Rep. 345; [1995] CLC 1532, distinguished.

(20) *Grupo Torras S.A.* v. *Bank of Butterfield Intl. (Cayman) Ltd.*, 2000 CILR 441, applied.

(21) *Hampshire Cosmetic Labs. Ltd.* v. *Mutschmann*, 1999 CILR 21, referred to.

(22) *James Roscoe (Bolton) Ltd.* v. *Winder*, [1915] 1 Ch. 62, referred to.

(23) *Kalley* v. *Manus*, 1999 CILR 566, applied.

(24) *Ketteman* v. *Hansel Properties Ltd.*, [1987] A.C. 189; [1987] 2 W.L.R. 312; [1988] 1 All E.R. 38; (1986), 36 B.L.R. 1; [1987] 1 F.T.L.R. 284, applied.

(25) *Lloyds Bank PLC* v. *Rosset*, [1991] 1 A.C. 107; [1990] 2 W.L.R. 867; [1990] 1 All E.R. 1111; [1990] 2 FLR 155, referred to.

GRAND CT.                    AHAB V. SAAD INVS. (Smellie, C.J.)

(26) *Muschinski* v. *Dodds* (1985), 160 CLR 583, referred to.
(27) *O. Co.* v. *M. Co.*, [1996] 2 Lloyd's Rep. 347, followed.
(28) *OJSC Oil Co. Yugraneft* v. *Abramovich*, [2008] EWHC 2613 (Comm), applied.
(29) *Philipps* v. *Philipps* (1878), 4 Q.B.D. 127, referred to.
(30) *Polly Peck Intl. PLC, No. 2, Re*, [1998] 3 All E.R. 812; [1998] 2 BCLC 185, distinguished.
(31) *Powell* v. *Thompson*, [1991] 1 N.Z.L.R. 579, referred to.
(32) *Practice Direction (C.A.: Leave to Appeal and Skeleton Arguments)*, [1999] 1 W.L.R. 2; [1999] 1 All E.R. 186, applied.
(33) *Shalson* v. *Russo*, [2005] Ch. 281; [2005] 2 W.L.R. 1213; [2003] WTLR 1165; [2003] EWHC 1637 (Ch), referred to.
(34) *Sinclair Invs. (UK) Ltd.* v. *Versailles Trade Fin. Ltd.*, [2012] Ch. 453; [2011] 3 W.L.R. 1153; [2011] 4 All E.R. 335; [2011] Bus. L.R. 1126; [2011] 2 BCLC 501; [2011] WTLR 1043; [2011] EWCA Civ 347, followed.
(35) *Streeter* v. *Immigration Bd.*, 1999 CILR 264, referred to.
(36) *Swiss Bank & Trust Corp. Ltd.* v. *Iorgulescu*, 1994–95 CILR 149, applied.
(37) *TMSF* v. *Wisteria Bay Ltd.*, 2007 CILR 310; further proceedings 2008 CILR 231, applied.
(38) *TSB Private Bank Intl. S.A.* v. *Chabra*, [1992] 1 W.L.R. 231; [1992] 2 All E.R. 245, referred to.
(39) *Taylor* v. *Anderton*, [1995] 1 W.L.R. 447; [1995] 2 All E.R. 420, applied.
(40) *Universal & Surety Co. Ltd., In re*, 1992–93 CILR 157, applied.
(41) *Westdeutsche Landesbank Girozentrale* v. *Islington London Borough Council*, [1996] A.C. 669; [1996] 2 W.L.R. 802; [1996] 2 All E.R. 961, referred to.
(42) *Yeshiva Properties No. 1 Pty. Ltd.* v. *Marshall* (2005), 219 ALR 112; [2005] NSWCA 23, distinguished.

*E. McQuater, Q.C., D. Quest* and *G. Keightley* for the plaintiff;
*M. Crystal, Q.C.* and *Ms. C. Wilkins* for the GT liquidators;
*M. Smith, Q.C.* and *I. Lambert* for the liquidators of the AWALCOs;
*T. Lowe, Q.C., D. Herbert* and *Ms. H. Neilson* for the liquidators of SIFCO 5.

1   **SMELLIE, C.J.:** Now, fully three years after the institution of this action by AHAB, I have before me applications by the present defendants to strike it out.

2   Described compendiously, the basis for their strike-out applications is the complaint that AHAB has failed, by its proprietary tracing claim, to plead "a reasonable cause of action," but merely one that is "frivolous and vexatious" and so "has no hope of success." The proprietary tracing claims are those upon which AHAB's case primarily proceeds against the present

defendants. To the extent proven, they would have established that the assets of the present defendants are AHAB's property. Thus, the consideration is of pivotal importance to these strike-out applications, for reasons to be explained below. AHAB pleads other restitutionary and damage claims as well and these too will be discussed.

3   The strike-out applications are all in terms of the Grand Court Rules, O.18, where the well-known rules are set out.

4   AHAB's response, also described compendiously, is that it has pleaded a good arguable case, one already recognized and described as such in judgments of this court in interlocutory proceedings (the earliest of which is reported in 2010 (1) CILR 553, at para. 80).

5   To the extent its pleadings still lack particularization and specificity, AHAB asserts that, as parties who are "mixed up" in the fraud perpetrated against AHAB by their principal, Mr. Al Sanea, the present defendants have an obligation to give discovery of all information that may be relevant to assist AHAB's advisers in the more detailed and specific pleading of its claim. For this proposition, AHAB relies on *Arab Monetary Fund* v. *Hashim (No. 2)* (3) as applied by this court in *Grupo Torras S.A.* v. *Bank of Butterfield Intl. (Cayman) Ltd.* (20), and this is a proposition to be more fully considered below.

6   The history of this action is already well-documented in the several judgments of this court, and of the Court of Appeal, issued since the action was commenced. Those judgments dealt with the several interlocutory applications which have, however well intentioned, nonetheless beset the progress of the action to trial. These included an earlier strike-out application brought on behalf of the present defendants.

7   In that application, the basis for strike-out was said to be the deliberate and contumelious breach by AHAB of its disclosure obligations resulting in an abuse of the process of the court, as well as prejudice to the applicants. While a breach was admitted by AHAB, the threshold test for strike-out—the alleged abusive nature of the breach—was not established and so that application was dismissed. A detailed judgment (reported at 2011 (2) CILR 434) was delivered on December 2nd, 2011 ("the December 2011 judgment").

8   Considerable time and expense has also been spent in addressing jurisdictional and procedural challenges which have been unsuccessfully raised by the second defendant, Mr. Al Sanea. In those challenges, going all the way to the Privy Council, he insisted that AHAB should bring its claim against him not in this jurisdiction, but in Saudi Arabia.

9   Steps have also been taken by AHAB itself. Having successfully resisted Mr. Al Sanea's challenges, and having obtained default judgment against him in light of his failure to file a defence, AHAB also moved to

obtain an interim award of damages pending the final determination of the action. This too, however, was resisted by the present defendants. They argued unsuccessfully that an interim award should not be made against Mr. Al Sanea lest it result in inconsistent outcomes in the event the allegations raised against him, and which implicated them as his accessories, were not to be substantiated, as against them, ultimately at trial. That unsuccessful argument was addressed in a written judgment (reported at 2012 (1) CILR 335) delivered on June 12th, 2012 ("the June 2012 judgment"). It is the subject of an application now also raised before me by the present defendants for leave to appeal; an application which will be separately addressed in this judgment.

10    That is a brief overview of the already protracted history of this action. The following is an essential brief summary of the factual background. The action arises from allegations that Mr. Al Sanea abused his position of trust, in which he was placed by AHAB as managing director of AHAB's Money Exchange, the financial division of AHAB's extensive business interests in Saudi Arabia.

11    It is AHAB's pleaded case that, primarily by means of his forgery of the signatures of AHAB partners on hundreds of bank loan and letters of credit transactions, Mr. Al Sanea, over the course of several years, was able to obtain fraudulently, and misappropriate to his own purposes, funding from many banks to the order of magnitude of some US$9.2 bn. Further, that some US$6.2 bn. of the proceeds have been shown by forensic accounting investigations to have been used by Mr. Al Sanea to fund a conglomerate of investment companies called the SAAD Group, established by him in this jurisdiction. The present defendants are 16 members of the group. AHAB sues to recover the proceeds of the fraud in this action by way of its personal claim against Mr. Al Sanea, as well as by its proprietary tracing, restitutionary and damages claims against the present defendants.

**The present defendants**

12    The present defendants are, along with others of Mr. Al Sanea's SAAD Group of companies, now in compulsory winding up before this court.

13    AHAB, having obtained its default judgment and interim award personally against Mr. Al Sanea, must now establish its claims against the present defendants in order to succeed in the action by which it seeks to claim ahead of the proven creditors in the liquidation of the present defendants. These are, in the main, banking creditors who provided investment capital to them, some by way of secured loans.

14    Without a proprietary tracing claim, AHAB would be able to resort, as against the present defendants, only to its claim for damages and/or

equitable compensation or restitution, as pleaded at sections K5 and K6 of its amended statement of claim.

15    Those claims are based upon the allegations that the present defendants, by their dishonest assistance to, and conspiracy with, Mr. Al Sanea, were in knowing receipt of, and unjustly enriched by, AHAB's money which was misappropriated by Mr. Al Sanea from the Money Exchange. If proved at trial, those claims would allow AHAB to rank only as a judgment creditor, and thus, at best, *pari passu* with other unsecured creditors and behind the secured creditor banks.

16    However, if AHAB is successful in its proprietary tracing claims, given the US$6.2 bn. magnitude of those claims, the claims of all creditors would likely be entirely defeated. The assets which have been recovered by the liquidators would be insufficient to satisfy AHAB's proprietary claim, let alone those of the banks and other creditors.

17    The liquidators of the present defendants are therefore understandably concerned to know, and to know as soon as possible, whether AHAB's proprietary tracing claim could succeed. Hence, I am told, this application.

18    The present defendants are members of different sub-groups of Mr. Al Sanea's SAAD Group and have different liquidators.

19    The first sub-group comprises nine companies: the 1st, 8th, 30th–33rd and 35th–37th defendants. These companies have appointed, as their joint official liquidators, directors of Grant Thornton Specialist Services (Cayman) Ltd. They will be referred to as the GT defendants and their liquidators as the GTJOLs.

20    Most prominent among the GT defendants, from AHAB's point of view, are the first defendant, SAAD Investments Co. Ltd. ("SICL") and the eighth defendant, Singularis Holdings Ltd. ("SHL"). The information so far discovered by AHAB indicates that SICL and SHL were, as among the SAAD Cayman Group, primary recipients of funds, by way of shareholder contributions by Mr. Al Sanea, funds which AHAB alleges were misappropriated by him from the Money Exchange.

21    The second sub-group comprises six companies: the 13th–18th defendants, which are members of the AWAL sub-group. They will, as the context requires, be referred to herein as the "AWALCOs." The AWALCOs are also alleged to have received massive injections of capital by way of shareholder contributions from Mr. Al Sanea, using money misappropriated from the Money Exchange.

22    The third sub-group, comprising what may be described as the SAAD Investments Financial Companies, is that sub-group within which

the 34th defendant (and last of the present defendants), SAAD Investments Financial Co. (No. 5) Ltd. ("SIFCO 5"), comes.

### The challenge to the legal basis of AHAB's claim

23  The applicable law is not controversial as the principles of law relating to striking out are agreed by all. The challenge goes to the inadequacy of AHAB's pleaded case. The GT defendants, the AWALCOs and SIFCO 5 have each filed separate summonses but are seeking similar relief pursuant to GCR, O.18, r.19.

24  The GT defendants' summons seeks the strike-out of AHAB's claim on alternative bases:

(i) that the entire claim as against them be struck out as disclosing no reasonable cause of action and/or as being vexatious and/or because it prejudices or embarrasses the fair trial of the action, and/or because it is otherwise an abuse of the process of the court;

(ii) alternatively, that AHAB's alleged proprietary and/or tracing claims (as set out in para. 187 of the statement of claim) be struck out for the same reasons and on the same basis as in (i) above; or

(iii) in the further alternative, that the claim in para. 187 be struck out unless, within 28 days of so being directed by the court, AHAB gives full particulars which identify:

(a) which of the specific assets in the hands of the GT defendants it is alleged are subject to proprietary and/or tracing claims; and

(b) the precise basis upon which any such alleged proprietary and/or tracing claim arises in relation to those assets, by reference to the claim of recipients, individual transactions and/or individual transfers pursuant to which the assets identified in sub-para. (i) above are alleged to be the subject of AHAB's proprietary and/or tracing claim.

25  The AWALCOs' summons seeks an order that AHAB's claim be struck out as against them on the basis that it discloses no reasonable cause of action and/or that it is an abuse of the process of the court.

26  SIFCO 5, in its summons, more specifically seeks an order striking out:

(i) each and all of those paragraphs in AHAB's pleadings which assert claims against it, and/or

(ii) each and all of the allegations in particular paragraphs of the claims (that is, paras. 161, 166, 176–189 and the prayer);

in each case on the ground that the pleadings disclose no reasonable cause of action as against SIFCO 5 and/or are frivolous, vexations and abusive of the court's process.

27    Each summons also, of course, seeks the usual order as to costs.

28    While each summons invokes GCR, O.18, r.19, seeking similar relief, given the different roles played by the different sub-groups of companies within the SAAD Group, the basis upon and extent to which they are said by AHAB to be implicated in Mr. Al Sanea's fraud is differently factually premised. These strike-out applications must therefore be considered in the context of the different circumstances of each set of applicants, in particular the nature and manner of funding they are said to have received from Mr. Al Sanea.

**Pleadings in general**

29    It is axiomatic that a plaintiff must plead clearly all the facts necessary to give rise to its claim (see GCR, O.18, r.12). An insufficiency of pleading in regard to an important issue can result in the action being struck out.

30    The purpose of a pleading is to ensure that the parties and the court know what the matters in issue are. This is settled law, most recently reaffirmed by this court in *TMSF* v. *Wisteria Bay Ltd.* (37) (2007 CILR 310, at para. 18).

31    The requirement to give adequate particulars reflects the overriding principle that litigation, and particularly the trial itself, should be conducted fairly, openly, free from surprise and without unnecessary delay or expense. A clear discussion of this equally settled proposition is presented in *Aktieselskabet Dansk Skibsfinansiering* v. *Wheelock Marden & Co. Ltd.* (2).

32    In that judgment, delivered by Bokhary, J.A. on behalf of the Hong Kong Court of Appeal, the following passage of general applicability appears ([1994] 2 HKC at 269–270):

"... [T]here are a number of things which pleadings should do. Ideally, they would do them from the outset. In any event, they must do them by the time they have been properly particularized—whether particularized on the pleader's own initiative, upon the other side's request, or pursuant to the court's order.

What those things are is to be gathered from the decided cases. That exercise has been performed by the learned editors of the 1993 *Supreme Court Practice*. And, as one sees from note 18/12/2 at pp 307–308 of Vol 1 thereof, the things which properly particularized pleadings must do are to:

    (1)   inform the other side of the nature of the case they have to meet as distinguished from the mode in which that case is to be proved;

    (2)   prevent the other side from being taken by surprise at the trial;

    (3)   enable the other side to know what evidence they ought to be prepared with and to prepare for trial;

    (4)   limit the generality of the pleadings, the claim and the evidence;

    (5)   limit and define the issues to be tried, and as to which discovery is required; and the hands of the party so that he cannot without leave go into any matters not included (although if the opponent omits to ask for particulars, evidence may be given which supports any material allegation in the pleadings)."

33   The obligation that rests upon AHAB to give adequate particulars of its claim must also be considered as juxtaposed with the obligation resting upon the present defendants to give discovery. This discovery obligation must also be examined in this judgment, given the nature of AHAB's response to their strike-out application, as mentioned above.

**Discovery**

34   The obtaining of discovery of documents in a proper case always was, according to English Law, a right as between subject and subject. It is a right which continues to exist unless taken away by order of the court. Discovery is automatic upon close of pleadings and a party dissatisfied with the opponent's compliance with the rules may require him to swear an affidavit and, of course, may seek an order for discovery from the court in the usual way (see, generally, the editorial introduction to O.24 of the R.S.C. (1 *Supreme Court Practice 1999*, at 442–443) and GCR, O.24, rr. 1 and 2. A refusal or contumelious failure to meet this obligation can itself result in a party's case being dismissed: *TMSF* v. *Wisteria Bay Ltd.* (37).

35   The rules place a mutual obligation on parties to disclose documents which are, or have been, in their possession, custody or power relating to any matter in question between them in the action. The words "relating to any matter in question between them," do not refer simply to the subject-matter of an action, but to the questions in the action.

36   The concept is explained at paras. 24/12/11 in the *Supreme Court Practice* (*loc. cit.*, at 448–449):

"So, [for example] in an action for possession of land where the plaintiff's title is in question, [the words] refer to the title, not to the

land (*per* Lindley J. in *Philipps* v. *Philipps* (1879) 40 L.T. 815 at 821. They are not limited to documents which would be admissible in evidence (*Compagnie Fin. & Comm. du Pacifique* v. *Peruvian Guano Co.* (1882) 11 Q.B.D. 55, *per* Brett L.J. at pp. 62, 63; *O'Rourke* v. *Darbishire* [1920] A.C. 581 at 630) nor to those which would prove or disprove any matter in question; any document which, it is reasonable to suppose "contains information which may enable the party (applying for discovery) either to advance his own case or to damage that of his adversary, if it is a document which may fairly lead him to a train of inquiry which may have either of those two consequence," must be disclosed (*Compagnie Fin. & Comm. etc.* (1882) 11 Q.B.D. 55 at 63)."

37    The later case law also explains the proper limitations on the principle, clarifying the test of relevance for discovery purposes.

38    The formulation of the principle above, cited from *Compagnie Fin. & Comm. du Pacifique* v. *Peruvian Guano Co.* (12), was approved by the English Court of Appeal in *Taylor* v. *Anderton* (39), when it stated that the formulation was stated to make it clear that the definition of relevance was framed in the widest possible terms.

39    It may be noted that a more restricted approach was, however, proclaimed at first instance in *O. Co.* v. *M. Co.* (27), but that was a case in which it appears that the Court of Appeal's decision in *Taylor* v. *Anderton* was not cited.

40    In *O. Co.* v. *M. Co.*, the court criticized the formulation in *Compagnie Fin.* (12) as "excessively wide," stating, as quoted in the *Supreme Court Practice* (*loc. cit.*, at 449), that—

"the formulation must not in my judgment, be understood as justifying discovery demands which would involve parties to civil litigation being required to turn out the contents of their filing systems as if under criminal investigation merely in the off-chance that something might show up from which some relatively weak inference prejudicial to the case of the disclosing party might be drawn. On the contrary, the document or class of documents must be shown by the applicant to offer a real probability of evidential materiality in the sense that it must be a document or class of document which in the ordinary way can be expected to yield information of substantial evidential materiality to the pleaded claim and defence to it . . . If the document or class cannot be demonstrated to be *clearly* connected to issues which have already been raised in the course of the proceedings, or which would in the ordinary way be expected to be raised in the course of the proceedings, if sufficient information were available, the application [for discovery] should be dismissed."

41   These limitations upon the discovery obligations are, of course, nothing more or less than a re-affirmation of the court's long-standing refusal to allow the process of discovery to be used as a "fishing expedition." This is the way the concern was pointedly put by Mr. Lowe, Q.C., on behalf of SIFCO 5, in arguing that the unsatisfactory state of AHAB's pleadings would be an improper basis upon which to require the defendants to go to discovery. AHAB having not managed to particularize its proprietary tracing claim now three years since its inception, the parties should be saved the time and expense of going to the discovery phase of the action. This, in the end, and as will be explained below, became the real practical issue to be resolved as I see the case as it is presently positioned.

**Proprietary tracing**

42   It is for its admitted failure to plead, with full particularity and specificity, the basis upon which AHAB alleges that assets held by the present defendants are, or represent, its assets that the defendants say AHAB's claim should be struck out.

43   Having pleaded its proprietary claim, AHAB will not succeed unless it can trace the funds misappropriated by Mr. Al Sanea into the assets held by the present defendants, and what is ultimately required of AHAB's pleadings, therefore, is that AHAB explains how this tracing exercise can be done. This too is uncontroversial as a matter of legal principle.

44   As Millett, L.J. said in *F.C. Jones & Son (A Firm)* v. *Jones* (15) ([1997] Ch. at 169–170), tracing is the process ". . . by which the plaintiff establishes what has happened to his property and makes good his claim that the assets which he claims can properly be regarded as representing his property."

45   The pleading of a tracing claim must ultimately, moreover, be distinguished from one based more simply and directly on "following," the exercise that involves a process whereby an owner recovers his property identified as his in the hands of another. "Tracing"—the exercise upon which AHAB must rely in the case if it might succeed—on the other hand "identifies a new thing as the potential subject matter of a claim, on the basis that it is the substitute for an original thing which was itself the subject matter of a claim" (see Smith, *The Law of Tracing*, 1st ed., at 6 (1997)).

46   Given the complex corporate chain through which moneys from the Money Exchange would have been passed before reaching the present defendants, and the multiplicity of likely transactions involved, AHAB does not claim to be able to "follow" its money.

47  There is yet a further distinction to be drawn in this regard: that between reliance on tracing and reliance on the so-called "swollen assets" theory. As Smith also explains (*op. cit.*, at 270):

"'Swollen Assets' is shorthand for approaches which de-emphasize the necessity for a claimant to trace beyond the point of receipt by the defendant . . . The idea is that showing the receipt amounts to showing that the assets of the defendant were augmented or swollen; and that it is not necessary to conduct the normal tracing exercise to permit a conclusion that the defendant remains enriched [and so liable to make restitution to the plaintiff]."

48  The notion that the swollen assets theory, instead of tracing, may be relied upon to prove a proprietary claim has been disapproved in the case law, a position already noted and recognized in the December 2011 judgment (2011 (2) CILR 434, at para. 36).

49  When the foregoing principles are applied, it becomes clear that the alleged proprietary and/or tracing claims asserted by AHAB are critical to its case against the present defendants and this is already recognized by this court. As is recorded in the December 2011 judgment (*ibid.*, at para. 3):

". . . AHAB's claim may be described in general terms as a personal claim against Mr. Al Sanea in respect of his fraudulent and unauthorized misappropriations and a proprietary claim against his Cayman companies in respect of moneys which they obtained—or assets representing those moneys—as being or as representing the property of AHAB."

50  Thus, it can also be said that the specific basis upon which AHAB must particularize its claim has already, for more than a year now, been brought to its attention by this court.

51  Indeed, the rules themselves of tracing explain the need for clarity of pleading. As Lord Millett explained in *Foskett* v. *McKeown* (17) ([2001] 1 A.C. at 127–128 (after explaining the distinction between "tracing" and "following"):

"Tracing is the process of identifying a new asset as the substitute for the old. Where one asset is exchanged for another, a claimant can elect whether to follow the original asset into the hands of the new owner or to trace its value into the new asset in the hands of the same owner . . .

Tracing is thus neither a claim nor a remedy. It is merely the process by which a claimant demonstrates what has happened to his property, identifies its proceeds and the persons who have handled or received them, and justifies his claim that the proceeds can properly be

regarded as representing his property. Tracing is also distinct from claiming. It identifies the traceable proceeds of the claimant's property. It enables the claimant to substitute the traceable proceeds for the original asset as the subject matter of his claim. But it does not affect or establish his claim."

52    And so, although the fact that a wrongdoer has misappropriated another's property (as alleged here against Mr. Al Sanea) is necessary to create the plaintiff's claim, the fact that such a claim exists does not automatically mean that the plaintiff can trace; tracing can only occur when the plaintiff can prove (the burden being on it) that some property held by the misappropriator, or his accomplice, represents the substitute of what was once his asset (see Smith, *op. cit.*, at 270).

53    As Clarke, J. further explained in *OJSC Oil Co. Yugraneft* v. *Abramovich* (28) ([2008] EWHC 2613 (Comm), at para. 349), three distinct premises must be established.

54    First, in order to be able to trace property, it is necessary for a plaintiff to identify property of his which has been unlawfully taken from him (that is, "a proprietary base").

55    Secondly, that that property has been used to acquire some other new identifiable property. The new property may then itself have been used to acquire another identifiable asset (that is, "a series of transactional links").

56    Thirdly, the chain of substitutes must be unbroken. This is in the sense that the unbroken chain of transactional links leads to new, identifiable property which has ended up in the hands of the defendant.

57    The main thrust of the arguments of the GT defendants and the AWALCOs is that AHAB's case falters at the first premise as it can show no "proprietary base" for its claim. This is an argument that SIFCO 5 also endorses, along with its further arguments presented by Mr. Lowe, which go as well to the second and third premises of the tracing principle, as explained by Clarke, J., that is, the lack of an unbroken series of transactional links which could lead to property now found in the possession of SIFCO 5.

58    The arguments as to the lack of the first premise—the absence of the proprietary base of AHAB's claim—are prompted by a fairly recent event of disclosure in this case, an event itself the subject of the earlier strike-out application and the December 2011 judgment.

59    Essentially, that recent disclosure (*circa* June 2011)—which first came to light in the form of so-called "N Files," disclosed in proceedings in London brought by certain banks against AHAB—revealed that significant amounts of borrowings undertaken by Mr. Al Sanea on AHAB's behalf through the Money Exchange had been authorized. This led to the

immediate and untimely collapse of AHAB's defence in the London proceedings, which, until then, had been premised on the basis that borrowings from those banks by Mr. Al Sanea were all unauthorized by AHAB and that Mr. Al Sanea had neither actual nor ostensible authority to bind AHAB, as its agent, to the loan agreements with those banks.

60    AHAB's concession was that the worldwide freezing order, which had been granted by this court in AHAB's favour over all of Mr. Al Sanea's assets (including any held by the present defendants), had been improperly obtained on the asserted basis that all borrowings had been unauthorized by AHAB.

61    The proprietary base of AHAB's claim, as originally pleaded, equally depended upon the assertion that all borrowings had been unauthorized and the extent of the purportedly unauthorized borrowings are listed in Schedule 6 of the statement of claim, showing a total of some SAR34 bn., or US$9.2 bn., the total sum allegedly misappropriated by Mr. Al Sanea.

62    The distinction between authorized and unauthorized borrowings is said by the present defendants to be fundamental to the proprietary base of AHAB's tracing claim. This is for the asserted reason that, to the extent that borrowings by Mr. Al Sanea were authorized by AHAB, funds derived from them, and transferred by Mr. Al Sanea to the present defendants (whether as shareholder contributions or otherwise), must be regarded as having taken place with the knowledge and approval of AHAB. Such funds, if regarded as the proceeds of authorized borrowings by Mr. Al Sanea, cannot now be regarded as AHAB's property so as to provide a base for its proprietary tracing claim.

63    What is more, the argument goes (according to the written submissions of Mr. Smith, Q.C. on behalf of the AWALCOs):

> ". . . [A]n *approved* loan will have had some approved purpose. It cannot be said that, by using the lent money, Mr. Al Sanea was *ipso facto* misappropriating it. The question of misappropriation would turn on the purpose of the loan, which will have to be investigated. To the extent that Mr. Al Sanea used money for its authorized purpose, then all questions of misappropriation must go out of the window, and the claim against Mr. Al Sanea (and so the claims against the other defendants) would fail."

64    The argument continues that AHAB must now therefore specify that borrowing which was authorized and that which was not. Having failed to do so (notwithstanding an attempted amendment of its pleadings since the N File disclosure came to light), AHAB can point to no property that was unlawfully misappropriated by Mr. Al Sanea and so to no proprietary base for its tracing claim.

65   Mr. Crystal, Q.C. put the argument in this way on behalf of the GT defendants:

> "A plaintiff cannot begin to conduct a tracing exercise without first identifying the property to which his claim relates and explaining why that particular property is capable of being the subject of a proprietary claim (that is, by identifying the property that has been appropriated and the reasons why the alleged appropriations were unlawful). AHAB has failed to do this.

> In particular, it is now clear from the N Files that very substantial payments to Mr. Al Sanea were authorized by AHAB. In this latest evidence to the Grand Court, Saud [Algosaibi] accepts that Mr. Al Sanea had authorization to borrow substantial sums from the Money Exchange. Paragraph 47 of his affidavit, dated September 10th, 2011 ('Saud 4') states as follows:

>> 'As to Mr. Al Sanea's borrowing from the Money Exchange, I have previously said in evidence prepared for the English Commercial Court proceedings that, whilst I was aware at about this time (2001/2002) that Mr. Al Sanea had borrowed from the Money Exchange, I never knew the amount of the borrowing, or, at any rate, I had no recollection of the amount (see para. 56 of my second witness statement and para. 95 of my third witness statement to the English proceedings).

>> In light of the information contained in the work sheet, I must accept that at least in 2001/2002, I was aware of the amount, and that I believed it to be in the region of SAR4 bn. (gross), albeit that I subsequently forgot this (that is, that the amount was somewhat in excess of US$1 bn., not SAR1 bn. [as had been believed]).'

> Saud goes on to state in Saud 4, at para. 58 that—

>> 'it was also my understanding that Mr. Al Sanea was not continuing to take money from the Money Exchange. I was told (by Mr. Al Sanea, but also, I believe, by Mr. Badr [a Money Exchange employee]) that Mr. Al Sanea had made repayments of his indebtedness, which I took to confirm my understanding. I did not check those representations of repayment, but I had no reason to doubt that they were true at the time.'"

66   Given that state of AHAB's evidence, Mr. Crystal submits that in the absence of AHAB saying which transactions with Mr. Al Sanea were "authorized" and which were "unauthorized," AHAB can have no proprietary tracing claim; the "proprietary base" cannot be established.

67   Further, Mr. Crystal submits that AHAB's amended statement of claim does not remedy this fundamental problem. Indeed, the amendments recognize the existence of substantial authorized borrowings by Mr. Al Sanea from the Money Exchange.

68   The ongoing failure is that there is no attempt to identify which specific borrowings by Mr. Al Sanea were authorized. Plainly, says Mr. Crystal, discovery from the GT defendants will not assist AHAB in identifying the property it is alleged has been unlawfully taken from it. It is only AHAB who can identify the "proprietary base" for its case. This is particularly so now that Mr. Al Sanea will be under no obligation to provide discovery to AHAB (it having now obtained the default judgment against him).

69   Pointed criticisms of the amended statement of claim itself are made in this regard.

70   It is said that para. 99.0(d) simply asserts that any documents signed by Sulaiman Algosaibi (the head of the family then in charge of AHAB) after September 30th, 2000 were signed on the understanding that the moneys so advanced would "be used for the benefit of the Money Exchange, and would simply replace or refinance (without increase) the already existing borrowings of the Money Exchange." (This has come to be called the "new-for-old" borrowing policy.)

71   And further that—

". . . if, and to the extent that, the advance was used for that purpose, then AHAB accepts, for the purpose of the proceedings, that Mr. Al Sanea was authorized to arrange the facility. If, however, the advance was used for some other purpose and, in particular, if it was used to fund misappropriations to Mr. Al Sanea, then Mr. Al Sanea was not authorized to arrange the facility."

72   It must be recognized that this is rather equivocal pleading. Paragraph 99.0(d) does not state what the existing borrowing of the Money Exchange was at the time of Sulaiman Algosaibi, nor what its purpose was. Nor does para. 99.0(d) identify the loan facility agreements in question. In particular, it fails to identify what facility agreements were signed by Sulaiman Algosaibi, or executed under his signing authority, after September 30th, 2000 and so to be regarded as authorized only for the purposes of the new-for-old borrowing, that which is said by AHAB to have been the only kind of borrowing for which Mr. Al Sanea was authorized after that date. Neither, for that matter, does the amended statement of claim identify which facilities were used to fund the alleged misappropriations by Mr. Al Sanea.

73   Not apparently being able to identify and particularize the proprietary base of its claim, it must follow, goes the argument, that AHAB has failed

to identify specific assets in the hands of the GT defendants (and other present defendants) and the precise basis upon which any alleged proprietary and/or tracing claim arises in relation to those assets. No link is pleaded between the money Mr. Al Sanea is said to have misappropriated from AHAB and the money that Mr. Al Sanea is said to have paid to the GT defendants.

74   Nor, it is said, do the pleadings which allege "shareholder contributions" to SICL and SHL (and to AWAL Bank as well) by Mr. Al Sanea assist AHAB's case. Those pleadings are in sub-paras. 188.1 and 188.2 of the amended statement of claim, where it is alleged that contributions of US$2,318m., US$3,000m. and US$1,250m., allegedly paid respectively to SICL, SHL and AWAL Bank by Mr. Al Sanea, are moneys to which AHAB has equitable title, having been received by those entities subject to a constructive trust in favour of AHAB. Indeed, para. 188 is that which is proffered as the particularization of para. 187, which avers that—

"AHAB was, and remains, the equitable owner of the money misappropriated from the Money Exchange, as pleaded in Section E above. It is entitled to trace those moneys into and through the hands of the recipients and claims an account from Mr. Al Sanea, SICL, the SIFCOs, Singularis, AWAL Bank, the AWALCOs, SAAD Air and AWAL Trust Company of the receipt of and use of the moneys."

75   It is said by Mr. Crystal that, even if such shareholder contributions can be proven by AHAB, the proprietary base and transactional links to prove that they were paid with AHAB's money has not been pleaded nor will likely be established by AHAB. This is because the alleged contributions would necessarily have been paid to SICL and/or SHL (and/or AWAL Bank) by Mr. Al Sanea, or some third party, and not by AHAB directly.

76   In such a scenario, the alleged misappropriated money may have been mixed with Mr. Al Sanea's money, to which AHAB will not be entitled. Thus, the "transactional links" would also have been broken.

77   Moreover, said Mr. Crystal, the GT defendants were themselves funded by third party banks. For example, on August 24th, 2007, SICL entered into a US$2,815m. facility agreement with Barclays Bank PLC, acting as agent for a syndicate of banks, and that facility was drawn down in three tranches: (i) US$2.1 bn. on August 31st, 2007; (ii) US$500m. on April 3rd, 2008; and (iii) US$215m. on January 2nd, 2009. SICL's indebtedness under this facility agreement formed the basis for its winding up at the instance of the syndicate banks and it is above the claims of these banks that AHAB seeks priority.

78   All of this will, of course, ultimately have legal consequences for AHAB's proprietary claim.

79   As already shown, it is a fundamental feature of the doctrine of tracing that the property to be traced has to be identified at every stage of its journey through life and that it can be identified as property to which a fiduciary obligation still attaches in favour of the person who traces it (*Borden (UK) Ltd.* v. *Scottish Timber Prods. Ltd.* (8) ([1981] Ch. at 46), *per* Buckley, L.J. Although stated in a case dealing with the impossibility of tracing resin so as to recover it after it had been mixed with other products to create chipboard, this *dictum* has stood as having general applicability to tracing claims).

80   The consequence, says Mr. Crystal, is that tracing is no longer available where it is not possible to show that an asset or fund in a defendant's possession represents the plaintiff's money (for example, where a plaintiff's money is paid into an overdrawn bank account which is not an asset but a liability): *In re Goldcorp Exchange Ltd.* (18) ([1995] 1 A.C. at 104–105, *per* Lord Mustill) and *Shalson* v. *Russo* (33) ([2005] Ch. 281, at para. 140, *per* Rimer, J.).

81   And once a right to trace has been lost, it is extinguished (*OJSC Oil Co. Yugraneft* v. *Abramovich* (28) ([2008] EWHC 2613 (Comm), at para. 353), *per* Clarke, J.).

82   Further, once a plaintiff's assets have been mixed with the defendant's assets, the plaintiff will not usually be entitled to subsequent additions to the mixture made by the defendant, unless the defendant intended them to be made for the benefit of the claimant (and so designated them): *In re Goldcorp Exchange Ltd.* (18), applying *James Roscoe (Bolton) Ltd.* v. *Winder* (22). See also *Bishopsgate Inv. Management Ltd.* v. *Homan* (6).

83   Accordingly, in the absence of a specific identification of property, a plaintiff can have no proprietary claim. AHAB's difficulty with its claim in this regard is already recognized by this court. As stated in the December 2011 judgment (2011 (2) CILR 434, at para. 17):

"In the absence of specific identification of property, a plaintiff can have no proprietary claim. A plaintiff has to identify his original proprietary right in respect of particular assets and then show that there is a nexus or causal link between the stolen property and the assets being claimed. Without that link no proprietary tracing can be established: see, for instance, *Serious Fraud Office (Director)* v. *Lexi Holdings Plc* . . . ([2009] Q.B. 376, at paras. 49–50, *per* Keene, L.J.)."

84   It was also already recognized in the December 2011 judgment (*ibid.*, at para. 18), that neither is it open to a plaintiff to overcome an inability to trace its specific property by instead asserting a general property right to,

or lien over, assets of a defendant on the basis of the so-called "swollen assets theory" (already discussed above at para. 47 of this judgment).

85   This aspect of the principle is of application and generally relied upon by all the present defendants but is of particular significance now to SIFCO 5 for the following reasons.

86   As its defence shows, SIFCO 5 was an SPV established for *bona fide* commercial reasons in order to acquire interests in private equity vehicles. It was established to implement a commercial agreement between SICL and Barclays Capital, a division of Barclays Bank PLC ("Barclays") which provided refinancing of SICL's interest in a portfolio of private equity funds. And, as taken from para. 8.4 of SIFCO 5's defence:

"SIFCO 5 did not receive any funds directly from Mr. Al Sanea or from AHAB or the Money Exchange . . .

   (a)   It received very significant funding from sources which . . . did not or could not have been involved in any fraud on AHAB . . .

   (c)   In respect of payments of money received from SICL (which amounted to at least US$68.7m.), SIFCO 5 relies on (i) the terms of the [financing agreement] under which Barclays paid SICL the sum of US$70m. for the financing of the [Investment] Funds Platform; and (ii) that capital calls made in respect of the Funds Portfolio over the lifetime of SIFCO 5 amounted to *circa* US$82.9m. It is inferred that the cash payments from SICL were funded largely by money from Barclays and were used to meet the ongoing capital calls.

   (d)   In respect of the claims for knowing receipt [in AHAB's statement of claim], AHAB is required to prove that (i) the Funds Portfolio, as transferred to it by SICL, was AHAB's traceable property and that it remained such notwithstanding the contribution of capital from Barclays and other sources; and (ii) it is denied in any event that SIFCO 5 had the requisite knowledge such that AHAB can found such a claim. In particular, it is denied that the knowledge of Mr. Al Sanea is that of SIFCO 5."

87   AHAB's reply to SIFCO 5's defence remains essentially in terms of para. 11.2 of its reply, thus:

"AHAB contends that since SIFCO 5, on AHAB's case, received the proceeds of Mr. Al Sanea's fraud by way of capital or shareholder contributions (to SICL and then by SICL to SIFCO 5), it was, or should be, treated as having been enriched in the Cayman Islands,

that being the place where SICL and SIFCO 5 were incorporated and maintained their share registers."

88    Thus, Mr. Lowe's criticism—that the entire edifice of AHAB's claim against SIFCO 5 is based on an inference that Mr. Al Sanea "must have . . . through SICL" (to quote from para. 161 of AHAB's statement of claim) paid misappropriated money to the SIFCOs by way of "equity capital used to purchase investments"—is justified.

89    Seen in that light, the proprietary tracing claim is based on nothing more than a theory that the assets of SIFCO 5 must have been swollen by receipt of AHAB's money paid into SICL by Mr. Al Sanea and passed on down to SIFCO 5.

90    As explained above, and more fully in the December 2011 judgment in respect of SIFCO 5, that is not a proper basis on which to mount a proprietary tracing claim.

91    Given that SIFCO 5 must be regarded as having pleaded its receipts with full particularity to the best of its JOLs' ability (as they are officers of this court), I see no prospect of AHAB being able successfully to plead a proprietary tracing claim against SIFCO 5, and for that reason am compelled to accede to SIFCO 5's summons where it seeks strike-out on the basis that the proprietary tracing claim is frivolous and vexatious, disclosing no reasonable cause of action. See *Kalley* v. *Manus* (23) and *Grupo Torras S.A.* v. *Bank of Butterfield Intl. (Cayman) Ltd.* (20), where it is explained that a case will be struck out if it can be shown to have no basis in incontrovertible fact.

92    Nor does AHAB's case against SIFCO 5 based on knowing receipt fare any better. AHAB has pleaded no facts to show that Mr. Al Sanea's knowledge should be attributable to SIFCO 5.

93    It is fundamental that a pleading, if it is not to be merely embarrassing to a defendant (and so also an abuse of process), should state the facts which will put those against whom it is directed on their guard and tell them what is the case which they will have to meet (see *Philipps* v. *Philipps* (29)). No averment can be omitted which is essential to the claim succeeding. Mere assertion will not suffice (see *TMSF* v. *Wisteria Bay Ltd.* (37)).

94    An allegation of bad faith, for example the denial that a person is an innocent purchaser for value (as SIFCO 5 claims in its defence to be in respect of the funding received from SICL), must be specifically and distinctly pleaded with the utmost particularity. The claims in knowing receipt require proof of knowledge of dishonesty in relation to each receipt: *Belmont Fin. Corp. Ltd.* v. *Williams Furniture Ltd.* (5).

GRAND CT.                    AHAB V. SAAD INVS. (Smellie, C.J.)

95    AHAB's only allegation against SIFCO 5 has been, and remains, that
SICL provided its equity capital (para. 153 of the statement of claim).
AHAB has not identified any receipt of its money and is unlikely to be
able to do so, given the nature of the third party funding known to have
been received by SIFCO 5. There is no evidence that any other funds
received by SIFCO 5 are the product of AHAB's funds received by SICL.
The paucity of the pleadings against SIFCO 5 was already the subject of
comments made in the December 2011 judgment (2011 (2) CILR 434, at
paras. 53–55). Then, the view was expressed that, at that stage of
proceedings, it was too early to strike out AHAB's case against SIFCO 5
for lack of particularization and that SIFCO 5, if so advised, could later
bring an application for summary judgment.

96    Now, the picture—after AHAB has amended its statement of claim
without advancing its claim against SIFCO 5—has crystallized more
clearly in its favour and in favour of the indisputably innocent party—
Barclays—who provided its known financing.

97    For those reasons, I grant the application from SIFCO 5 that AHAB's
case against it be struck out in its entirety.

98    The same result does not necessarily follow, however, in respect of
AHAB's proprietary tracing claims against the GT defendants and the
AWALCOs.

99    As direct recipients allegedly of some US$6.2 bn. from Mr. Al Sanea
by way of capital contributions, their position is very different from that of
SIFCO 5.

100    A further basis for AHAB's claim against them, addressed specifi-
cally to the "lack of proprietary base" and "broken transactional links"
arguments, was presented by Mr. McQuater, Q.C. by reliance upon the
authority of *Sinclair Invs. (UK) Ltd.* v. *Versailles Trade Fin. Ltd.* (34). The
well-established principle discussed in the case is most clearly explained
by Lord Neuberger, M.R. (as he then was) ([2011] 4 All E.R. 335, at para.
138):

"I do not doubt the general principle, reiterated by Lord Millett in
*Foskett* v. *McKeown* . . . that, if a proprietary claim is to be made
good by tracing, there must be a clear link between the claimant's
funds and the asset or money into which he seeks to trace. However,
I do not see why this should mean that a proprietary claim is lost
simply because the defaulting fiduciary, while still holding much of
the money, has acted particularly dishonestly or cunningly by creat-
ing a maelstrom. Where he has mixed the funds held on trust with his
own funds, the onus should be on the fiduciary to establish that part,
and what part, of the mixed fund is his property."

101   By reference to that principle, Mr. McQuater argued that—

"it is . . . already arguable that [AHAB's] inferential case is strong enough such that the burden shifts to the defendants in liquidation to prove that assets are not derived from our money, because Mr. Al Sanea created a black hole, or a maelstrom, if there is one. And even if our inferential case is not yet sufficiently strong for that, following discovery, it may be."

102   This is of course presented here on the further premise that the defendants in liquidation stand, as Mr. Al Sanea's alter egos, in the same position as the archetypal "defaulting fiduciary" of Lord Neuberger's *dictum*.

103   Mr. Crystal's response is that the circumstances of AHAB's pleaded case do not permit of reliance upon the principle from *Sinclair Invs*. (34). He submits that the quoted principle is authority for the proposition *only* that where a trustee has mixed and confused property which he held in a fiduciary character with his own property, so that they cannot be separated with perfect accuracy, then the *onus* is on the trustee to distinguish the separate assets and, to the extent he failed to do so, they belonged to the trust.

104   Thus the principle can have no application to the present case because it applies only where the plaintiff is seeking to trace into property held by the "defaulting fiduciary" himself. No allegation is made in the present case that the GT defendants owed fiduciary duties to AHAB, only that Mr. Al Sanea owed fiduciary duties to AHAB. Rather, the allegation made against the GT defendants is that they were the recipients of moneys misappropriated by Mr. Al Sanea. *Sinclair Invs*. does not support the proposition that the burden of proof is reversed in such a situation.

105   Assuming, for present purposes only, that Mr. Crystal is correct in this argument, I must nonetheless turn to consider the evidence relied upon by AHAB in support of its proprietary tracing claim against his clients, the GT defendants.

106   It comes primarily from Mr. Simon Charlton's eighth affidavit. He is the senior Deloitte accountant who heads AHAB's forensic investigation team.

107   This is evidence upon which AHAB relies, by way of inference, for the proprietary base of its tracing claim that its property was received by the GT defendants (and AWALCOs) and, if given the proper disclosure that their JOLs are obliged in law to give (see paras. 34–41 above) will allow AHAB to develop its pleadings of the transactional links, leading to identification of its property still in the hands of their JOLs. As a matter of the law of discovery, this is a proposition in support of which Mr. McQuater placed strong reliance on *Grupo Torras S.A.* v. *Bank of*

GRAND CT.                    AHAB V. SAAD INVS. (Smellie, C.J.)

*Butterfield Intl. (Cayman) Ltd.* (20) as that case applied *Arab Monetary Fund* v. *Hashim* (3).

108    In *Grupo Torras*, as in this case, the allegation centred on fraudulent breaches of trust by which the plaintiffs, agencies of the Kuwaiti Government, were defrauded of hundreds of millions of dollars, some of which was traced to a Cayman Islands trust established by the fraudster, Sheikh Fahad Al-Sabah, giving rise to the inference that further large amounts had likely been secreted away by him into that and other trusts established in other jurisdictions. Among other claims, Grupo Torras brought a proprietary tracing claim against Sheikh Fahad's trusts. Upon the defendants' application to strike out the claim for lack of a reasonable cause of action, it was held, *inter alia* (as stated in the headnote to the case in *The Cayman Islands Law Reports* (2000 CILR at 442)), that—

> "although, in order to succeed at trial, the plaintiffs would have to prove the precise path by which their moneys were acquired by the defendants, it was unnecessary [at that interlocutory strike-out stage] for them to be able to do so. Rather, they needed only to show that the defendants held property identifiable (with the benefit of discovery) as representing their moneys. In the interests of justice they were entitled to expect the co-operation of the court and would be permitted to proceed so as to obtain the means of particularizing and proving their claims, if necessary by working backwards, tracing from the defendants' assets to themselves. The defendants, who had become [as trustees of Sheikh Fahad's trusts] "mixed-up" in their grantor's fraud, had a duty to assist them by giving full information, and would not be permitted to use the rules of pleading to defeat arguable claims."

109    As in the present case, in *Grupo Torras* (20) I was faced with the question of whether the plaintiffs' proprietary tracing claim was unsustainable for lacking what is here identified as the "proprietary base" and so should be struck out. This became a matter of what reasonable inferences could be drawn.

110    I am recorded as having said the following (2000 CILR at 446–447):

> "Can the wider claim in tracing or unjust enrichment be sustained? The answer to that question would depend on whether the inferences which the pleadings invite are themselves *prima facie* sustainable. In answering that question and having regard to authority (see *CH Ltd.* v. *F* . . .), I consider it would be inappropriate to seek a definite answer at this stage to the further question whether the plaintiffs, at trial, will ever be able to present the evidence necessary to prove those inferences to the appropriate standards.

229

Given the known and relevant background to the pleadings, I can find no basis for concluding that they obviously will not be able to do so. It is a matter of procedure and evidence. Now that the pleadings are settled and the issues may be fairly joined, there is already, to my mind, sufficient to allow the plaintiffs to invoke the course of discovery which the court may properly direct.

For the following reasons, I consider that the statement of claim, in paras. 18 and 19, invites inferences which are reasonable and, as a matter of meeting the formal requirements of pleadings, sufficient to disclose the aforesaid cause of action."

111   Then followed a listing of the circumstances giving rise to the inference that the defendants may have been in receipt of moneys or assets representing the proceeds of Sheikh Fahad's fraud.

112   First, among that list of circumstances, and in striking similarity to the relationship which Mr. Al Sanea, as the fraudster, is said to have enjoyed with AHAB here, was the following (*ibid.*, at 447):

"As their chief executive officer, Sheikh Fahad was the plaintiffs' fiduciary. Thus fiduciary obligations still attach to all of the plaintiffs' money stolen by him and passed on by him to any person or entity: see *Borden (U.K.) Ltd. v. Scottish Timber Prods. Ltd.* . . ."

113   In the same way, Mr. McQuater urges me to accept here that AHAB may rely upon the inferences, those already arising from the evidence it has adduced and disclosed (and which even earlier in the judgments of this court were found to show a good arguable case); the same inferences which point irresistibly to a proprietary base for AHAB's moneys being comprised in the massive capital contributions made by Mr. Al Sanea to his Cayman companies, including the present defendants. It is the irresistible inference, says Mr. McQuater, that those contributions—to the tune of US$6.2 bn.—must, from all the known circumstances, have been AHAB's moneys borrowed from banks or otherwise obtained and then misappropriated by Mr. Al Sanea through the Money Exchange.

114   When paid over to the GT defendants and AWALCOs, by way of capital contributions, those moneys were still attached with the fiduciary obligations which they carried.

115   Mr. Crystal would have me distinguish *Grupo Torras* (20) from this case primarily on the basis that there, unlike in the present case, the plaintiffs were already able to identify specific property paid into Sheikh Fahad's trust (some US$2.2m.) which they could trace as their property.

116   Moreover, no question arose in *Grupo Torras* as to significant sources of third party funding available to the defendants as is the case here. The court's decision in *Grupo Torras* was based on the reasonable

inference, specific to the facts of that case, that Sheikh Fahad's trust would likely have been the recipient of further proceeds of the fraud. No comparable inference arises in this case, says Mr. Crystal.

117   But further evidential basis for the "strong inferential case" of the existence of the proprietary base of AHAB's claim is said by Mr. McQuater to be now provided by Mr. Charlton's eighth affidavit. In summary:

(1) AHAB applied to the US District Court for the Southern District of New York for judicial assistance pursuant to 28 U.S.C., §1782 in order to obtain documents from various US banks. Against the strong opposition of those banks, AHAB eventually obtained 17,000 pages of account statements and 1,200 pages of account-opening and know-your-customer materials. Because of the difficulty in obtaining the documents, and certain restrictions on their use, Deloitte's analysis of the materials is not yet complete. Mr. Charlton explains (at paras. 10–25) that the documents have gone a long way to evidence the transfer of moneys misappropriated by the use of fraudulent letters of credit ("LCs") (as described in section E4 of the statement of claim) from TIBC (described below) and the Money Exchange to STCC, the principal SAAD Group company controlled by Mr. Al Sanea. STCC was based in Saudi Arabia and is shown to have been the direct recipient of some US$6 bn. as the proceeds of LCs, cheques, cash withdrawals and electronic transfers from the Money Exchange (see para. E.1.62 of the amended statement of claim). The SAAD Group's own statements and the financial records relating to the lending banks are now required in order to trace the transfers further, says Mr. Charlton. Further requests under §1782 are also pending. (For its part, it is to be noted that TIBC was a bank promoted and operated in Bahrain by Mr. Al Sanea as an AHAB entity and itself now the subject of criminal investigations and proceedings in Bahrain. (It is one of the more remarkable features of this case that the current AHAB partners disclaim any detailed knowledge of TIBC's operations.))

(2) AHAB has initiated a claim against the Saudi bank SABB with the Saudi Arabian Monetary Authority Committee (SAMA) seeking, *inter alia*, a complete set of bank and portfolio account statements and account-opening documents and cheques. SABB was a banker to the Money Exchange and Mr. Al Sanea used the SABB account in order to draw the fraudulent cheques, as described in section E3 of the statement of claim (at a rate of US$1m. or more per day). It is clearly a central part of the tracing exercise to identify the recipients of those cheques, which was the largest single mechanism of misappropriation used by Mr. Al Sanea. SABB has consistently resisted providing the information but AHAB is pursuing its claim in SAMA.

(3) In connection with proposed criminal proceedings in Switzerland, AHAB obtained through the Swiss *procureur* (prosecutor), *inter alia*, account statements from financial institutions holding funds frozen pursuant to the *procureur*'s attachment order. Those included 32 files of (hard copy) documents from Citibank. From an analysis of those documents, the Deloitte investigation team was able to identify 110 transactions with AHAB which result in a net cash outflow of funds (within this particular portfolio), amounting to approximately US$223m., from AHAB to SICL. All of these transfers have been traced and matched with the Money Exchange's Bank of America account statements. On review of one of SICL's bank accounts with Deutsche Bank, in Geneva, the investigation team has also found US$50m. from the Money Exchange transferred to that account. These are clearly highly significant findings as they appear to show direct, and therefore easily traceable, payments from AHAB to a defendant in liquidation, SICL.

(4) The investigation team also noted two significant payments of US$50m., each in 2006, into SICL's Citibank account from STCC (Mr. Al Sanea's principal business in Saudi Arabia). As set out in para. 63 of the amended statement of claim, cheque payments (totalling US$2,185m.), LC payments (totalling US$2,030m.) and withdrawals (totalling US$560m.), were regularly made from the Money Exchange for the benefit of STCC. These two further huge payments of $50m., each from STCC to SICL, indicate a further potential link between funds from the Money Exchange benefitting one of the present defendants.

118   Mr. Charlton set out (at paras. 48 and 49) some further investigations still to be conducted, including production of the banking records for the accounts set out in Schedule A of his affidavit, which may in due course be obtained from the banks; further Swiss bank records, which may be obtained from the *procureur*; and continued efforts to obtain documents through SAMA from SABB in Saudi Arabia.

119   At the end, however, says Mr. McQuater, the records obtainable from third parties are at best an indirect means of finding out what happened within the SAAD Group. It is the SAAD Group's own records which should show the money flows directly.

120   Despite that state of the evidence potentially in support of the existence of a proprietary base of AHAB's tracing claim, the GT defendants (says Mr. Crystal) emphasize four reasons in particular why AHAB's claims should nevertheless be struck out now, before discovery.

121   First, they say (at para. 82(1)(i) of the written submissions) that AHAB "now accepts that at least some of the money borrowed by Mr. Al Sanea from AHAB was authorized," referring to the N Files disclosure. But, says Mr. McQuater, that is a mischaracterization of AHAB's case and it confuses the difference between unauthorized borrowings on behalf of

the Money Exchange and unauthorized or misappropriated payments away from the Money Exchange. AHAB's case is that *all* of the payments away from the Money Exchange to the SAAD Companies were unauthorized and so misappropriated.

122    I consider this to be an important point for present purposes, having regard to the following matters. As I understand AHAB's case, as now pleaded in its amended statement of claim, borrowings on behalf of the Money Exchange, and from it for Mr. Sanea's own purposes, were only ever authorized up until 2001/2002, when it is said that Sulaiman Algosaibi only authorized that such new borrowings be made to replace those existing before, and only to the extent that the old borrowings (acknowledged by Saud Algosaibi to have been then at SAR4.1 bn.) had been repaid. It would follow, if that were proved to be true, that further borrowings after that time, made for funding Mr. Al Sanea's STCC and AWAL Bank, were unauthorized and, even if not made solely for those purposes but also for AHAB's purposes, to the extent used for Mr. Al Sanea's purposes were unauthorized (and largely forgeries) and misappropriated.

123    Secondly, the GT defendants say—at para. 82(1)(ii) of Mr. Crystal's written submissions, and as discussed above by reference to *Sinclair Invs. (UK) Ltd.* v. *Versailles Trade Fin. Ltd.* (34)—that the money may have passed from AHAB to the defendants in liquidation by a route which precludes tracing, for example by mixing or through a *bona fide* recipient (*e.g.* via an overdrawn bank account).

124    That is a possibility but, as Mr. McQuater submits, whether such obstacles exist cannot be determined until the court has seen all the relevant evidence, in particular the evidence which may become available on discovery from the GT defendants themselves. It would therefore be wrong to *assume*, for the purpose of a strike-out, that such a defence is available.

125    Thirdly, the GT defendants argue that "various and significant sources of third party funding were available to the GT defendants."

126    Again, says Mr. McQuater, while that might ultimately affect the tracing claim, it must nonetheless be a matter to be determined at trial. It is important to note that the third party borrowing alleged was at the SICL level, yet the massive shareholder contributions to SICL and SHL appear to have come from Mr. Al Sanea himself. There is no evidence that those capital contributions were funded by third parties.

127    Fourthly, the GT defendants say that AHAB should not be permitted to put their estates to the great trouble and expense of providing discovery simply in the hope that something "may turn up" to allow AHAB to particularize its proprietary claim. But, says Mr. McQuater, that is not

what AHAB has done or seeks to do. AHAB has properly pleaded its case by reference to a strong inference that Mr. Al Sanea has fraudulently funded the GT defendants with AHAB's money, an inference that is supported by volumes of contemporaneous documents. It is a legitimate use of discovery to obtain material from which an existing pleaded case can be further particularized. And the further argument that discovery will not assist AHAB in identifying its misappropriated property is also misconceived. That is because, as already noted, it proceeds on the basis that the proprietary claim depends on whether the borrowings were unauthorized, rather than on whether the payments to Mr. Al Sanea were unauthorized.

128   On the latter basis, a proprietary base for the claim is established sufficiently to justify giving access to the records of the defendants in liquidation for the purposes of the tracing exercise. To the extent that a loan facility taken in AHAB's name (even if its existence was known to AHAB) was in fact used to fund a misappropriation to Mr. Al Sanea, the loan would be unauthorized and so a link developed between the question of authorization and the destination of the borrowed funds.

**Analysis of the GT defendants' arguments**

129   In my analysis of these arguments, it must, to begin with, be acknowledged that massive borrowings took place through the Money Exchange whilst under Mr. Al Sanea's control and that AHAB is liable to the banks for it. The alleged sum of US$9.2 bn. is said to represent the total indebtedness claimed by some 118 banks in legal actions taken in many jurisdictions against AHAB.

130   AHAB is entitled to ask the rhetorical question at this stage: Where did all that money go?

131   While in charge of the Money Exchange, the evidence shows that Mr. Al Sanea injected some US$6.2 bn. into his Cayman companies through STCC and AWAL Bank.

132   AHAB's liability to the banks would, by itself, be sufficient reason, assuming that AHAB can establish proper legal causes of action, to pursue Mr. Al Sanea and his companies, on the basis of the reasonable inference that the contributions by Mr. Al Sanea to his companies were made with AHAB's money.

133   Even AHAB's inability to deny the banks' claims alleged in the London proceedings, because of its ostensible knowledge and authorization of certain loans, allegedly borrowed in cahoots with Mr. Al Sanea in a scheme to "rob Peter to pay Paul," and allegedly also to maintain Mr. Al Sanea's and AHAB's partners' lavish lifestyles, would not mean that AHAB must be estopped from pursuing Mr. Al Sanea for moneys

misappropriated by him. AHAB's capitulation in the London proceedings was made expressly without prejudice to its claims in this action.

134   Furthermore, I must be mindful that the GT defendants' further argument, that their discovery will not establish AHAB's tracing claim because it will not show an unbroken chain of links in the transfer of money, is not the same thing as forensic evidence to that effect.

135   The GT JOLs have not said that they have themselves undertaken a reverse tracing exercise such as could establish any such premise. They have instead steadfastly refused (no doubt on legal advice) to provide discovery to AHAB, despite specific requests for disclosure of bank account records as spoken to by Mr. Charlton in his eighth affidavit. Bank account records are the obvious place to begin a search for the transactional links with any money that Mr. Al Sanea (or STCC or AWAL Bank on his behalf) would have paid into the Cayman SAAD companies.

136   Rather than provide such records, one of the GT JOLs, Mr. Akers (in his eighth affidavit), in response to Mr. Charlton's evidence, argues that despite having obtained certain SICL bank account records from the Swiss authorities, AHAB has not been able to particularize its proprietary claim against SICL. He also argues that AHAB will never be able to establish a chain of payments from SICL's discovery because SICL is "only one link in a chain of possible recipients," including STCC. He emphasizes (at para. 37) that STCC is not a party to this action and, moreover, is an entity that had its own sources of third party funding. Thus, from a practical perspective, tracing funds where there is a missing link in the chain is virtually impossible, says Mr. Akers. Moreover, it would be extremely difficult for an effective tracing exercise to be undertaken in circumstances where the GT defendants themselves still do not have access to all relevant company documentation.

137   I am not persuaded by the arguments on behalf of the GT JOLs. I am firmly of the view that they should consider themselves, as officers of the court in search of the true ownership and proper disposition of the assets under their control, duty bound to assist the court in the proper resolution of AHAB's claim. An obstructionist approach will not do. The GT JOLs have a common interest with AHAB in securing full discovery of their companies' documentation from entities or sources controlled by Mr. Al Sanea, wherever they might be. In this regard, efforts taken by them in Saudi Arabia, with the approval of the court, have not yet borne fruit, having been met at every turn with obstruction or lack of co-operation by Mr. Al Sanea.

138   Recourse to the Saudi authorities may be the only answer, recourse of the kind AHAB has sought with SAMA. It simply will not do for the GT defendants to refuse to assist AHAB by way of discovery by pleading —for instance, as SICL does—that important SICL documents, salted

away from SFS (the related entity in Switzerland) to Saudi Arabia by Mr. Al Sanea, remain beyond their control. As a matter of Cayman law, those remain SICL documents and so potentially come within the purview of the GT JOLs' discovery obligations, as described above (at paras. 34–41).

139   Moreover, criticisms of AHAB's case as being still unparticularized, despite the passage now of three years since its inception, ring rather hollow when the impediment of the various interlocutory skirmishes to its claim are considered.

140   Rather than striking out AHAB's claims against the GT defendants now, it must be right, as Mr. McQuater submits, that the discovery process should be allowed to run its proper course, with all parties doing their reasonable best to comply, and so at trial for the court to determine whether the arguments such as those sought to be advanced by Mr. Akers in his eighth affidavit against the practical feasibility of tracing, are correct.

**Analysis of the AWALCOs' arguments**

141   In respect of the AWALCOs, further arguments were put by Mr. Smith against AHAB's tracing claim, as it relates specifically to them, relying on the third affidavit of Mr. Carlton-Kelly (one of the JOLs of the AWALCOs) and on the first affidavit of Mr. Mark Oldfield, a chartered accountant and analyst in Baker Tilly Restructuring and Recovery LLP, Mr. Carlton-Kelly's firm.

142   Mr. Oldfield provides a very detailed analysis of funding obtained by the AWALCOs which were formed, like the SIFCOs, as special purpose investment vehicles. In essence, his analysis shows that their funding came from AWAL Bank B.S.C. and (respectively for each AWALCO) from various well-known international banks ("the external banks"). In one case—that of AFCLS or AWALCO 5 (formerly SIFCO 6)—some financing also came from SICL.

143   Mr. Oldfield's analysis explains that, in all but one of the AWAL-COs, the AWAL Bank/external banks' financing was co-mingled for investment purposes and later investments were liquidated or otherwise redeemed and distributed back to the investors, including AWAL bank. In the case of each AWALCO, the net position is retained on its books as reflecting a net liability owed to AWAL Bank or receivables due from it.

144   The sole exception among the AWALCOs, as recipients of mixed funding from AWAL Bank (or SICL) and the external banks, is AFCL 3 (AWALCO 3, the 16th defendant). As Mr. Oldfield explains, at para. 44, AWALCO 3 was established as a special purpose investment company to invest in a portfolio of investment securities using loan finance provided by AWAL Bank. According to its audited financial statements for the year ended December 31st, 2008, between November 2006 and December

2006, AWALCO 3 purchased investment securities from a "related party" at a fair value of US$73.7m. As at December 31st, 2007, the audited accounts reflected the US$73.7m. as owed to AWAL Bank, and, as at October 31st, 2010, the net effect of the financial position of AWALCO 3 is that it is a dormant SPV, apparently owing some US$38m. to AWAL Bank.

145   This summary of the financial history of the AWALCOs tends to suggest that (with the possible exception of AWALCO 3, because of its direct source of funding from AWAL Bank) a proprietary tracing claim for AHAB's money would no longer be sustainable against them, even had they been in direct receipt of AHAB's money. The view of the JOLs of the AWALCOs is that moneys could no longer be traced into assets acquired by the comingled use of external bank financing and subsequently liquidated and divested back to the banks, there being no way of knowing whether any positive net assets remaining with the respective AWALCOs represent money contributed by AWAL Bank and/or SICL or not.

146   Thus, it appears that this proprietary tracing claim, which emerged against the AWALCOs only after their initial ensnarement in the action for being parties related to Mr. Al Sanea, AWAL Bank and SICL (on *TSB Private Bank Intl. S.A. v. Chabra* (38) grounds), is unsustainable as against them.

147   Even the exceptional position of AWALCO 3 is said by the AWALCO JOLs not to justify AHAB's claim.

148   This is because, although funded exclusively by AWAL Bank, that entity itself (now in administration in Bahrain and the subject, along with Mr. Al Sanea, of criminal proceedings or investigations in that country), is shown to have received funding from sources other than Mr. Al Sanea. On that basis, there would be no way of knowing whether the US$73.7m. it received from AWAL Bank, and used to purchase securities from a "related party," was AHAB's moneys transferred to AWAL Bank by Mr. Al Sanea.

149   This too is a plausible but yet, to my mind, inconclusive argument.

150   On the contrary, and as Mr. McQuater argued, AWAL Bank (which is admitted to have made the loan to fund AWALCO 3 investments) was owned in part by Mr. Al Sanea, directly as well as otherwise by his holding company SICL, and so inferentially was likely to have been funded directly by him.

151   AWAL Bank is in administration in Bahrain and AHAB does not have access to its documents; it seems that the AWALCO JOLs are able to request access to relevant AWAL Bank documents (as indicated by the Bahraini authorities) and AHAB has been taking steps in the United States to gain access to AWAL banking documentation, at least for US dollar

transactions. AWAL Bank has also already been the subject of a detailed report, prepared by representatives of the international accounting firm Kroll, at the behest of the Bahraini Public Prosecutor, so there are good prospects that, by time of trial, further and better information relating to Mr. Al Sanea's use of AWAL Bank will be available.

152   And, while the AWALCO JOLs have shown that much, if not all, of the alleged contributions by Mr. Al Sanea to AWAL Bank (totalling US$1,250m. as pleaded) could not have been paid from moneys trans-ferred from the Money Exchange at times after January 1st, 2007—when those contributions were largely made (see Oldfield's affidavit, para. 24)—AHAB's case is that contributions to AWAL Bank by Mr. Al Sanea or SICL were not limited to those amounts. As at January 1st, 2007, AWAL Bank already had existing equity capital of US$750m. which inferentially must also have been provided by Mr. Al Sanea and/or SICL (as AWAL Bank's shareholders) between 2004 (when AWAL Bank was established) and the end of 2006.

153   For those reasons, and the further reason that the Bahraini Public Prosecutor has recently indicted Mr. Al Sanea and other members of the AWAL Bank's management are subject to a series of criminal charges (including false accounting and aiding and abetting the destruction and concealment of documents); Mr. McQuater argues that it would be premature to strike out, based merely on findings at this interlocutory stage, AHAB's tracing claim against the AWALCOs.

154   I agree. While the makings of a proprietary tracing claim appear to exist, as relating to the AWALCOs, only as against AWALCO 3, a case for knowing receipt and dishonest assistance, and restitution, could well be sustainable against all the AWALCOs, as fully particularized, after discov-ery.

155   That being so, the AWALCO JOLs may not avoid their discovery obligations in this case simply by virtue of their minimization of AHAB's proprietary tracing claim. AHAB's claim overall has not been shown, as against the AWALCOs, to be devoid of a reasonable cause of action or to be an abuse of the process of the court.

156   I conclude that, as in the case of GT defendants, the AWALCOs' summons does not meet the strict test for striking out as explained (and accepted by all sides now) in the earlier case law. A concise summary appears in *Grupo Torras* (20) (2000 CILR at 445):

"The rules governing an application to strike out a pleading for disclosing no reasonable cause of action are well settled. They have been invoked and applied in these courts on a number of occasions in the past. The following passage from a leading English case is an appropriate summary. I quote from the well-known passage in the

GRAND CT.                    AHAB V. SAAD INVS. (Smellie, C.J.)

judgment by Stephenson, L.J. in *McKay* v. *Essex Area Health Authority* . . . ([1982)] 2 All E.R. at 778):

> 'The defendants have to show that the case is "obviously unsustainable": see *A-G of Duchy of Lancaster* v. *London and North Western Rly Co* . . .; "obviously and almost incontestably bad": see *Dyson* v. *A-G* . . .; "one which cannot succeed", "unarguable": see *Nagle* v. *Fielden* . . .; "quite unsustainable": see *Schmidt* v. *Secretary of Home Affairs* . . .; "hopeless": see *Riches* v. *DPP* . . . This is all summed up in a sentence from the judgment of Lord Pearson in *Drummond-Jackson v. British Medical Association* . . . which Lawson J. followed in this case: ". . . the order for striking out should only be made if it becomes plain and obvious that the claim or defence cannot succeed."'"

157   For the reasons discussed above by reference to the case law, the precise particularization of every pleading (or here every unauthorized loan facility and its subsequent dispersal) is not necessary for a party to be allowed to proceed with its claim to discovery. Here, although precise pleadings of that kind may yet be required before AHAB is allowed to proceed to trial on its proprietary tracing claim, an inability now to give such particulars is not a valid ground for striking out those claims, let alone to preclude discovery for the other claims for knowing receipt and dishonest assistance which may not require the same degree of specificity of pleadings.

158   Neither do I accept, as the present defendants have variously argued, that the unparticularized state of AHAB's pleaded case is such that it is "impossible" for them to give discovery as required by the rules.

159   My view is that, while the proprietary tracing claim certainly needs to be better particularized in terms of the "proprietary base" and the "unbroken chain of transactional links," it is clear that the enquiry must begin with the funds received by the present defendants either directly from Mr. Al Sanea or indirectly from him through STCC, AWAL Bank or any other channel revealed by the forensic investigation.

160   The *prima facie* case, already observed in AHAB's favour by the courts, support the inference that any such funds were probably obtained by means of Mr. Al Sanea's position at the Money Exchange. No evidence to refute that inference (save in the case of SIFCO 5, as discussed above) has been presented so far in this case so as to justify insulating any other of the present defendants from the discovery process.

161   There is not a "mere coincidence in time" explaining the transfers of funds to the present defendants, as Mr. Crystal submits. It is a reasonable inference based upon the circumstances that no other source of such

massive amounts of funds appears to have been available to Mr. Al Sanea apart from the Money Exchange.

162   It is this *prima facie* inference that creates, in my judgment, the obligation upon the GT defendants and the AWALCOs to respond by way of giving discovery. And it is in this context that, in my view, the distinction sought to be struck by the present defendants between "author-ized" and "unauthorized" borrowings becomes inconclusive. If AHAB can establish its "new-for-old" borrowing policy at trial (as now pleaded in the amended statement of claim) and, further, that all subsequent transfers of money away from the Money Exchange by Al Sanea to his SAAD companies were unauthorized or misappropriated, the fact that some earlier borrowings were authorized will likely change nothing.

163   For all the foregoing reasons, in my view AHAB's pleaded case has brought it to the stage where it is entitled to discovery from the GT defendants and the AWALCOs.

164   Neither on the summons of the GT defendants nor on that of the AWALCOs am I satisfied that the test for striking out is met and so their applications are refused.

**Further specific arguments in relation to the letters of credit**

165   Mr. Crystal further argued that, in any event, AHAB's proprietary tracing claim specifically as it relates to LC payments must be struck out because those payments were made directly by the banks, not with AHAB's money, but with the banks' money and so can provide no proprietary base for AHAB's claim.

166   This argument again invokes the *dictum* of Clarke, J. from *OJSC Oil Co. Yugraneft* v. *Abramovich* (28) ([2008] EWHC 2613 (Comm), at para. 349) that, in order to be able to trace property, it is necessary for a plaintiff first to identify property *of his* which has been unlawfully taken from him, that is "a proprietary base."

167   Of the sums alleged to have been misappropriated by Mr. Al Sanea from the Money Exchange, US$2.03 bn. is said, at para. 62 of the amended statement of claim to have been derived from "payments received for the benefit of the SAAD Group under letters of credit issued for the account of the Money Exchange."

168   AHAB's case in relation to these LC payments is particularized in paras. 72–79. In para. 72, as follows:

"Mr. Al Sanea caused the Money Exchange to open LCs as payments for goods purportedly supplied to AHAB. The goods included very large quantities of air conditioning and heating equipment, lift machinery, marble and fabrics. AHAB had no need for these goods,

240

GRAND CT.                    AHAB V. SAAD INVS. (Smellie, C.J.)

did not order them and never received them—they did not exist. The proceeds of the LCs were paid initially to the purported suppliers but then retransferred to Mr. Al Sanea or the SAAD Group."

169   This is an allegation of an elaborate fraud perpetrated by the use of false letters of credit and false invoicing by Mr. Al Sanea and his intermediary abettors, by which he was able to misappropriate the massive sum of US$2.03 bn.

170   It is a fraudulent scheme in respect of which the Deloitte forensic investigations have unearthed strong *prima facie* evidence. Nonetheless, the thrust of Mr. Crystal's argument is that this was not AHAB's money but the banks'. This is an argument he now presents, notwithstanding the unrefuted evidence from AHAB that it remains liable and has been sued by the banks in multifarious actions around the world for these proceeds of the LCs, and the other sums, all totalling US$9.2 bn.

171   Mr. Crystal's argument is that, crucially, AHAB does not allege in the amended statement of claim that it ever received any sums paid under the LCs. Rather its complaint is that as the ostensible applicant (or the opener of the LCs), it was liable to reimburse the issuing banks: see para. 7 of the statement of claim.

172   Put shortly, AHAB does not, as regards the LCs, identify property *of it*, which has been unlawfully taken and so identifies no proprietary base for its claim.

173   In *Group Josi Reassur. S.A.* v. *Walbrook Ins. Co. Ltd.* (19), Phillips, J. (as he then was) held that it was not possible for a plaintiff to assert a proprietary interest in moneys paid by a bank pursuant to a LC but not received by the plaintiff. In *Group Josi*, the plaintiffs were reinsurance companies which had procured the opening of LCs in favour of the defendant insurance companies. The plaintiff reinsurers sought injunctions restraining the banks from honouring the LCs and, secondly, restraining payments under the LCs to the defendants. The plaintiffs relied on allegations of fraud tainting the underlying reinsurance contracts (referencing certain fraudulent claims for commission payments) in respect of which the LCs were to be paid. The applications for injunctions were refused. In particular, as to the second basis for the application (to restrain payment of the proceeds of the LCs to the defendants), Phillips, J. held as follows ([1995] 1 W.L.R. at 1036):

"Mr. Bartlett [for the plaintiffs] has failed to persuade me that there is any basis upon which his clients can assert a proprietary interest in moneys that may be paid to the reinsured [defendants] by banks, out of the banks' own funds, pursuant to obligations undertaken under letters of credit. True it is that the [plaintiff] reinsurers will have to reimburse those banks, directly or indirectly, but I cannot see how

241

that can give rise to a proprietary claim to the moneys advanced by the banks."

174   This *dictum* was not delivered in the context of a case in which a defrauded bank customer was seeking to recover the proceeds of fraudulent letters of credit from a fraudster. It was delivered, as explained above, in circumstances where it was sought to restrain payment on letters of credit, which were themselves regularly authorized by the bank's customer (the plaintiffs) and issued to payees who had allegedly procured their issuance by an underlying arrangement that was tainted by fraudulent commission claims.

175   In those circumstances, the fact that the moneys to be paid were to be paid from the banks' own funds, pursuant to obligations undertaken under letters of credit, provided (as Phillips, J. described it (*ibid.*)) "barren ground in which to attempt to nurture a remedial constructive trust."

176   That view was hardly surprising, given the long line of settled cases that showed, as Phillips, J. further declared, that payments made by a bank under a letter of credit are not to be treated as payments of funds beneficially owned by the opener of the credit.

177   This long line of cases also explains the reasons, as much based in legal policy as in banking contract, for refusing the injunctive relief that was sought in the case. As Phillips, J. also explained (*ibid.*, at 1037):

> "More generally, the claim to relief which Mr. Bartlett advances would, if well founded, be available in every case where a plaintiff challenged the right of a beneficiary under a letter of credit to payment under the underlying transaction. Such relief would clot what has been described as the lifeblood of international commerce as surely as an injunction restraining drawing on the credit.
>
> For these reasons, I am not prepared to grant the injunctions sought under Ord. 29, r. 2."

178   Later on appeal, the Court of Appeal agreed with that decision and the general reasons given in it for the refusal of the injunctions, while declining to answer the question ([1996] 1 W.L.R. at 1167) "is there a constructive trust, and do reinsurers have a proprietary right?" (that is, a proprietary right to proceeds of a letter of credit paid out by reliance upon an underlying fraudulent transaction).

179   Whether the circumstances presented by the present case would provide more fertile ground for the nurturing of a constructive trust may well be a more arguable proposition. What is alleged here is that proceeds were paid out by reliance upon LCs, which were themselves fraudulently procured from and issued by the banks by reliance upon forged mandates from the Money Exchange.

180  This is the kind of proposition more fully explained, also by Phillips, J., in *Group Josi* (19) ([1995] 1 W.L.R. at 1035–1036):

"Such a [remedial constructive] trust has been recognised in a number of Commonwealth jurisdictions. In *Metall und Rohstoff A.G. v. Donaldson Lufkin & Jenrette Inc.* [1970] 1 Q.B. 391, 479 Slade L.J. considered whether such a trust could arise under English law:

'The extent to which a constructive trust can properly be treated as a remedy is far from clearly defined in the authorities. The position is stated thus in *Snell's Principles of Equity*, 28th ed. (1982), p.193: "In some jurisdictions the constructive trust has come to be treated as a remedy for many cases of unjust enrichment; whenever the court considers that the property in question ought to be restored, it simply imposes a constructive trust on the recipient. In England, however, the constructive trust has in general remained essentially a substantive institution; ownership must not be confused with obligation, nor must the relationship of debtor and creditor be converted into one of trustee and cestui qui trust. Yet the attitude of the courts may be changing; and although the constructive trust is probably not confined to cases arising out of a fiduciary relationship, it is far from clear what other circumstances suffice to raise it or how far it can be employed as a species of equitable remedy to enforce legal rights." However, the authors of *Goff and Jones, the Law of Restitution*, 3rd ed. (1986), after a comprehensive review of the authorities, state their views at p.78: "Equity's rules were formulated in litigation arising out of the administration of a trust. In contrast restitutionary claims are infinitely varied. In our view, the question whether a restitutionary proprietary claim should be granted should depend on whether it is just, in the particular circumstances of the case, to impose a constructive trust on, or an equitable lien over, particular assets, or to allow subrogation to a lien over such assets." While we have had the benefit of very full argument on almost all other aspects of the law involved in this case, we have neither heard nor invited comprehensive argument as to the circumstances in which the court will be prepared to impose a constructive trust de novo as a foundation for the grant of equitable remedy by way of account or otherwise. Nevertheless, we are satisfied that there is a good arguable case that such circumstances may arise and, for want of a better description, will refer to a constructive trust of this nature as a "remedial constructive trust."'"

181  Whether the proceeds of the fraudulent LCs in the hands of Mr. Al Sanea should be impressed with a remedial constructive trust in the circumstances of this case has not been specifically pleaded, although the

constructive trust claim appears in paras. 187 and 188 of AHAB's amended statement of claim (and discussed above at para. 74).

182   Nonetheless, in effect, Mr. McQuater's response to Mr. Crystal's arguments is that the payments out to Mr. Al Sanea, ultimately fraudulently obtained by him as AHAB's fiduciary under forged letters of credit, were impressed with a constructive trust in AHAB's favour.

183   For this proposition, he relied upon the case of *Agip (Africa) Ltd.* v. *Jackson* (1), a case also discussed by Phillips, J. in *Group Josi* (19) (*ibid.*, at 1036) but distinguished by him because the payments made by the bank in *Agip*, and deemed to be traceable as being the property of the plaintiff, were payments by wire transfer of the banks' money, secured against the plaintiffs' money only hours later received in its account held with the bank. In that way, those moneys were distinguishable from payments made by a bank of its own money by way of letters of credit.

184   While that distinction might yet prove to prevent AHAB's reliance upon *Agip*, or other case law, for founding a constructive trust, the further distinction to be recognized, and not overlooked on the allegations in this case, is that Mr. Al Sanea is here alleged to have obtained the proceeds of the letters of credit by fraudulent breach of his fiduciary duties owed to AHAB. Viewed in this light, these were moneys which the banks paid acting in dual capacities, not only to discharge their own apparent obligations under the letters of credit, but also as agents on AHAB's behalf.

185   Thus, argued Mr. McQuater, when ultimately received by Mr. Al Sanea as the fruits of his fraud upon AHAB, the payments were made to him, on AHAB's behalf, in his capacity as AHAB's fiduciary, giving rise to compelling circumstances for the imposition of a constructive trust in AHAB's favour upon the proceeds. Mr. Al Sanea received not the banks' property, but a new species of property derived from his breaches of fiduciary duty. And hence, at least arguably, a proprietary interest of AHAB's existed in those proceeds and AHAB's proprietary base for its tracing claim is established.

186   A strike-out application is not the appropriate means for the determination of such issues, argued Mr. McQuater. They involve complex questions of fact and law which should be left to the trial.

187   In response to these arguments, I must begin by noting that the concept of the remedial constructive trust as a means of the exercise of judicial discretion to vary proprietary rights in the context of insolvency has been firmly denounced by the English Court of Appeal in *Re Polly Peck Intl. PLC, No. 2* (30).

188   There it was said that there was no prospect of the imposition of a remedial constructive trust on the assets of an insolvent company so as to

give the claimants a proprietary interest to the detriment of creditors. To do so would confer priority not accorded by the insolvency legislation. Although the law moves, ". . . it cannot be legitimately moved by judicial decision down a road signed 'No Entry' by Parliament. The insolvency road is blocked to remedial constructive trusts, at least when judge-driven in a vehicle of discretion" ([1998] 3 All E.R. at 827, *per* Mummery, L.J.). Nourse, L.J. emphasized (*ibid.*, at 831) that his conclusions were not confined to insolvency, because property rights in general could only be varied by statute.

189   This decision has been heralded by academic writers as "the end of the remedial constructive trust" in English law (Birks, *The End of the Remedial Constructive Trust*, 12 *Trust Law International*, 202 (1998). See also the critique in Millett, *Restitution and Constructive Trusts*, 114 *Law Quarterly Review*, 399 (1998)).

190   The concept of the remedial constructive trust continues to thrive elsewhere in the Commonwealth, as anticipated by Phillips, J. in his *dictum* cited from *Group Josi* (19) (above, at para. 171).

191   The Privy Council decision in *Att.-Gen. (Hong Kong)* v. *Reid* (4) is most authoritatively on point. The cases show that a constructive trust may be imposed on the trustee or fiduciary who receives a bribe from a third party, thereby enabling the bribe to be seized, or its product to be traced and all profits deriving from it to be stripped in favour of the principal (there the Crown in the right of Hong Kong).

192   A leading text book notes that the remedial constructive trust has been accepted in Australia (*Muschinski* v. *Dodds* (26)); New Zealand (*Powell* v. *Thompson* (31)—described ([1991] 1 N.Z.L.R. at 615) as a "broad equitable remedy for reversing that which is inequitable or unconscionable") and Canada—although recognized there more in the context of property disputes between cohabitees than in the commercial context. See Hanbury & Martin, *Modern Equity*, 17th ed., para. 12–007, at 308 (2005).

193   The New Zealand courts have noted that caution is required before a remedial constructive trust may be enforced in insolvency cases: *Fortex Group Ltd.* v. *MacIntosh* (16).

194   But perhaps more to the point in the present case, as Hanbury & Martin explain (*op. cit.*):

"One distinction between institutional and remedial constructive trusts may lie in the date from which the claimant may assert proprietary rights. This question has significance for third parties acquiring interests in the property [in dispute] before the court makes its order. It seems clear that the traditional institutional constructive trust vindicates a pre-existing proprietary interest which is operative

before the date of the court order. The effect of a remedial construc-
tive trust, on the other hand, may be to confer a new proprietary
interest on the claimant. In such a case it will have prospective effect
only, operating from the date of the court order which creates it . . .''

(citing *Lloyds Bank PLC* v. *Rosset* (25) and *Westdeutsche Landesbank
Girozentrale* v. *Islington London Borough Council* (41)).

195   Given the nature of the fiduciary relationship between Mr. Al Sanea
and AHAB, and the alleged breaches of fiduciary duties involving the
forgery of the LCs, it is the implicit argument of Mr. McQuater that
the constructive trust sought to be relied upon here by AHAB is of the
institutional kind, citing the receipt of the proceeds of the LCs as being
impressed with the constructive trust as at the moment they were received.

196   As noted above, the existence of such an institutional constructive
trust, arising from fraudulent or other breach of duty by a trustee or other
fiduciary, is well established in English law going back at least to 1878 in
*De Bussche* v. *Alt* (14) and authoritatively settled in *Boardman* v. *Phipps*
(7).

197   The well-settled principle is that a fiduciary may not abuse his
position to gain a benefit for himself. In *Boardman* v. *Phipps*, the House of
Lords held that Boardman was constructive trustee for his principal (the
trust for which he acted as solicitor) of the profit he had made from
investments made (albeit in good faith) by reliance on confidential
information he had obtained in his fiduciary position as solicitor.

198   The principle applies *a fortiori*, of course, when the fiduciary has
acted fraudulently or otherwise dishonestly, as alleged here against Mr. Al
Sanea.

199   The local case law already records instances of constructive trusts
being recognized or enforced in such circumstances, most notably: *Cay-
man Islands News Bureau Ltd.* v. *Cohen* (9), *Grupo Torras S.A.* v. *Bank of
Butterfield Intl. (Cayman) Ltd.* (20), *Contadora Enterprises S.A.*
v. *Chile Holdings (Cayman) Ltd.* (13), *Hampshire Cosmetic Labs. Ltd.* v.
*Mutschmann* (21), and *Codelco* v. *Interglobal Inc.* (11).

200   A proprietary tracing claim, having a proprietary base in property
derived from, and held upon, an institutional constructive trust may, at
least arguably, it seems to me, come to be regarded differently from the
remedial constructive trust invoked in the *Polly Peck* (30) case as a basis
for claiming against an insolvent corporate estate. Whether the court in
*Group Josi* (19) would have viewed the proceeds of the letters of credit
differently had they been impressed with an institutional constructive trust
is also a question, as shown from the deliberations of Phillips, J., to be
regarded as yet to be settled.

GRAND CT.                AHAB V. SAAD INVS. (Smellie, C.J.)

201   Such a question, as it may well arise in this case, may not properly be addressed by way of a strike-out application without the benefit of full legal arguments. For this reason, I do not accede to Mr. Crystal's further arguments for the striking out of AHAB's proprietary tracing claim as it is premised upon the proceeds of the LCs.

**Effect of AHAB's election under the default judgment against Mr. Al Sanea**

202   As a separate matter, the GT defendants assert, through Mr. Crystal, that, because AHAB is no longer pursuing a proprietary tracing claim against Mr. Al Sanea, AHAB is no longer entitled to pursue its proprietary and/or tracing claims against them.

203   For this proposition they rely on *obiter dicta* from an Australian case, *Yeshiva Properties No. 1 Pty. Ltd. v. Marshall* (42), where Bryson, J.A. said (219 ALR 112, at para. 80):

> "To my mind it is doubtful whether an equitable remedy against an alleged accessory [(for present purposes such as the GT defendants are alleged to be)] should be granted to a plaintiff who has given the alleged defaulting trustee or fiduciary a release, or has decided not to sue the trustee or fiduciary. Doing equity as between the plaintiff and the accessory, who is not the person principally liable, seems to me to be possible only if the plaintiff also pursues his claim against the person principally liable."

204   While the pursuit of equitable remedies will always require a plaintiff to behave fairly, Bryson, J.A.'s *dictum* does not appear to leave room for circumstances where it may be feasible only to pursue the accessory (such as where a principal wrongdoer is beyond the jurisdiction and cannot, for practical reasons, be pursued).

205   In addition to that consideration, I agree with and adopt the following submissions from Mr. McQuater:

(1) The statement of principle was clearly *obiter*; Bryson, J.A. also said (*ibid.*) that his concerns "were not debated on appeal and the appeal case was disposed of without reaching conclusions on them." The GT defendants have not referred to any other case in which Bryson, J.A.'s observation was followed or considered.

(2) The facts of *Yeshiva Properties* (42) were far removed from the present action. It is not the case that AHAB has released or ignored Mr. Al Sanea. On the contrary, AHAB has pursued him as vigorously as possible. It was only his resolute refusal to engage with the merits of the claims that led AHAB to seek the best and most convenient remedy available against him.

247

(3) The so called "abandonment" of the claims (which was made expressly for the purpose of the application for an interim award on the default judgment) was not an acceptance that the claims would not have succeeded but simply a procedural limitation on the relief being sought.

(4) Moreover, by virtue of GCR, O.21 r.4, AHAB is not precluded in principle from bringing again its proprietary tracing claims against Mr. Al Sanea. They have not been determined in his favour on the merits and AHAB could bring them again in a new action.

For those reasons, this argued basis for striking out is also refused.

**Leave to appeal against the interim award**

206   For reasons explained in the June 2012 judgment, I awarded an interim payment of damages to AHAB against Mr. Al Sanea in the amount of US$2.5 bn. That award was made on the express basis (2012 (1) CILR 335, at para. 59) that—

"(i) such [an award] represents a reasonable proportion of the damages which, in the opinion of the court, are likely to be ultimately recoverable by AHAB from Mr. Al Sanea;

(ii) this order and the reasons herein given for it shall not be binding on the defendants in liquidation, and shall be without prejudice to their right to pursue any argument pleaded in their defences . . ."

207   Those express limitations upon the interim award notwithstanding, the GT defendants (but not the AWALCOs or SIFCO 5) now apply for leave to appeal against the award.

208   AHAB's position is that the award was rightly made for the reasons given in the June 2012 judgment. In that regard, Mr. McQuater's submissions are persuasive. I fully agree with them and adopt them in refusing the GT defendants' application for leave to appeal, being satisfied that it shows no prospect of success and that no point of public importance arises for consideration by the Court of Appeal, as required by the case law (see *In re Universal & Surety Co. Ltd.* (40) and *Practice Direction (C.A.: Leave to Appeal and Skeleton Arguments)* (32) (*per* Lord Woolf, followed and applied in *Streeter* v. *Immigration Bd.* (35)).

209   The submissions which I adopt (and expanded upon by me) are as follows:

(1) There are two main questions which arose on the application for the interim award: first, whether it was appropriate to make an award at all; and secondly, what was the appropriate amount.

(2) Grounds (7) and (8) of the GT defendants' proposed appeal relate to the first question.

(i)  In ground (7), the GT defendants repeat their argument that the making of an award gave rise to a risk of inconsistent decisions by different tribunals. As AHAB explained at the original application, and the court accepted, there is no inconsistency because the court should, and did, approach the application on the express assumption that, as against Mr. Al Sanea, all allegations of liability are established as a result of his default of defence and the default judgment entered against him.

(ii) In ground (8), the GT defendants argue that GCR, O.37 required the court to wait to assess damages at trial where there are multiple defendants. However, the court has an express discretion under O.37 to assess damages earlier. As the court rightly held (2012 (1) CILR 335, at paras. 18–19), the reason for the rule is the avoidance of the risk of inconsistent decisions. In the present case, there was no risk and it was entirely proper for the court to exercise its discretion to make an (interim) assessment.

(3) Grounds (1)–(5) are not matters of law or principle but go to the calculation of the appropriate amount of the interim award. As the court had well in mind, there is no need for the court to formally or finally assess the damages, the exercise is rather one of finding a figure which represents a lower bound on the future recovery. AHAB presented a number of different approaches to assessing damages, each of which came out, even on the most conservative basis, at US$2.5 bn. or more.

(4) Ground (9) is a reiteration of the GT defendants' argument at the interim award hearing that the court was bound to take into account, in assessing the damages payable by Mr. Al Sanea, a potential counterclaim which he had not actually made. The court rightly said (ibid., at para. 24) that this argument would result in "obvious unfairness and absurdity." The GT defendants say that an appeal is justified (in the public interest) because there is no reported case on this issue, but that is hardly surprising given that the point is wholly unmeritorious.

(5) In ground (6), the GT defendants argue that the court was not entitled to take into account the contemporaneous records of Mr. Al Sanea's misappropriations, prepared by Mr. Mark Hayley, which were pleaded verbatim in the statement of claim. However, the existence and authenticity of those documents is not challenged (they can be produced if necessary and have been exhibited on more than one occasion in the proceedings) and the court was entitled to have regard to them. Mr. Hayley was Mr. Al Sanea's immediate subordinate at the Money Exchange and,

having acted on his instructions, has direct knowledge of the payments (at times running to US$1m. per day) from the Money Exchange to STCC.

(6) Finally, as the court rightly observed (*ibid*., at para. 57):

"While the defendants in liquidation remain entitled to raise their objections and counter-arguments at the trial of the case as against them, they are not entitled, in my view, to raise those objections and counter-arguments now, in effect as surrogates of Mr. Al Sanea."

As AHAB has repeatedly said, the defendants in liquidation have no legitimate interest in intervening in an application which only concerns, and only affects, AHAB and Mr. Al Sanea. For all those reasons, leave to appeal is refused.

### The amendment of AHAB's statement of claim: leave to appeal

210   As discussed above, AHAB, on July 23rd, 2012, filed and served its amended statement of claim to reflect its case in light of the N Files disclosure. AHAB's obligation to plead those amendments was recognized in the December 2011 judgment, when refusing to strike out AHAB's claim, and an undertaking was then given to the court by AHAB to file and serve amendments. The court, having determined that AHAB's failure to earlier disclose the N Files was not contumelious, did not strike out AHAB's claim, as had been contended for by the present defendants, but, as they also contended, the court recorded AHAB's obligation to amend its pleadings to reflect its case as dictated by the N Files disclosure, and hence AHAB's undertaking in that regard.

211   However, by the time of its application for an interim award of damages on its default judgment against Mr. Al Sanea, AHAB had not yet filed and served the amended statement of claim. The GT JOLs complained strongly about this as a basis for refusing AHAB's application, complaining that AHAB was in contempt of the court and so had no standing to apply for an award. AHAB's application for an interim award was nonetheless granted by me, but with the requirement that AHAB first rectify its breach of the undertaking by filing and serving the appropriate amendments before a formal order for the interim award would be issued.

212   AHAB then immediately filed and served the amended statement of claim and the formal order for the interim award was issued.

213   Against that background, Mr. Smith, on behalf of the AWALCOs, seeks leave to appeal against the "permission" granted to AHAB by the court for the filing and service of the amended statement of claim.

214   Mr. Smith's arguments (which I gather are adopted by the other present defendants) are as follows:

215   The order of the court of July 31st, 2012 awarding interim damages to AHAB appears to have given AHAB permission to amend its statement of claim. The court has indicated in the present proceedings to the parties that they should proceed on the basis that the court did indeed grant permission to AHAB to amend.

216   On this basis, the court has permitted AHAB to amend its statement of claim without—

(1) requiring it to make an application at which the AWALCOs can be heard and their objections properly considered; and

(2) submitting to an appropriate costs order.

217   Further that, in doing so, the court has acted improperly and in breach of the rules of fairness and natural justice. There can be no justification for disregarding—without any hearing whatsoever—the objections of the parties affected by the amendment. Such objections were notified in writing to the court, but ignored. Equally, the process adopted by the court meant that matters normally aired on amendment—such as costs and consequential amendments—could not be raised by the defendants and were completely unconsidered by the court.

218   In these circumstances, permission to appeal to the Court of Appeal should be granted.

219   I disagree, for the following reasons.

220   In *Swiss Bank & Trust Corp. Ltd.* v. *Iorgulescu* (36), the Court of Appeal adopted the long-standing *dictum* of Brett, M.R. from *Clarapede & Co.* v. *Commercial Union Assn.* (10), as cited and approved most authoritatively by the House of Lords in *Ketteman* v. *Hansel Properties Ltd.* (24) ([1987] A.C. at 203, *per* Lord Griffiths):

"The rule of conduct of the court [in a case where leave to amend a pleading is sought] is that, however negligent or careless may have been the first omission, and however late the proposed amendment, the amendment should be allowed if it can be made without injustice to the other side. There is no injustice if the other side can be compensated by costs."

221   That being the state of the law on whether amendments to pleadings should be allowed, and given the background described above to AHAB's amendment to its statement of claim (including the insistence of the present defendants that it be done), there appeared no good reason why I should have entertained an *inter partes* contest over whether leave to amend should have been granted. I therefore allowed AHAB to obtain its interim award on the basis that it had completed its undertaking given to the court; was therefore no longer at risk of being in contempt in that regard; and, most importantly, there was no conceivable prejudice to any

of the present defendants in allowing the amendments to be filed and served without a contested hearing.

222   They would, of course, be entitled to any consequential costs resulting from the amendments. This is another settled proposition of law. And a still further settled proposition is that they would also be entitled to make consequential amendments to their own pleadings.

223   In keeping with the overriding objectives of the Grand Court Rules, the court must deal with every cause or matter in a just, expeditious and economical way. This will include, as far as is practicable (GCR, *Overriding Objectives*, para. 2.2)—"ensuring that the normal advancement of the proceedings is facilitated rather than delayed; and . . . saving expense."

224   Further, as to the application of the overriding objectives, the court must seek to give effect to them by ensuring (*ibid.*) that—

"these Rules shall be liberally construed to give effect to the overriding objective and, in particular, to secure the just, most expeditious and least expensive determination of every cause or matter on its merits."

225   By para. 3, the parties are obliged to help the court to further the overriding objectives. In applying the Rules to give effect to the overriding objectives, the court may take into account a party's failure to help in this respect.

226   When it was brought to my attention that the AWALCOs wished to oppose AHAB's proposed amendments to its statement of claim, I formed the distinct impression that they were not being mindful of their obligations under the overriding objectives to assist the court in their fulfilment. I remain of that impression. Neither the AWALCOs, nor any other of the present defendants, have sought to argue that any prejudice to them arises from the amendments being allowed.

227   The application for leave to appeal is refused. I confirm that, in the usual way, the present defendants will be entitled to their costs arising from having to make any amendments to their pleadings in turn, as the result of AHAB's amendments.

**Directions to trial**

228   The draft proposed directions for trial previously circulated by AHAB are reasonable. They allow four months for discovery, three months thereafter for witness statements, two months for expert reports, with a view to a trial in a year's time. I propose to issue such directions as part of the formal order to arise from this judgment unless other more reasonable proposals are submitted in writing within 10 days of the delivery hereof.

**Costs**

229   There are two outstanding issues in relation to costs; as well as the issue of the costs of this strike-out application.

   (1) The costs of the earlier application by the defendants in liquidation to strike out AHAB's claim, and in which the defendants were unsuccessful, must follow that event. AHAB is therefore entitled to its costs incurred in that application in any event, to be taxed if not agreed and it is so ordered.

   (2) AHAB is also entitled, in any event, to its costs occasioned by the adjourned hearing of the application for the interim award hearing on February 14th, 2012. That hearing was adjourned to allow for two days of argument in April 2012, on which AHAB was ultimately successful. AHAB shall have its costs of the adjourned hearing to be taxed if not agreed, in any event.

**Security for costs**

230   I am not oblivious to the concern (now reiterated by the GT and AWALCO JOLs) about AHAB's ability to meet any costs arising from this action to which their estates may ultimately become entitled. In particular, the GT JOLs have expressed their concerns, through Mr. Crystal, about the very large costs likely to be incurred in giving discovery on the scale that AHAB's claims would demand and AHAB's, already demonstrated, inability to meet the mounting costs of litigation here and in the United Kingdom.

231   This and the disruptive impact AHAB's claim has had upon the liquidation proceedings are concerns already recognized in the December 2011 judgment (2011 (2) CILR 434, at para. 51).

232   But those are not proper objections to raise in support of strike-out applications as they have been raised on this occasion. They may, however, be a proper basis for seeking further security for costs from AHAB, but that is a matter about which I must reserve my opinion unless and until an application is brought.

*Orders accordingly.*

Attorneys: *Mourant Ozannes* for the plaintiff; *Walkers* for the GT JOLs, *Bodden & Bodden* for the AWALCO JOLs; *Harney Westwood & Riegels* for the SIFCO 5 JOLs.

---