# EXHIBIT 10

# IN THE COURT OF APPEAL OF THE CAYMAN ISLANDS

**CICA 12 of 2017**
**(Cause FSD 14 of 2016 (NSJ)**

## IN THE MATTER OF SHANDA GAMES LIMITED

**BETWEEN**

### SHANDA GAMES LIMITED

**Appellant**

**AND**

### (1) MASO CAPITAL INVESTMENTS LIMITED
### (2) BLACKWELL PARTNERS LLC – SERIES A
### (3) CROWN MANAGED ACCOUNTS SPC ACTING FOR AND ON BEHALF OF CROWN/MASO SEGREGATED PORTFOLIO

**Respondents**

Before:

The Right Honourable Sir John Goldring, President
The Honourable John Martin QC, Justice of Appeal
The Honourable Dennis Morrison, Justice of Appeal

Appearances:

For the Company's Re-Open Appeal
Ms. Madeline Heal, Mr. Paul Madden and Mr. James Elliott of Harneys on behalf of the Appellant
Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms. Gemma Freeman of Maples and Calder

For the Company's Substantive Appeal
Mr. Philip Jones QC instructed by Mr. Paul Madden and Mr. James Elliott of Harneys for the Appellant
Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms Gemma Freeman



**CICA 13 of 2017**
**(Cause FSD 14 of 2016 (NSJ)**

**IN THE MATTER OF SHANDA GAMES LIMITED**

**(1) MASO CAPITAL INVESTMENTS LIMITED**
**(2) BLACKWELL PARTNERS LLC – SERIES A**
**(3) CROWN MANAGED ACCOUNTS SPC ACTING FOR**
**AND ON BEHALF OF CROWN/MASO SEGREGATED**
**PORTFOLIO**

**Appellants**

**AND**

**SHANDA GAMES LIMITED**

**Respondent**

| | |
|---|---|
| Appearances: | Mr. Robert Levy QC instructed by Mr. Mac Imrie and Ms. Gemma Freeman of Maples and Calder for the Appellants<br>Mr Philip Jones QC instructed by Mr. Paul Madden and Mr. James Elliott of Harneys for the Respondent |
| Date of Hearing: | 4 and 5 September 2017 |
| Date of Delivery: | 6 March 2018 |
| Judgment Finalised:<br>and approved | 9 March 2018 |

**JUDGMENT**

MARTIN JA:

*Introduction*

1.   A shareholder in a Cayman-registered company who dissents from a merger or consolidation of the company under ***Part XVI of the Companies Law*** is entitled under section 238 of that Law to be paid "*the fair value of his shares*" as determined by the court, together with a fair rate of interest.  These appeals raise important questions about the methodology to be applied in determining the fair value and fixing a fair rate of

interest, and about the extent to which principles developed in other jurisdictions with similar regimes may legitimately be applied to a section 238 determination.

2.    On 18 November 2015 Shanda Games Limited ("**Shanda**"), a Cayman-incorporated company, merged with Capitalcorp Limited in the culmination of a take-private transaction led by Shanda's principal shareholders and management.  At the EGM held on that date to authorise the merger, 99.3% of Shanda's shareholders that voted did so in favour of the merger.  Under the terms of the merger, they received US$3.55 per share (or US$7.10 for each American depository share ("**ADS**"), those shares equating to two ordinary shares).  Certain shareholders ("**the Dissenting Shareholders**") dissented from the merger: they are the respondents to the petition by Shanda seeking determination of the fair value of their shares that gives rise to these appeals.

3.    On 17 May 2017 Segal J made an order on Shanda's petition, determining the fair value of the Dissenting Shareholders' shares to be US$8.34 per share (US$16.68 per ADS) – more than double the merger price - and the fair rate of interest to be 4.295%.  This resulted in an order for payment to the Dissenting Shareholders of US$73,575,995 plus interest of US$2,788,801.  Shanda appeals with leave of the judge against the judge's refusal to discount the value of the Dissenting Shareholders' shares to reflect their minority holdings, and against his decision on the rate of interest.  The Dissenting Shareholders appeal, again with the leave of the judge, against aspects of the methodology adopted by the judge to determine the fair value of the shares.

4.    Shanda also took issue with the refusal of the judge to admit further expert evidence and defer his decision on value until after the evidence had been heard, and filed a notice of appeal without leave.  On 4 September 2017 we determined that leave was necessary and refused it, alternately dismissing the appeal if we were wrong about the necessity for leave.  My reasons for this are incorporated in this judgment.

*Background*

5.    In his commendably careful and comprehensive judgment, the judge set out in detail the history of the companies, the merger and the proceedings.  For the purpose of these appeals, it is unnecessary to say more than the following.

6.      Shanda was incorporated in the Cayman Islands on 12 June 2008. It is an online game developer, operator and publisher. It is one of China's largest video game companies, offering a diverse portfolio of popular online and mobile games primarily in China, as well as in overseas markets.

7.      As at 31 December 2014, Shanda had an aggregate of 537,832,318 ordinary shares outstanding, comprising Class A and Class B shares including Class A ordinary shares represented by the ADSs. The ADSs were publicly listed on the US NASDAQ Global Select Market from September 2009 until Shanda was taken private in November 2015. Each Class B ordinary share was convertible into one Class A ordinary share but carried ten times as many votes. At the conclusion of the merger the Dissenting Shareholders were between them the registered owners of 8,822,062 Class A ordinary shares, representing some 1.64% of the issued share capital.

8.      The merger was effected under the provisions of *Part XVI of the Companies Law*. Those provisions, which were introduced in 2009, in their current form have the effect that a merger or consolidation ordinarily requires authorisation only by special resolution of the shareholders of each constituent company – that is to say, by a two-thirds majority. As will be seen, this provides a simpler method of effecting a merger, consolidation or take-over than other regimes contained in the *Companies Law*, which require majorities of 90% or 75% and contemplate intervention by the court.

9.      Section 238 (which forms part of Part XVI) contains a procedure for dissenting from a merger. It was complied with in the present case. One consequence of dissent is, by subsection (7), that from a period no longer than 40 days after the meeting approving the merger the dissenting shareholder ceases to have any of the rights of a member except the rights to be paid the fair value of his shares as determined by the court, to participate in the petition and to institute proceedings disputing the validity of the merger.   A first step towards arriving at the fair value of the dissenter's shares is the making by the company of an offer for the dissenter's shares at a specified price that the company determines to be their fair value (subsection (8)); but that cannot occur before the dissenting shareholder has lost his rights as member by virtue of subsection (7). Such an offer was made in the present case by Shanda but was rejected by the Dissenting Shareholders.

10.    Shanda's petition was issued on 4 February 2016.

11.    Each side engaged an expert.   Shanda's expert was Professor Gregg A. Jarrell ("Professor Jarrell"), a tenured Professor of Economics and Finance at the University of Rochester's Simon Business School, where he has been a member of the faculty since 1988. He holds a Ph.D. in Business Economics from the University of Chicago (1978), with major concentrations in Industrial Organization and Finance, as well as an MBA (1976) from the University of Chicago. The Dissenting Shareholders engaged William Inglis ("Mr. Inglis"), a Senior Managing Director in the Singapore office of FTI Consulting, a global expert services firm specialising, amongst other matters, in expert witness services and litigation support. Mr. Inglis is a Chartered Accountant and since 1989 has specialised in valuation and the quantification of loss in the context of legal disputes.

12.    The hearing of the petition took place in November 2016 over eight days, of which five were taken up by the expert evidence.   At all stages of the petition, up to and including the hearing, the attorneys acting for Shanda were Conyers Dill & Pearman ("Conyers"). On 20 January 2017, however, Shanda gave the Court and the Dissenting Shareholders notice that it had changed its attorneys and was now represented by Harneys.

13.    On 20 March 2017 the judge circulated a draft judgment. He had signalled his intention to do so at various stages over the preceding weeks, but because of an administrative error by the court, Harneys were unaware of this.  On the same day, but before the draft was circulated, Shanda, acting by Harneys, issued a summons seeking liberty to reopen its case and to introduce additional expert evidence. The judge dismissed this summons on 25 April 2017.  He gave reasons for his decision on 27 July 2017. As already stated, Shanda appealed against the judge's dismissal of the summons ("the reopen application"), contending that leave was unnecessary – although it applied for leave if in fact it was necessary. Also on 25 April 2017, the judge formally released his substantive judgment. On 6 May 2017 he produced a note on the fair value calculation; on 16 May 2017 he issued a further judgment dealing with the fair rate of interest; and on 17 May 2017 he made the order referred to in paragraph 3 above embodying his various decisions.

14.     As I have said, both Shanda and the Dissenting Shareholders appealed against that order. I deal in turn with the reopen application, Shanda's substantive appeal and the Dissenting Shareholders' appeal.

*The reopen application*

15.     Following their replacement of Conyers as Shanda's attorneys, Harneys commissioned Jaime d'Almeida ("Mr. d'Almeida") to review the trial transcripts and the reports and evidence of Professor Jarrell and Mr. Inglis.  Mr. d'Almeida subsequently provided a fresh expert opinion, which concluded that the evidence from Professor Jarrell was so inadequate, both in its own methodology and approach and in its failure adequately to challenge Mr. Inglis's work and conclusions, that the court had been misled at trial. The basis of Shanda's summons was that Mr. d'Almeida's evidence was necessary if the court was to make a proper and just decision as to fair value.

16.     The reasons given by the judge for refusing to allow Shanda to reopen its case and adduce the evidence of Mr. d'Almeida, which were again expressed in a clear and comprehensive judgment that extended to 69 pages, may be summarised as follows.

   (1)     The court had jurisdiction to admit new evidence and reopen the trial after judgment had been handed down in draft. The principle to be applied when deciding to exercise the jurisdiction was the overriding objective to deal with cases justly and at proportionate cost. Although the application was made to the trial judge, the court should take into account the ***Ladd v Marshall*** factors restricting reliance on new evidence on appeal - which, even applied more leniently than on an appeal, meant that powerful factors or strong reasons would be needed to justify the application. When applying the overriding objective after a judgment had been handed down, the court needed to take into account the question of reconsideration and the prejudice caused by depriving a successful party of a judgment; and in the context of applications to admit new evidence after trial, whether or not a judgment had been handed down, there was a balance to be struck between on the one hand the court's desire (and the parties' entitlement) to have a decision based on the true factual position and on the other the need for finality in litigation.

*CICA 12 and 13 of 2017 – In the matter of Shanda Games Ltd - Judgment*

(2)  The court had to "*consider and weigh in the balance in particular the reasons for the application, the conduct of the parties, the delay between the conclusion of the trial and the making of the application, the prejudice to the applicant as a result of not allowing the new evidence to be admitted and the trial re-opened, the prejudice to the other party of being deprived of the judgment or the further costs and delays of having to deal with new evidence and a new hearing and the need to secure the "just, most expeditious and least expensive determination of every cause or matter on its merits (see paragraph 2.2 of the Preamble to the Grand Court Rules). The need for justice to other litigants and a fair allocation of the court's resources must be taken into account*".

(3)  A number of factors weighed strongly in favour of dismissing the summons. They were as follows:

    a.  The issues dealt with in Mr. d'Almeida's report had been the subject of detailed submissions and cross-examination during the course of a long trial conducted by leading counsel. Many if not most of the difficulties faced by Professor Jarrell during his cross-examination were crystal clear during the trial because he was candid and straightforward about the limited nature of his evidence and preparation and his failures fully to understand parts of Mr Inglis's evidence. It had been Professor Jarrell's poor performance in the witness box on some issues that had presumably caused Shanda and its counsel to make a series of concessions and not to contest a significant number of issues at trial.

    b.  The trial had concluded on 17 November 2016, but Shanda had waited until 20 March 2017 to make its application. The fact that the court had not by then delivered its judgment was no excuse for the delay in a case where the problems with the expert witness and evidence were apparent at trial. The court's concern and criticism arose from Shanda's failure to act with sufficient expedition during or shortly after the trial, when the performance of the expert was visible and clear during the trial. Some delay was bound to be involved in instructing a new expert and awaiting the outcome of his work; but, even taking that into account, Shanda could have acted much more rapidly in bringing on an application to deal with the perceived deficiencies in, and problems with the expert evidence.

c.  The judge accepted that Harneys had not been aware of his updates regarding the timing of the handing down of the judgment, and consequently did not take the view that the application was an abuse of process. He did, however, comment that it was a remarkable coincidence that the filing of the summons almost precisely coincided with the handing down of the draft judgment, and he said that he felt himself entitled at least to note that the filing of the summons could be viewed as a litigation tactic to delay the conclusion of the litigation.

d.  If the summons were acceded to, the whole process of preparation of revised experts' reports – including the provision of further information, further meetings with management, and a further joint meeting of the experts – would have to be gone through again, and there would have to be another trial at which they could both be cross-examined. In many respects the proceedings would need to revert to the stage reached when the original directions order had been made. This would involve significant further cost to the parties, delays and significant further amounts of limited court time and resources.

e.  The real thrust of Shanda's complaint was that Professor Jarrell had been negligent in the performance of his duties. The negligent performance of his duties by an expert would not generally be, and in the present case was not, sufficient to allow the party that selected him to re-open the trial and instruct a second expert (and in effect have a second bite at the cherry). The prejudice suffered by the party concerned could be remedied by making a claim against the expert. It would be disproportionate and unjust to make the other party suffer the consequences when both had been able to select whichever expert they chose.

f.  Shanda had rightly accepted that it needed to demonstrate that the problems with the experts meant that the court's decision was unsafe. In this respect a section 238 petition was no different from other cases. Although the court had to determine the fair value for itself and form its own independent view, it was (both generally and in the present case) particularly dependent on the expert evidence to assist it. If it could be shown that the expert opinion evidence was fundamentally flawed the

court's decision-making would of necessity be unsafe because there would be no other evidence on which the court could have relied for the purpose of forming its view.

g.  Shanda had asserted that both Professor Jarrell and Mr. Inglis had failed properly to deal with a number of critical issues, with the result that their valuations were fundamentally flawed and their evidence was so seriously deficient that the court had been materially misled by the entire corpus of opinion evidence going to value and its determination of fair value was as a result unreliable. However, Mr. d'Almeida's report did not establish that Mr. Inglis's evidence on the material matters he identified was so deficient and incompetently prepared as to be outside the range of reasonable professional opinions on the valuation issues. The court had been properly able to rely on Mr. Inglis's evidence, as well as on parts of Professor Jarrell's evidence. Although parts of Professor Jarrell's evidence were weak and unreliable, his failures did not undermine the credibility and reliability of all his evidence.  On a number of issues he had demonstrated the expertise of a properly qualified expert and had given evidence that was reasonable and consistent with the academic and professional literature and accepted methodologies of those qualified in the field of financial valuation and statistical analysis. Nor did Professor Jarrell's failure to raise the points and challenge Mr. Inglis on the issues identified by Mr. d'Almeida mean that Mr. Inglis's evidence must be treated as unsafe.

h.  There had been problems caused by serious deficiencies in the factual record that had required the experts and ultimately the court to make certain assumptions or inferences. That had been largely the fault of Shanda; but it was not in any event a sufficient reason for concluding that the expert evidence given at trial was unsafe as a whole or to a material extent. Mr. Inglis had dealt with the evidential deficiencies properly and reasonably and had produced an opinion that was reasonable and reliable and based on reasonable assumptions informed by accepted professional practice. The fact that Shanda had belatedly found an expert who was prepared to support a much lower value for the shares was not sufficient to justify the conclusion that the evidence

at trial was seriously compromised and flawed and that the judgment was unsafe. It would be wrong to permit Shanda to indulge in opinion shopping and to impose on the Dissenting Shareholders the further costs and delays associated with further evidence and a new trial (as well as to cause them the significant prejudice resulting from being deprived of the judgment already delivered).

17.    Shanda filed a notice of appeal on 9 August 2017, and on the same day filed a summons in the Grand Court seeking leave to appeal. That summons was not pursued; but in its initial skeleton argument in support of the reopen application Shanda sought leave to appeal from the Court of Appeal, albeit only in paragraphs 50 to 53 of the 54-paragraph document. The Dissenting Shareholders formally objected to the appeal being pursued without leave; and Shanda devoted its reply skeleton (but not its oral submissions, which were directed to the merits of the reopen appeal) to the issue of whether leave was or was not required.

18.    Section 6 of the ***Court of Appeal Law*** (2011 Revision) provides that, subject to certain exceptions not presently relevant, no appeal shall lie from an interlocutory judgment of the Grand Court without the leave of that court or of the Court of Appeal. Shanda's contention was that the order dismissing the application to reopen the hearing was not an interlocutory order but a final order. This startling proposition was argued in the reply skeleton in the following way.

   A.    Rule 12(3) of the ***Court of Appeal Rules*** (2014 Revision) provides that "*a judgment or order shall be treated as final if the entire cause or matter would (subject only to any possible appeal) have been finally determined whichever way the court below had decided the issues before it*".

   B.    Rule 12(4) provides that "*for the purposes of sub-rule (3), where the final hearing or the trial of a cause or matter is divided into parts, a judgment or order made at the end of any part shall be treated as if made at the end of the complete hearing or trial*".

   C.    Properly analysed, the petition fell into two parts or stages: identification of the relevant valuation principles, followed by the determination of the fair value by reference to those principles.

D. Shanda's summons was made "*so that Mr d'Almeida's report could be admitted into evidence at the first stage, but taken into account at the second stage i.e. the stage at which the court (with the assistance of the experts) would determine the actual dollar amount representing fair value*" (original emphasis).

E. "*It was no part of the Company's case on the Summons that there should be a re-hearing of the first stage. It sought only to re-open its case prior to the conclusion of the first stage to adduce evidence to be taken into account later*" (original emphasis).

F. If the judge had allowed Shanda's summons, "*the first stage would still have been at an end at that point. Any expert evidence in reply by the Dissenters and/or cross-examination by them of Mr d'Almeida would have happened as part of the second stage. Clearly the first stage was also at an end upon the Summons being dismissed. In other words, whether or not the orders sought in the Summons were granted, either way the first stage of the trial of the petition was at an end*".

G. The Dissenting Shareholders were wrong to classify the order as having been made on a summons for directions, since the purpose of such a summons was to make preparations for trial. They were also wrong to classify the order as one made on an application for a new trial or rehearing; all that Shanda wanted to do was to add to its evidence before judgment. None of the deeming provisions in Rule 12 applied.

19.    It is in my view plain that the order was interlocutory. Whilst it is true that the judge determined the fair value and the fair rate of interest separately, with separate evidence being admitted on the latter, and that he left the calculation of Shanda's value to the parties in the light of his determination of the relevant principles, the suggestion that the hearing of the petition was otherwise divided into stages is wholly artificial. So also is the suggestion that any evidence in rebuttal, or cross-examination of Mr d'Almeida, would have been heard at the stage of turning valuation principles into actual value, rather than at the stage where the expert evidence was being taken. The refusal to allow Shanda to adduce further evidence was a decision about the conduct of an aspect of the trial, and the judge's order was not in any respect determinative of the parties' substantive rights. Leave to appeal was required.

20.     Leave to appeal will not be granted unless there is a real prospect of the appeal succeeding, or there is a point at issue that should be considered by the Court of Appeal in the public interest. Shanda contends that it is entitled to leave on both bases.

21.     Shanda's contentions were founded on what it said was the nature of section 238 proceedings. The purpose of such proceedings was to establish a fair value for all the shares, and the court's determination of that value was binding on the entire world. Although in fact in the present case all shareholders who had dissented from the merger were parties to the proceedings, that would not always necessarily be the case; and any shareholder who had dissented from the merger but had elected not to participate in the litigation would be entitled to receive the same fair value for his shares as was due to those shareholders who had litigated. It followed that the proceedings were not ordinary litigation, and the Court's task was not just to do justice between the parties but to determine the fair value of the shares for the benefit of all. That in turn meant that the Court was to have regard to anything which might assist it to arrive at the fair value; and accordingly the only real issue on the reopen application was whether or not Mr d'Almeida's evidence was relevant to the Court's determination of fair value. It was submitted that it plainly was relevant, particularly but not exclusively in areas where the judge had not accepted the evidence of either Professor Jarrell or Mr. Inglis. The judge had mischaracterised the reopen application as being an application to adduce fresh evidence after judgment, and had therefore required Shanda to satisfy a stricter test than was appropriate. The fact that he had delivered a judgment in draft did not make the situation one where a formal judgment had been delivered, so that questions of recalling his decision and disappointing the expectations of the successful party did not arise. Nor were ***Ladd v Marshall*** considerations relevant, even in the modified form in which the judge had dealt with them, since the trial was not at an end. Although the judge had gone on to consider Mr. d'Almeida's evidence, he had done so only in his judgment refusing the reopen application. What he should have done was to appreciate that he was being asked to admit additional evidence during the course of the trial; and had he done so he would have realised that the evidence would assist him in his only task, that of determining fair value, and that any prejudice to the Dissenting Shareholders could be met by an appropriate award of costs.

22.   I do not accept the fundamental premise of Shanda's argument. Whilst it is true that section 238 requires determination of the fair value of the shares, the significance of the determination is limited: the only persons affected by it are the company and dissenting shareholders, whether or not they participated in the litigation. A shareholder who consented to the merger or accepted the merger price cannot claim to be entitled to a different price depending on the outcome of the section 238 proceedings. Essentially, the proceedings affect only those who have taken issue with the merger price, so that there is in reality a lis between them and the company. The purpose of the proceedings is to resolve that lis, and in that respect a section 238 petition is no different from ordinary litigation. Moreover, Shanda's argument ignores the process by which the determination of fair value is to occur. Since the fair value is not necessarily the same as the merger price or the price at which the shares were trading before the market in them was affected by knowledge of the merger, it is inevitable that the determination will involve an assessment of a substantial quantity of information relating to the financial affairs of the company whose shares are to be valued. It is unlikely in the extreme that the court will be able to make that assessment without expert assistance. In the ordinary case, as in this one, both the company and any dissenting shareholders will appoint experts; but even in a case where no dissenting shareholder is prepared to participate in the litigation, the company, and perhaps also the court itself, will instruct an expert. In every case, the court's task will be to assess the utility of the expert evidence to the determination of fair value. Carrying out that task in the context of section 238 proceedings is no different in nature from carrying it out in ordinary inter-partes litigation. In ordinary litigation, and in section 238 proceedings, the court will determine generally, or on an issue by issue basis, whether an expert's evidence is to be accepted in whole or in part and how conflicts are to be resolved. If necessary, the court is entitled to substitute its own view for that of the experts. The process, however, is one that will be familiar to most judges. The fact that the outcome of the process in a section 238 case is capable of affecting persons other than those who participated in the litigation seems to me immaterial: shareholders who do not participate cannot complain if the fair value of their shares is determined by reference to evidence into which they have had no input.

23.   Shanda's argument came very close to amounting to an assertion that the judge had no real discretion and was obliged to take into account any evidence relevant to fair value

presented to him before formal delivery of his judgment. As I have pointed out above, however, the judge's decision related to the conduct of an aspect of the trial, and was plainly a matter for his discretion. It seems to me impossible to fault his exercise of that discretion. Even accepting, as the judge did, that Harneys had not been kept informed of the progress of his draft judgment, Shanda's application was made extremely late. As the judge said, it must have been apparent during the course of the hearing that there were significant problems with Professor Jarrell's evidence; indeed, the only possible explanation for the engagement of Mr. d'Almeida was that Shanda had recognised those problems. Nevertheless, the application was not made until just over four months after the conclusion of the hearing. Moreover, the judge was best placed to assess the extent to which he could place reliance on the evidence of Professor Jarrell and Mr. Inglis, and the extent to which the assistance to be derived from Mr. d'Almeida's evidence justified a resumption of the hearing. The passage from his judgment I have quoted in paragraph 16(2) above demonstrates that the judge had firmly in mind the relevant considerations; and, although on occasion he does appear erroneously to have regarded the application as one for a reopening of the trial after judgment, there was ample material to justify his conclusion that justice did not require him to accede to an application that was too late and too inadequate.

24.    These considerations meant that there was no reasonable prospect of an appeal succeeding, and nothing in the nature of section 238 proceedings to justify an appeal, so that leave to appeal should not be granted. The same considerations justified dismissing the reopen appeal if, contrary to our view, leave to appeal was unnecessary.

*Shanda's substantive appeal*

25.    Shanda's notice and grounds of appeal as originally drawn took issue with several aspects of the methodology used by the judge to arrive at his decision on the fair value of the Dissenting Shareholders' shares. All but one of these was abandoned, however, and before us Shanda's only contention (apart from in relation to interest) was that the judge should have discounted the value of the Dissenting Shareholders' shares to reflect the fact that they had only minority holdings ("the minority discount point").

The minority discount point

26.   The shares held by the Dissenting Shareholders between them amounted to about 1.64%
      of Shanda's issued share capital. So small a proportion would give them virtually no
      influence, and still less control, over Shanda's affairs. They would not be able on their
      own to promote or resist any type of shareholder resolution. This lack of influence and
      control would ordinarily have an adverse impact on the market price of the shares; and
      Shanda argued before the judge that this should be reflected by way of a minority
      discount in the valuation of the Dissenting Shareholders' shares. The experts agreed
      that, if such a discount were to be incorporated in the valuation, it should be 23%.
      According to Shanda, this would mean that the value of the Dissenting Shareholders'
      shares would reduce by about US$16.9m.

27.   The judge held that no minority discount should be applied. His reasoning was as
      follows.

      (a) In Delaware and Canada, each of which had regimes similar to that contained
          in section 238 of the ***Companies Law***, it was clear that no minority discount
          was to be given. The shares of a dissenting minority were to be valued as a
          proportion of the value of the company, not as a block of shares offered for sale.
          In Delaware, this was in part a consequence of the rejection of market value as
          the measure of fair value.

      (b) In ***Re Integra Group*** [2016] 1 CLR 192, Jones J in the Grand Court considered
          that there should be no minority discount, although the point had not been
          argued or live.

      (c) The purpose of the fair value standard was to ensure that the dissenting minority
          was fully protected. That meant that they should be compensated for the full
          value of their interest in the company, which was their proportionate share in
          the capital and value of the company.

      (d) This approach was consistent with one aspect of the legal nature of a share and
          the rights of a shareholder, namely that a shareholder owned an undivided share
          in the share capital of the company.

      (e) The full value of a dissenting shareholder's interest included the right to a
          distribution of his share of the company's assets and value following a sale or
          other realisation of the company's business. This was equivalent to the value
          of a partner's interest in a partnership, which was based on a notional sale of the

business as a whole to an outside purchaser and the distribution to the partners of their share of the partnership property.

(f) The English and Bermuda cases relied on by Shanda, to which I refer below, were distinguishable.

28. Shanda's principal contention was that the judge should not have followed the Delaware (and Canadian) jurisprudence, but should instead have looked to the English authorities dealing with the compulsory acquisition of shares by way of a scheme of arrangement or a "*squeeze-out*" or in a claim of unfair prejudice – all of which applied or permitted a minority discount. There was nothing in jurisprudential terms to distinguish between a merger, a squeeze-out and a scheme of arrangement as a mechanism for compulsory purchase of shares, and similar principles should apply to all three. The judge should also have had regard to authorities from Bermuda and the British Virgin Islands, both common law jurisdictions, which again recognised the possibility of a minority discount. The Delaware jurisprudence, which was to the effect that a dissenting shareholder was entitled to his proportionate interest in the overall fair value of the corporation appraised as a going concern, was influenced by public policy considerations that had no place in the Cayman Islands, or in England and Wales. It had never been part of the public policy of the Cayman Islands or of England and Wales that there was anything unjust in the compulsory purchase of shares for less than the amount a shareholder would receive on the sale of the company's business and the distribution of the proceeds. Moreover, the language of the Delaware statute required valuation of a dissenter's "*shares of stock*" and so placed the emphasis on the totality of the stock. By contrast, the statutory criterion in section 238 was "*the fair value of his shares*", which focused on what the dissenter owned. A shareholder who had a minority shareholding should receive the fair value of what he possessed, namely a minority shareholding. Applying conventional principles of statutory construction, there was no justification in the wording of the section for valuing the company rather than the shares themselves. Unless the shares, as opposed to the company, were valued, there would be no means of giving effect in the valuation to differences in the rights and obligations attaching to different classes of shares, for example preferential rights to distributions of income and capital or to votes (such as the voting rights of the class B shares in the present case), or liability to calls; but there was no justification for leaving such differences out of account. If it was right to take them into account, however, then the

difference between a majority and a minority shareholding should likewise be taken into account in the valuation exercise.

29.    The principal contentions of the Dissenting Shareholders were as follows. Section 238 required determination of the "*fair value of the shares*", and the focus should be on the expression "*fair value*", not on "*the shares*". Fair value was different from market value, and different from the value at which shares might trade on a stock exchange. The United Kingdom, Bermuda and BVI authorities were distinguishable. There was no provision in the United Kingdom legislation relating to schemes of arrangement, squeeze-out acquisitions or unfair prejudice petitions that required the court expressly to apply a standard of fair value; but that was the criterion in the Delaware and Canadian legislation, and on the grounds both of similarity of the statutory language and because Delaware, like the Cayman Islands, was a substantial financial centre the Delaware jurisprudence should be followed.  That was the course taken in *Integra*, and the judge was right to follow it. The Delaware principle of valuing the shares as a proportion of the value of the business represented the reality of the situation in a merger, where all the shares were being acquired, whether voluntarily or compulsorily, and the entirety of the business merged in the new structure.

30.    In order to deal with these contentions, it is convenient first to consider the position in other jurisdictions.

*Delaware*

31.    A number of states in the USA have appraisal regimes, but the one that is most used is the one in Delaware.  The relevant statutory provision in Delaware is section 262 of the Delaware General Corporation Law. Subsection (a) provides that any holder of "*shares of stock*" in a Delaware corporation who dissents in defined circumstances from a merger "*shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock*" through a defined process.  Subsection (h) provides that through that process "*the Court shall determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, if any, to be paid upon the amount determined to be the fair value*".

32.     The Delaware appraisal regime has been the subject of substantial authority.  In relation
        to the minority discount point, the judge referred to and quoted from three of those
        authorities: ***Cavalier Oil Corp v Harnett*** 1988 WL 15816 at first instance, and 564 A.2d
        1137 (1989) on appeal to the Delaware Supreme Court; ***Re Appraisal of The Orchard
        Enterprises Inc*** 2012 WL 2923305; and ***Re Appraisal of Dell Inc*** 2016 WL 3186538
        (at first instance).  Three points in particular emerge from these decisions.  First, the
        concept of "*fair value*" in the Delaware jurisprudence, in the words of Laster V.C. in
        ***Dell***, "*derives more from judicial writings than from the appraisal statute itself*", and
        is "*a largely judge-made creation, freighted with policy considerations*". [***Dell*** has very
        recently been overturned in part on appeal by the Supreme Court of Delaware, primarily
        on the basis that insufficient weight was given to the merger price.  However, the
        statement I have quoted was not affected.]  Secondly, the object of a Delaware appraisal
        is to value the corporation itself and allocate to a dissenting shareholder "*his
        proportionate interest in the overall fair value of the corporation, appraised as a going
        concern*" (Jacobs V.C. in ***Cavalier***).  Thirdly, and consequent on the second point, no
        allowance is to be made for the size of a shareholding.  This point is stated most clearly
        by Walsh J in the Delaware Supreme Court in ***Cavalier***:

> "*In rejecting a minority or marketability discount, the Vice Chancellor
> concluded that the objective of a section 262 appraisal is "to value the
> corporation itself, as distinguished from a specific fraction of its shares
> as they may exist in the hands of a particular shareholder". We believe
> this to be a valid distinction.*
> *A proceeding under Delaware's appraisal statute, 8 Del.C. § 262,
> requires that the Court of Chancery determine the "fair value" of the
> dissenting stockholders' shares. The fairness concept has been said to
> implicate two considerations: fair dealing and fair price. Weinberger v.
> UOP, Inc., 457 A.2d at 711. Since the fairness of the merger process is
> not in dispute, the Court of Chancery's task here was to value what has
> been taken from the shareholder: "viz. his proportionate interest in a
> going concern." **Tri-Continental Corp. v. Battye, Del.Supr.,** 74 A.2d 71,
> 72 (1950). To this end the company must be first valued as an operating
> entity by application of traditional value factors, weighted as required,
> but without regard to post-merger events or other possible business
> combinations. See **Bell v. Kirby Lumber Corp.,** Del.Supr., 413 A.2d 137
> (1980). The dissenting shareholder's proportionate interest is
> determined only after the company as an entity has been valued. In that
> determination the Court of Chancery is not required to apply further*

*weighting factors at the shareholder level, such as discounts to minority shares for asserted lack of marketability. ...*

*The application of a discount to a minority shareholder is contrary to the requirement that the company be viewed as a "going concern." Cavalier's argument, that the only way Harnett would have received value for his 1.5% stock interest was to sell his stock, subject to market treatment of its minority status, misperceives the nature of the appraisal remedy. Where there is no objective market data available, the appraisal process is not intended to reconstruct a pro forma sale but to assume that the shareholder was willing to maintain his investment position, however slight, had the merger not occurred. Discounting individual shareholdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result."*

*Canada*

33.    The principal appraisal regime in Canada is that under section 190 of the ***Canada Business Corporations Act***, although there are also provincial appraisal statutes. Section 190 applies in a number of situations including a resolution by a corporation to carry out a going-private transaction or a squeeze-out transaction.  Subsection (3) provides, so far as relevant, that "*a shareholder who complies with this section is entitled, when the action approved by the resolution from which the shareholder dissents ... becomes effective, to be paid by the corporation the fair value of the shares in respect of which the shareholder dissents*".

34.    There has been less litigation about the Canadian provisions than about the Delaware provisions, apparently partly because Canada ordinarily allows only a reasonable rate of interest, whereas Delaware now ordinarily awards compound interest at 5% p.a. over the Federal Reserve discount rate, and partly because adverse costs orders are ordinarily available in Canada but not in Delaware.   Moreover, although some Canadian provincial legislation allows a dissenter to acquire shares after the intended transaction becomes public knowledge, as does Delaware, the ordinary rule in Canada is that the dissenters must already have held their shares.  These factors have historically made Canada less attractive to "*appraisal arbitrageurs*" (that is to say, speculators who

purchase shares with the intention of exercising appraisal rights to make a profit), and that in turn has resulted in a lower volume of litigation. However, it is well established in Canada, at least at provincial level, that no minority discount is to be applied in determining fair value. In ***Kummen v Kummen-Shipman Ltd*** (1983) 19 Man R (2nd) 92, a decision of the Manitoba Court of Appeal, the rationale for the exclusion of a minority discount was said to flow from the context in which appraisals of fair value take place: the shares are effectively being purchased by existing shareholders to consolidate their existing position.

*England and Wales*

35.     England and Wales does not have an appraisal regime similar to section 238 or to those in Delaware and Canada. There are, however, two circumstances in which majority shareholders may acquire the shares of an unwilling minority; and each of these has a direct parallel in the Companies Law in this jurisdiction.

A.    The first of these circumstances is known as a squeeze-out, under which the offeror in a proposed takeover that has been approved by 90% of the shareholders of the target company may acquire the remaining shares. The current provisions, which are contained in Chapter 3 of Part 28 of the Companies Act 2006, apply where the offeror has acquired or unconditionally contracted to acquire 90% in value and (if the shares are voting shares) by voting rights of the shares or class of shares; and on giving notice the offeror is entitled and bound to acquire the shares on the terms of the offer unless the court, on an application made by the shareholder under section 986, orders that the offeror is not entitled and bound to acquire the shares or that the terms on which he is entitled and bound to acquire them shall be such as the court thinks fit. Section 986(4) provides that the court may not require consideration of a higher value than that specified in the offer unless the holder of the shares shows that the offer value would be unfair. In their earlier, simplified form the squeeze out provisions were contained successively in section 155 of the *Companies Act 1929* and section 209 of *the Companies Act 1948*, and the relevant part of each of these was in identical terms to section 88 of the *(Caymanian) Companies Law*. They applied, as does section 88, where a scheme or contract involving the transfer of shares to another company had been approved by the holders of not less than 90% by value of the shares in the transferor company; and the

transferee company was then *"unless the Court thinks fit to order otherwise"* entitled to acquire the shares of any dissentients on the same terms as were offered to the approving shareholders. This formulation too imported considerations of fairness. Thus in *Re Hoare & Co Ltd* (1933) 150 LT 374 at 375 Maugham J, considering section 155 of the 1929 Act, said this:

> *"I have some hesitation in expressing my view as to when the court should think fit to order otherwise. I think, however, the view of the Legislature is that where not less than nine-tenths of the shareholders in the transferor company approve the scheme or accept the offer, prima facie, at any rate, the offer must be taken to be a proper one, and in default of an application by the dissenting shareholders, which includes those who do not assent, the shares of the dissentients may be acquired on the original terms by the transferee company. Accordingly, I think it is manifest that the reasons for inducing the court to "order otherwise" are reasons which must be supplied by the dissentients who take the step of making an application to the court, and that the onus is on them of giving a reason why their shares should not be acquired by the transferee company.*
>
> *One conclusion which I draw from that fact is that the mere circumstance that the sale or exchange is compulsory is one which ought not to influence the court. It has been called an expropriation, but I do not regard that phrase as being very apt in the circumstances of the case. The other conclusion I draw is this, that again prima facie the court ought to regard the scheme as a fair one inasmuch as it seems to me impossible to suppose that the court, in the absence of very strong grounds, is to be entitled to set up its own view of the fairness of the scheme in opposition to so very large a majority of the shareholders who are concerned. Accordingly, without expressing a final opinion on the matter, because there may be special circumstances in special cases, I am unable to see that I have any right to order otherwise in such a case as I have before me, unless it is affirmatively established that, notwithstanding the views of a very large majority of shareholders the scheme is unfair."*

The fact that the offer price involved a minority discount did not make the scheme unfair. That was established in ***Re Grierson, Oldham & Adams Ltd*** [1968] Ch 17, in which Plowman J (dealing with section 209 of the 1948 Act) said this (at 35F-g, 36G-37A):

> *"Then it is said that the price of 6s. a share does not reflect the advantages to Holts by their obtaining complete control of the company. I agree with Mr Instone [for Grierson] that that might possibly be used as an argument to justify paying a shareholder with a controlling interest a larger price for the shares than the price paid to minority holders. But,*

*in my judgment, __it is not unfair to offer a minority shareholder the value__*
*__of what he possesses, i.e., a minority shareholding.__ ... [O]n general*
*principle, ... in my judgment, the element of control is not one which ought*
*to have been taken into account as an additional item of value in the offer*
*of these shares"* (emphasis added).

B.  The second circumstance in which a minority shareholding may be acquired is
    under a scheme of arrangement. Such schemes are dealt with by Part 26 of the
    *Companies Act 2006.* So far as material, section 899 provides for an
    arrangement between a company and its members that is approved by a majority
    in number representing 75% of the members by value to bind all members if
    sanctioned by the Court. Section 900 applies in the case of an application made
    under section 899 for sanction of a scheme of arrangement proposed for the
    purpose of the amalgamation of two companies involving the transfer of the
    whole or part of the undertaking of one of those companies to the other; and it
    allows the Court to deal with, among other things, the provision to be made for
    any persons who dissent from the arrangement. These provisions are mirrored
    in sections 86 and 87 of the (Caymanian) *Companies Law.* Schemes of
    arrangement may be utilised in a wide range of circumstances, but are
    commonly used to effect a merger, consolidation or takeover. In *Re Linton Park*
    *plc* [2005] EWHC 3545 (Ch); [2008] BCC 17 Lewison J said this:

    *"[5] A court will usually sanction a scheme if (1) the requirements of the*
    *statute have been complied with; (2) the class is fairly represented by*
    *those who attended the meeting and the statutory majority were acting*
    *bona fide; and (3) the scheme is one which an honest and intelligent*
    *person acting in his own interests as a member of the class might*
    *reasonably approve. Thus stated the third limb of the test is not whether*
    *the opposing shareholders or creditors have reasonable objections to the*
    *scheme. A shareholder or creditor may be equally reasonable in voting*
    *for or against the scheme. In such a case shareholder democracy or*
    *creditor democracy, as the case may be, should normally prevail. ...*
    *[13] The third question is whether the terms of the scheme are fair. The*
    *issue here is the price of the shares, not the principle of the scheme. The*
    *philosophy underlying s.425 is that the members of the company are*
    *better able to pass judgment on what is in their best financial interests*
    *than a judge. There are safeguards in the requirement that not only a*
    *majority in number of the shareholders vote in favour of the scheme but*
    *also that they represent three quarters in value of the shares. Mr Kinch*
    *relies on the proposition that the price on offer is at a discount to net*

*asset value which the independent directors did not take into account. The evidence, so far as it goes, shows that the independent directors did take into account the net asset value of Linton Park and also the net asset value of Camellia. Teller and Greenwood, the advisers to the independent directors, in addition reworked Mr Kinch's figures and concluded that the share price of both Linton Park and Camellia traded at a roughly equal discount to net asset value. This is clearly a question upon which different views are possible, indeed a question upon which different views may be equally reasonable. But whether the package on offer is a fair price for the shares is a matter which the shareholders are far better to able to judge than the court, and for that reason the court will be very slow to depart from the majority view".*

This case accordingly establishes that in ordinary circumstances the majority will be regarded as the best judge of the fairness of the price, even if that price is at a discount to the net asset value.

36.     There is a further circumstance in United Kingdom law (although one not directly reproduced in Caymanian law) in which shares may be ordered to be transferred at a discount.  In the context of a petition brought under section 994 of the ***Companies Act 2006*** on the grounds that the affairs of the company are being or have been conducted in a manner unfairly prejudicial to shareholders, section 996(2)(e) provides that the court may order the purchase of the shares of any members of the company by other members or by the company itself.  The general rule is that the court will direct that the shares be purchased at a discount reflecting the size of the holding unless the case is one of quasi-partnership.  The position was summarised in ***Irvine v Irvine (No 2)*** [2007] 1 BCLC 445 in a passage quoted in the Bermudan decision of ***Golar LNG Ltd v World Nordic SE*** (see paragraph 38 below); and was stated as follows in the Court of Appeal in ***Strahan v Wilcock*** [2006] EWCA Civ 13; [2006] BCC 320 by Arden LJ:

> *"[17] The burden of the dispute between the parties on this appeal is as to the basis of valuation in the buy-out order. Shares are generally ordered to be purchased on the basis of their valuation on a non-discounted basis where the party against whom the order is made has acted in breach of the obligation of good faith applicable to the parties' relationship by analogy with partnership law, that is to say where a "quasi-partnership" relationship has been found to exist. It is difficult to conceive of circumstances in which a non-discounted basis of valuation would be*

*appropriate where there was unfair prejudice for the purposes of the 1985*
*Act but such a relationship did not exist. However, on this appeal I need not*
*express a final view on what those circumstances might be."*

Although some doubt has been cast on this general rule by two recent first instance decisions (***Re Blue Index Ltd*** [2014] EWHC 2680 (Ch) and ***Re Addbins Ltd*** [2015] EWHC 3161 (Ch), both proceeding on the basis that the oppressing majority should not ordinarily be rewarded for their oppressive conduct by receiving the benefit of a minority discount), it appears to me that the rule as I have described it is established at least at Court of Appeal level in England.

*Bermuda and BVI*

37.   Bermuda and the British Virgin Islands also have appraisal regimes. In Bermuda, the relevant provision is section 103 of the ***Companies Act 1981***, which is in the following terms:

>  *"103(1) The holders of not less than ninety-five per cent of the shares or any*
>  *class of shares in a company (hereinafter in this section referred to as the*
>  *"purchasers") may give notice to the remaining shareholders or class of*
>  *shareholders of the intention to acquire their shares on the terms set out in*
>  *the notice. When such a notice is given the purchasers shall be entitled and*
>  *bound to acquire the shares of the remaining shareholders on the terms set*
>  *out in the notice unless a remaining shareholder applies to the Court for an*
>  *appraisal under subsection (2):*
>  *Provided that the foregoing provisions of this subsection shall not apply*
>  *unless the purchasers offer the same terms to all holders of the shares whose*
>  *acquisition is involved.*
>  *(2) A shareholder to whom notice has been given under subsection (1) may*
>  *within one month of receiving the notice apply to the Court to appraise the*
>  *value of the shares to be purchased from him and the purchasers shall be*
>  *entitled to acquire the shares at the price so fixed by the Court".*

38.   This provision was considered in ***Golar LNG Ltd v World Nordic SE*** [2011] Bda L R 9. Ground CJ held at [5] that the shares should be appraised at their fair value; and in relation to minority discounts he said this:

*"[23] This was a relatively small shareholding in a quoted public company. In such a case I consider that it is appropriate to apply a minority discount to any share value derived from the pro-rated NAV. It may be that in this respect the law of Canada has diverged from that of England, but if I had to choose I would choose to follow the latter. In that regard I have been helped by the review of the law conducted by Blackburne J in Irvine v Irvine (No 2) [2007] 1 BCLC 445, and by his conclusion at 449 [11]:*

> *"a minority shareholding, even one where the extent of the minority is as slight as in this case [there the split was 50% plus and minus one share on each side], is to be valued for what it is, a minority shareholding, unless there is some good reason to attribute to it a pro rata share of the overall value of the company. Short of quasi-partnership or some other exceptional circumstance, there is no reason to accord to it a quality that it lacks".*

*Applying that to this case, this was not a quasi-partnership and there are no exceptional circumstances, and so a minority discount should be applied.*

*[24] It is also necessary to keep a sense of perspective, and bear in mind that the NAV is an entirely hypothetical figure which cannot easily be realised, particularly in a case such as this where the sudden sale of the entire tanker fleet at valuation is likely to be unachievable. The reality is that in a case such as this there is no possible way for the NAV to translate into money in a shareholder's pocket without incurring substantial break-up costs and associated losses. It is therefore appropriate to discount the NAV ...."*

39.     In BVI the relevant provision is section 179 of the ***BVI Business Companies Act 2004***, which entitles a member of a company to payment of the fair value of his shares upon dissenting from a merger or consolidation, as well as in certain other circumstances. The appraisal mechanism is set out in section 179(9), which is in the following terms:

> *"If the company and a dissenting member fail, within the period of 30 days referred to in subsection (8), to agree on a price to be paid for the shares owned by the member, within 20 days immediately following the date on which the period of 30 days expires, the following shall apply: (a) the company and the dissenting member shall each designate an appraiser; (b) the two designated appraisers together shall designate an appraiser; (c) the three appraisers shall fix the fair value of the shares owned by the dissenting*

> *member as of the close of business on the day prior to the date on which the*
> *vote of members authorising the action was taken or the date on which*
> *written consent of members without a meeting was obtained, excluding any*
> *appreciation or depreciation directly or indirectly induced by the action or*
> *its proposal, and that value is binding on the company and the dissenting*
> *member for all purposes; and (d) the company shall pay to the member the*
> *amount in money upon surrender by him of the certificates representing his*
> *shares".*

In ***Olive Group Capital Limited v Mayhew,*** [2016] ECSCJ No 167, a decision of the
Eastern Caribbean Court of Appeal, it was held that the BVI appraisal provisions as a
matter of law allowed for the application of a minority discount, but whether or not one
should be applied in any given case was a matter for the appraisers to determine.

*The position in the Cayman Islands*

40.     Apart from the present case, there are two Caymanian decisions that do or may bear on
the question of the proper approach to minority discounts.

41.     The decision of Jones J in ***Integra*** is directly to the effect that no minority discount is
permissible in a fair value determination under section 238. More generally, since that
decision the Delaware and Canadian jurisprudence has been regarded as relevant to
such determinations. In his substantive judgment in that case at [16], Jones J cited from
an article published in the Canadian Annual Review of Civil Litigation (2011) called
*Fair Value – A Common Issue With Surprisingly Sparse Canadian Authority* by Clarke
Hunter QC and Clarissa Pearce, which he said he had found to be helpful in a number
of respects; and he remarked on the fact that the Canadian legislation was very similar
to section 238. At [19] he set out a summary of the comparable United States legislation
provided by the expert instructed by the dissenting shareholders and accepted it as a
useful summary of the Delaware jurisprudence, which he said he thought could be
relied on as a helpful guide to the meaning of "*fair value*" in section 238. At [20] he
agreed with the following proposition, expressly based on Delaware and Canadian
principles, from an article called *Dissenting Shareholders' Appraisal Rights in Cayman
Islands Mergers and Consolidations* by Tony Heaver-Wren and Andrew Jackson:

> *"Fair value is the value to the shareholder of his proportionate share of the*
> *business as a going concern, save where it is worth less on a net assets (i.e.*

*liquidated) basis as at the merger date: ex hypothesis the shareholder has*
*bought into the company as a going concern, not in anticipation of*
*participating in a liquidation, and it follows that, when he elects to dissent*
*from a merger or consolidation brought about at the behest of the majority,*
*he is thereafter deprived of his proportionate share of an active enterprise*
*and is entitled to be compensated for it. In determining the measure of such*
*compensation, the Court should be guided by the following considerations:*

1.1    *Fair value does not include any premium for forcible taking (i.e.*
       *expropriation of the shares).*

1.2    *It is neither appropriate nor permissible to apply a minority*
       *discount when making the determination."*

At [27] he expressed his conclusion as follows:

"*In conclusion, the Court is therefore required to determine the fair value of*
*Integra's business as a going concern as at the Valuation Date, meaning at*
*the point immediately before the merger was approved. The fair value of the*
*Respondents' shares is their proportionate share of this amount without any*
*minority discount or any premium for the forcible taking of their shares.*
*There is no presumption that the fair value offer made by Integra on 2 July*
*2014 in accordance with section 238 (8) constitutes a minimum price and it*
*is open to the Court to determine that the fair value is less than $10 per*
*share*".

42.    The second case (although the first in time) is the decision of the Privy Council on
       appeal from this court in ***CVC/Opportunity Equity Partners Ltd v Demarco Almeida***
       [2002] 2 BCLC 108.  That case arose in the following way.  As I have indicated in
       paragraph 36 above, section 994 of the ***Companies Act 2006***, which gives a remedy in
       cases of unfair prejudice, has no direct parallel in Cayman law. In this jurisdiction, the
       only remedy available to a minority shareholder who alleges that the company's affairs
       have been conducted in a manner oppressive to him is to petition for the winding-up of
       the company on the just and equitable ground; although section 95(3) of the ***Companies***
       ***Law*** now gives the court power to make a range of alternative orders, including an order
       for a buy-out of shares, on a just and equitable winding-up petition.  A threat to present

such a petition will often have the effect that the majority shareholders make an offer to buy the shares of the minority in order to avert the risk that the company will be put into liquidation. The purpose of the offer will be to encourage the court to make an order for the acquisition of the shares under section 95(3). So long as the offer is of an "*appropriate*" amount, the court will restrain presentation of a petition. That is what happened in ***CVC/Opportunity***. There, the issue was as to the appropriateness of the offered price; and the outcome was that the minority shareholder was entitled to an offer that reflected his interest in the business as a going concern and was not subject to a minority discount. The opinion of the Board was delivered by Lord Millett, and it is necessary to quote a substantial part of what he said under the heading "*The basis of the valuation*":

> "*[36] The parties cannot be expected to agree upon the monetary value of Mr Demarco's interest. This is a matter of judgment and opinion, and their respective advisers may be expected to disagree. But there should be no difficulty in agreeing the basis of valuation and the machinery for resolving any disagreement.*
>
> *[37] There are essentially three possible bases on which a minority holding of shares in an unquoted company can be valued. In descending order these are: (i) as a rateable proportion of the total value of the company as a going concern without any discount for the fact that the holding in question is a minority holding; (ii) as before but with such a discount; and (iii) as a rateable proportion of the net assets of the company at their break up or liquidation value.*
>
> *[38] Which of these should be adopted as the appropriate basis of valuation depends on all the circumstances. The choice must be fair to both parties, and it is difficult to see any justification for adopting the break-up or liquidation basis of valuation where the purchaser intends to continue to carry on the business of the company as a going concern. This would give the purchaser a windfall at the expense of the seller.*
>
> *[39] If the going-concern value is adopted, a further question arises: whether a discount should be applied to reflect the fact that the holding is a minority one. An outsider would normally be unwilling to pay a significant price for a minority holding in a private company, and a fair price as*

between a willing seller and a willing purchaser might be expected to reflect this fact. It would seem to be unreasonable for the seller to demand a higher price from an unwilling purchaser than he could obtain from a willing one. Small private companies commonly have articles which restrict the transfer of shares by requiring a shareholder who is desirous of disposing of his shares to offer them first to the other shareholders at a price fixed by the company's auditors. It is the common practice of auditors in such circumstances to value the shares as between a willing seller and a willing buyer and to apply a substantial discount to reflect the fact that the shares represent a minority holding.

[40] The context in which the shares fall to be valued in a case such as the present is, however, very different. Mr Demarco is not desirous of disposing of his shares; he would rather keep them and continue to participate in the management of the company. It is Opportunity's conduct in excluding him from management that has driven him, however reluctantly, to seek to realise the value of his investment. In this situation the case law in England is that normally the shares should be valued without any discount: see for example **Re Bird Precision Bellows Ltd** [1985] 1 BCLC 493; [1986] Ch 658; **Virdi v Abbey Leisure Ltd, Re Abbey Leisure Ltd** [1990] BCLC 342 ; and **O'Neill v Phillips** [1999] 2 BCLC 1, [1999] 1 WLR 1092. In **Re Bird Precision Bellows Ltd** [1985] BCLC 493 at 498, [1986] Ch 658 at 667 Oliver LJ cited with evident approval the observations of Nourse J at first instance where he said:

> 'I would expect that in a majority of cases where purchase orders are made under s. 75 in relation to quasi-partnerships the vendor is unwilling in the sense that the sale has been forced upon him. Usually he will be a minority shareholder whose interests have been unfairly prejudiced by the manner in which the affairs of the company have been conducted by the majority. On the assumption that the unfair prejudice has made it no longer tolerable for him to retain his interest in the company, a sale of his shares will invariably be his only practical way out short of a winding-up. In that kind of case it seems to me that it would not merely not be fair, but most unfair, that he should be bought out on the fictional basis applicable to a free election to sell his shares in accordance with the company's articles of association, or indeed on any other basis which involved a discounted price. In my judgment the correct course would be to fix the price pro rata according to the value

*of the shares as a whole and without any discount, as being the only fair method of compensating an unwilling vendor of the equivalent of a partnership share. Equally, if the order provided, as it did in **Re Jermyn Street Turkish Baths Ltd.** [1971] 1 WLR 1042, for the purchase of the shares of the delinquent majority, it would not merely not be fair, but most unfair, that they should receive a price which involved an element of premium.'*

*To require Mr Demarco to submit not only to his exclusion from the company but to the acquisition of his shares at less than their going-concern value by a purchaser which intends to carry on the business is hardly less unfair.*

*[41] The rationale for denying a discount to reflect the fact that the holding in question is a minority holding lies in the analogy between a quasi-partnership company and a true partnership. On the dissolution of a partnership, the ordinary course is for the court to direct a sale of the partnership business as a going concern with liberty for any of the former partners who wish to bid for the business to do so. But the court has power to ascertain the value of a former partner's interest without a sale if it can be done by valuation, and frequently does so where his interest is relatively small: see Syers v Syers (1876) 1 App Cas 174 . But the valuation is not based on a notional sale of the outgoing partner's share to the continuing partners who, being the only possible purchasers, would offer relatively little. It is based on a notional sale of the business as a whole to an outside purchaser.*

*[42] In the case of a company possessing the relevant characteristics, the majority can exclude the minority only if they offer to pay them a fair price for their shares. In order to be free to manage the company's business without regard to the relationship of trust and confidence which formerly existed between them, they must buy the whole, part from themselves and part from the minority, thereby achieving the same freedom to manage the business as an outside purchaser would enjoy."*

43.     The Dissenting Shareholders placed great reliance on this passage. They pointed out that they were no more "*desirous of disposing of* [their] *shares*" than Mr. Demarco had been in that case: under the terms of section 238(7) the consequence of their dissent

was that they automatically ceased to be shareholders in the Company, and the offer subsequently made to them by the Company was unacceptable. They were being forced to give up their investment in the Company, whereas following the merger the business would continue as a going concern. To require them to submit not only to their exclusion from the Company but to the acquisition of their shares at less than their going-concern value by a purchaser which intended to carry on the business would, just as in Mr. Demarco's case, be most unfair. The passage demonstrated that, at least so far as concerned minority discounts, the public policy of the Cayman Islands coincided with that of Delaware.

44.     In my judgment, neither the passage I have cited, nor *CVC/Opportunity* read as a whole, supports the Dissenting Shareholders' case. The statements on which the Dissenting Shareholders rely are all premised on the existence of a relationship of trust and confidence that means the company is to be regarded as a quasi-partnership: see in particular paragraph [41], but also the references to quasi-partnership in the quotation from Nourse J's judgment in *Bird Precision Bellows*, to exclusion from management in paragraph [40], and to the relationship of trust and confidence in paragraph [42]. As I have said when discussing the English unfair prejudice cases, it is established as a general rule that a minority discount will be applied unless the case is one of quasi-partnership; and *CVC/Opportunity* is consistent with that general rule. It is, however, only "*in the case of a company possessing the relevant characteristics*" that the shares will be valued as a proportion of the value of the company itself; and it is plain that Shanda is not a quasi-partnership company.

*Discussion*

45.     As the authorities I have cited demonstrate, the position in relation to the availability of minority discounts differs between Delaware and Canada on the one hand and England and Wales and Bermuda (and to an extent BVI) on the other.   In Delaware and Canada it is established that no minority discount is to be applied; in England and Wales, the fact that shares are to be acquired at a discount is no obstacle to a squeeze-out or scheme of arrangement, and the application of a discount is the general rule where shares are purchased in the context of an unfair prejudice claim unless the company is a quasi-partnership.   The position in Bermuda follows the English rule in unfair prejudice cases, and BVI permits (although does not prescribe) a minority discount.   Although

the English cases do not concern an appraisal mechanism, or deal with a statutory standard of fair value, they are concerned with fair value of the shares: see the explicit references to fairness in *Re Hoare, Re Grierson*, paragraph [13] of *Re Linton Park* and in paragraph 38 of *CVC/Opportunity*. The same applies in Bermuda (see paragraph [5] of *Golar*) and explicitly in the BVI legislation.

46.    In paragraph 75 of his judgment in the present case, the judge recorded that when section 238 was introduced the Honourable G Kenneth Jefferson noted, when moving the second reading of the *Companies (Amendment) Bill 2009* in the Legislative Assembly, that "*.. this Bill responds to requests from the private sector in relation to merger and consolidation provisions and reflects extensive consultation with the private sector as well as the review of Bermuda, BVI, Delaware and U.K. legislative precedents*" [Official Hansard Report for 20 March 2009]. In paragraph 76 he said that it therefore appeared that Delaware was one of the jurisdictions whose statutory merger law was reviewed, although there was no indication that section 238 was intended to implement or closely follow the Delaware model in particular; and in paragraph 79 he said that "*Delaware was perhaps particularly in mind since it was mentioned as being one of the jurisdictions whose laws had been reviewed and the jurisdiction with the most substantial and sophisticated jurisprudence in the area*". For my part, I do not think that the statement made in the Legislative Assembly provides any assistance in the interpretation of section 238. The jurisdictions said to have been reviewed do not necessarily provide consistent answers to the problems capable of arising from an appraisal regime, and in the case of minority discounts they provide different answers. Moreover, the appraisal regime to which section 238 bears most similarity is that of Canada, but its legislation is not said to have been reviewed. That is not to say that the Delaware jurisprudence is incapable of being of help in the interpretation of section 238: it is, as the judge remarked, frequently used and has given rise to a large number of cases and a well-developed jurisprudence.  So long as that jurisprudence does not conflict with Caymanian law and practice, it is sensible to look to Delaware for assistance in solving problems that are novel to Cayman but not to Delaware. There is no point in trying to reinvent the wheel.  I think, however, that the judge went too far when he said in paragraph 79 that "*when this Court comes to consider the meaning under Cayman law of the terms used in and language of section 238 it is entirely appropriate to have regard to and pay close attention to the decisions of the courts in*

*Delaware (and Canada)*", and that it was *"preferable, where possible, to ensure consistency of approach by focusing on one rather than a multiplicity of jurisdictions"*.

47.   As the judge himself recognised, again in paragraph 79, "*it will also be necessary always to take care and be satisfied that the law and practice developed by such other courts fits and is consistent with other relevant parts of Cayman law and practice*". The judge appears not to have been alerted to the possible relevance of the squeeze out and scheme of arrangement regimes, and in relation to English law was taken only to the unfair prejudice regime – which he held was clearly distinguishable, on the ground that it assumed a sale of the shares, whereas section 238 required an assessment of fair value and so was not predicated on a sale.  Since the English cases are concerned with fair value, this does not seem to me to be an adequate ground of distinction.  It is possible that, had the judge been directed to the other regimes, he would have taken a different view; but be that as it may, it appears to me that in relation to the question of minority discount the judge failed to ensure that his application of the Delaware rules was consistent with other relevant parts of Cayman law.

48.   As is made clear by the quotation from ***Dell*** set out in paragraph 32 above, the Delaware approach to fair value is heavily influenced by, if not based on, considerations of public policy. The relevant policy appears to be that stated at the end of the quotation, also set out in paragraph 32 above, from ***Cavalier***:

> "*More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.*"

So stated, the policy is in direct conflict with what was said in ***Re Grierson*** (paragraph 35(a) above):

> "*Then it is said that the price ... does not reflect the advantages to Holts by their obtaining complete control of the company. ... But, in my judgment, it is not unfair to offer a minority shareholder the value of what he possesses,*

> *i.e., a minority shareholding. ... [T]he element of control is not one which ought to have been taken into account as an additional item of value in the offer of these shares".*

49.    In my judgment, it is the latter policy which should prevail. As I have pointed out, the squeeze-out provisions interpreted in *Re Grierson* and *Re Hoare*, and the scheme of arrangement provisions considered in *Re Linton Park*, are replicated in sections 86, 87 and 88 of the *Companies Law* in this jurisdiction. Those provisions are capable of being used to acquire the shares of a dissenting minority on a takeover, merger or consolidation. The position in the Cayman Islands is accordingly that there are now three mechanisms contained in the *Companies Law* by which the shares of dissentients may be acquired: by squeeze-out with a 90% majority, by scheme of arrangement with a 75% majority, and under section 238 with a two-thirds majority. Assuming, as I do, that the English approach to squeeze-out and scheme of arrangement acquisitions would be applied in the Cayman Islands, those two mechanisms allow a minority discount to be applied to the cost of acquisition of dissentients' shares. It seems to me unlikely in the extreme that the simplified merger and consolidation regime introduced as Part XVI of the *Companies Law* was intended to depart from that approach: it is to be presumed that the three mechanisms, contained in the same piece of legislation and capable of serving the same purpose in different ways, are to be construed from the same standpoint. Nothing in the wording of section 238 suggests that a different approach was intended; indeed, as Shanda pointed out, there is nothing in the wording of the section that suggests that the focus is to be on the value of the company rather than on the value of the shares. The absence of such wording is overcome in Delaware by the application of policy considerations; and in Canada the rationale for the exclusion of a minority discount is said to lie in the context, which is in effect that the majority are purchasing the shares of the minority in order to consolidate their existing position (see *Kummen*, referred to in paragraph 34 above). However, that is also the context in which shares may be purchased by squeeze-out or scheme of arrangement, and in England that context does not have the effect of requiring the shares to be valued as a proportion of the value of the company itself.

50.    For these reasons, it appears to me that section 238 requires fair value to be attributed to what the dissentient shareholder possesses. If what he possesses is a minority

*CICA 12 and 13 of 2017 – In the matter of Shanda Games Ltd - Judgment*

shareholding, it is to be valued as such. If he holds shares to which particular rights or liabilities attach, the shares are to be valued as subject to those rights or liabilities. As a matter of mechanics, this can be done by adjusting the value that the shares would otherwise have as a proportion of the total value of the company; but failing to make such adjustments means that particular rights or liabilities will often be ignored, and the shares will be valued as something they are not. It follows that the judge (and Jones J in *Integra* before him) was wrong to hold that a minority discount should not be applied in the assessment of the value of the Dissenting Shareholders' shares. I would allow Shanda's appeal on the minority discount point.

Interest

51.    Shanda's other complaint is about the judge's award of interest.

52.    The rate of interest awarded by the judge was 4.295%, being the mid-point between 3.5% (being the rate at which he decided Shanda could have borrowed the amount representing the fair value of the Dissenting Shareholders' shares in order to pay it to them) and 5.09% (being the rate which he decided prudent investors in the position of the Dissenting Shareholders could have obtained, had they had the money to invest).

53.    In adopting a mid-point approach the judge followed the approach taken by Jones J in *Integra* and by the Delaware courts. He recorded that Jones J had said that the provision for a fair rate of interest appeared to have been reproduced from an earlier version of section 262(h) of the ***Delaware General Corporations Law***, and then cited the following passage from *Integra*:

> *"72. The Delaware courts interpreted this provision in a way which involves balancing the rate which the surviving corporation would have had to pay to borrow funds and the rate which a prudent investor could have earned on cash or cash equivalents during the relevant period. The 'legal rate' payable on judgment debts was treated as a useful default rate in cases where the parties failed to adduce any relevant evidence. (**Cede & Co., Inc v. Medpoint Healthcare, Inc** 2004 Del. Ch, Lexis 124 at page 21).*
> *73. The 'legal rate' under Delaware law is the equivalent of the 'prescribed rates' payable on judgment debts under the Judgment Debts (Rates of*

*Interest) Rules in the sense that it is the statutory rate payable on judgment debts, but I have no evidence about the way in which the Delaware rate is fixed. The prescribed rates applicable in this jurisdiction are fixed from time to time by the Rules Committee for a basket of different currencies using the following formula: 3- month LIBOR (or equivalent) rounded to the nearest one eighth per cent plus two percentage points or increased by 125%, whichever is the greater. The prescribed rate for US$ has been fixed at 2.375% since 1 February 2013....*

*76. The Respondents [dissenting shareholders] have not adduced any evidence about the effective rate of interest which they actually earned or which a prudent investor could reasonably have expected to earn on cash or cash equivalents during the relevant period. Integra's audited consolidated financial statements reflect that it had the equivalent of US$59,468,000 in cash and cash equivalents as at 31 December 2013 but the notes do not disclose the results of its cash management operations. ... In the absence of any affidavit evidence about the way in which Integra has actually been managing its treasury operation during the period since the merger, I think that it is reasonable to assume that it was generating around 0.2% per annum.*

*77. Counsel for the Respondents submits that the Court should adopt a mid-rate between the prescribed rate for US$ (2.375%) and Integra's assumed US$ borrowing rate (9.7%), which would be 6.0375% per annum. There is no obvious logic to this submission. The prescribed rate does not reflect the rate which a judgment creditor can expect to earn on cash deposits. The mid-rate between Integra's assumed return on cash (0.2%) and Integra's assumed US$ borrowing rate (9.7%) is 4.95% per annum. I conclude that this is a "fair rate of interest" which should be awarded to the Respondents from 2 July 2014 until payment."*

54. The judge also cited, as representing the proper approach for him to adopt, the following passage from the judgment of Noble VC in **Cede v Medpoint Healthcare**, referred to by Jones J:

"*The award of interest serves two important purposes. First, 'it compensates the plaintiff for the loss of the use of his money during this period,' and thus*

> *'endeavours to place the dissenting shareholder in the position she would have been in had the corporation promptly paid the value of her shares.' Second, 'it forces the surviving corporation to disgorge the benefit it received from having the use of the plaintiff's funds.' 'In determining the fair rate of interest, the Court may consider all relevant factors, including the rate of interest which the surviving or resulting corporation would have had to pay to borrow money during the pendency of the proceeding.' In addition to looking to the company's cost of borrowing, or 'borrowing rate', the Court 'has historically examined the return that a prudent investor would have received if he had invested the judgment proceeds at the time of the merger.' The Court may also consider the legal rate of interest; indeed, 'the legal interest rate serves as a useful default rate when the parties have inadequately developed the record on the issue.' The Petitioners' argument that the interest rate should be based solely on the borrowing rate or the rate 'a prudent investor would require to provide a substantial unsecured loan to the Respondent' must be rejected. As noted above, this Court traditionally looks at both the 'prudent investor rate' and the 'borrowing rate' in fixing the interest rate and the Petitioners have provided no compelling argument as to why this Court should deviate from this practice. Awarding the proposed [unsecured loan] interest rate of 9.940% would grant an 'undeserved windfall' given the volatility of the market."*

55.   The judge then said this, starting at paragraph 19 of the fair interest ruling:

> *"The Vice Chancellor's explanation of the purpose of the statutory right to an award of a fair rate of interest seems to me to be consistent with the nature and purpose of the statutory jurisdiction and language - to protect the dissenting shareholders from the effects of the forced merger and in particular to compensate them for being out of their money and to fix a "fair" rate of interest. Furthermore, the need to take into account all relevant factors having regard to the facts of the case also seems to me to be what is required in order to ensure that a fair rate is used.*
> *20. It also seems to me that the balancing of interests and positions involved in the midpoint approach is consistent with the statutory mandate to*

> *establish a fair rate. Interest should address the dissenting shareholders'*
> *financial disadvantage of being out of their money. The disadvantage*
> *materialises either in loss of earnings on the funds or in the costs of having*
> *to borrow a loan to substitute for the funds not received. Equally the debtor*
> *gains a financial advantage through withholding the sums payable to the*
> *dissenting shareholders. In the meantime he or she can yield returns from*
> *investing the funds or avoid the cost of a loan. Therefore the non-payment*
> *of a sum of money results in what can be described loosely as an unjustified*
> *enrichment of the debtor. It follows that for the assessment of the financial*
> *consequences of the delay two different perspectives have to be borne in*
> *mind. The mid-point approach achieves this. In some respects the exercise*
> *which the Court is required to undertake is similar to that which the Court*
> *undertakes when exercising its discretion under section 34(1) of the*
> ***Judicature Law (2013 Revision)*** *to award interest on a debt or damages in*
> *respect of which a judgment is awarded.*
>
> *21. I accept that the Court may have regard to the prescribed rate (that is*
> *the statutory rate of interest payable on judgment debts which is 2.375% for*
> *U.S. dollars, as set out in the Judgment Debts (Rates of Interest) Rules 2012)*
> *as a reference point, particularly in cases where there is no or insufficient*
> *evidence filed by the parties. However, it does not seem to me appropriate*
> *to place much weight on it. Had the intention been to use the prescribed rate*
> *section 238(11) could easily have referred to it. Furthermore, the statutory*
> *requirement to establish a fair rate, as I have noted, does seem to me to*
> *involve taking into account the purpose of the requirement to pay interest*
> *and to balance the position of and impact of the delay in payment on both*
> *the company (debtor) and the dissenting shareholders."*

56.    It was common ground before the judge that the mid-point approach was the correct
       one to adopt. On appeal, however, Shanda asserted that that approach was inconsistent
       with the purpose of an award of interest under English (and hence Caymanian) law, and
       that the judge had accordingly erred in principle. He should instead have awarded a
       rate representing only the cost to the Dissenting Shareholders of being deprived of their
       money, which was conventionally to be assessed as equivalent to the rate which they
       would have had to pay to borrow money to replace the unpaid fair value of their shares.

The rationale for that conventional basis was that the payee could by borrowing an equivalent sum have done exactly the same as he would have done if the money had been paid, so that his loss was not the lost opportunity to deploy the money but the cost of making the borrowing. In the present case, neither party had led any evidence of the cost to the Dissenting Shareholders of borrowing: instead, working on the basis that the mid-point approach applied, they had supplied information about Shanda's cost of borrowing and the likely investment return to a prudent investor in the position of the Dissenting Shareholders. This meant that, if the Court of Appeal accepted that the judge had erred in principle, there would be no material on which it could arrive at a proper interest rate. It could therefore either remit the matter to the judge, or in default of anything else award interest at the judgment rate of 2.375% for US dollars.

57.   The cornerstone of Shanda's argument on this point was the following passage from the judgment of Steyn J concerning interest on damages in ***Banque Keyser Ullman SA v Skandia (UK) Insurance Co Ltd*** [1987] Lexis Citation 1106:

> "*The issue of the appropriate rates of interest must now be considered. The selection of an appropriate interest rate is a matter of discretion. But it is not an entirely open textured discretion. A practical and consistent approach has emerged. The purpose of the award of interest is to achieve restitutio in integrum. The enquiry does not focus, in a case such as the present, on the profit to the defendant of the use of the money. It is directed to an estimation of the cost to the plaintiff of being deprived of the money which he should have had. But for practical reasons courts will not allow an enquiry into the plaintiff's actual loss. To do so might sometimes involve enquiries, in relation to the ancillary relief of interest, approximating the length of the trial. Instead, in cases such as the present, courts award a commercial rate of interest or the rate which somebody in the position of the plaintiff would have had to pay to borrow the money. In the interests of a cost effective administration of civil justice, the courts must adopt a fairly broad brush approach to the award of interest. On the other hand, in the light of the overriding criterion of fairness, the courts are vigilant to ensure that the broad brush approach does not become too blunt an instrument. On this question I have been assisted by a judgment of Forbes J in **Tate &**</i>*

*Lyle Food and Distribution Ltd v Greater London Council [1981] 3 All ER716, [1982] 1 WLR 149.* In dealing with the approach to be adopted Forbes J said (at p 154C-E):

> "I feel satisfied that in commercial cases the interest is intended to reflect the rate at which the plaintiff would have had to borrow the money to supply the place of that which was withheld. I am also satisfied that one should not look at any special position in which the plaintiff might have been: one should disregard, for instance, the fact that a particular plaintiff, because of his personal situation, could only borrow money at a very high rate or, on the other hand, was able to borrow at specially favourable rates. The correct thing to do is to take the rate at which plaintiffs in general could borrow money. This does not, however, to my mind, mean that you exclude entirely all attributes of the plaintiff other than that he is a plaintiff. There is evidence here that large public companies of the size and prestige of these plaintiffs could expect to borrow at 1 per cent over the minimum lending rate, while for smaller and less prestigious concerns the rate might be as high as 3 per cent over the minimum lending rate. I think it would always be right to look at the rate at which plaintiffs with the general attributes of the actual plaintiff in the case (though not, of course, with any special or peculiar attribute) could borrow money as a guide to the appropriate interest rate."

That is, if I may say so, a sensible and practical approach. All I would respectfully add is that an issue as to the appropriate categorisation of a particular plaintiff involves the exercise of judicial discretion."

58.    I accept that this statement accurately represents the position in England.  It is important, however, to appreciate that it is a statement about the principles to be applied in assessing interest on damages.  Such an assessment can of course be made only when damages have been awarded, and damages can be awarded only when some right of the plaintiff has been infringed.  The purpose of an award of interest will be to ensure that the plaintiff is put back, so far as money can, in the position he would have been in had his right not been infringed.   That inevitably places the focus solely on the plaintiff: it is only his position that is of relevance.  A section 238 determination, however, does not proceed on the basis that any right of the dissentient shareholder has been infringed by the company.  The legislative concern is not to restore him to some anterior position

but to ensure that he receives fair value for what he is obliged by statute to give up. In my view, that has the effect when it comes to an assessment of the fair rate of interest of removing the entire focus from the dissentient and instead placing it on the entirety of the circumstances. When those circumstances are considered, it is right to say – as the judge did – that both the disadvantage to the dissentient and the advantage to the company should be taken into account. To adopt the mid-point approach is a logical way of balancing the advantage and disadvantage, with a fall-back reliance on the judgment rate – which must theoretically itself represent a rate deemed to be fair – if the evidence supports no other conclusion. Although it is possible to take the view that the cost of borrowing is a better measure of the dissentient's loss than the putative investment returns a prudent investor in his position could have achieved, both measures represent the dissentient's lost opportunity and consequently the disadvantage to the dissentient of being out of his money. Overall, it seems to me that Jones J and the judge were right to adopt the (former) Delaware practice in relation to the award of interest. That practice, as explained in *Cede,* provides a principled approach that is not in conflict with Caymanian law or practice. Accordingly, I consider that the judge did not err in principle in his approach to the assessment of a fair rate of interest. It was accepted by Shanda that, if the judge had applied the right principle, there was evidence on which he was entitled to reach the conclusion he did about the fair rate.

59.     For these reasons, I would dismiss Shanda's appeal in relation to interest.

*The Dissenting Shareholders' appeal*

60.     The Dissenting Shareholders complain about three aspects of the judge's judgment, each of them relating to an element of the methodology to be applied in determining the fair value of Shanda's business, and hence of the Dissenting Shareholders' shares. These elements are (1) a component - known as beta - of the discount rate to be applied in the discounted cash flow analysis adopted by the experts as the appropriate method of valuing Shanda's business; (2) the measure of market capitalisation to which to apply a Small Stock Risk Premium ("**SSRP**"); and (3) the growth rate during the terminal period.

*Context*

61.     Professor Jarrell and Mr. Inglis agreed that Shanda's business was to be valued by use
        of a discounted cash flow ("**DCF**") model. As its name indicates, a DCF analysis
        contains two main elements: a prediction of future cash flows, and the application to
        those cash flows of a discount rate so as to translate the future cash flows into a present
        capital value. In effect, the exercise is designed to identify how much it would have
        cost at the valuation date to buy an investment with a rate of return and a risk profile
        equivalent to that of the company's business.

62.     As a result, the discount rate will generally be taken as the expected rate of return on
        equivalent investment opportunities in the capital markets, also known as the weighted
        average cost of capital ("**WACC**") of the company. The weighting exercise implicit in
        determining the WACC involves estimating the cost of equity of a company and its
        debt. It was common ground in the present case that Shanda would have no debt, so
        the only assessment required was of the cost of its equity. Assessment of the cost of
        equity is ordinarily done, and was in this case done, through use of a capital asset pricing
        model ("**CAPM**"). A CAPM starts by assessing the rate of return on a risk-free
        investment, and then adjusting that rate upwards to take account of risk factors. One
        such factor is systematic risk, which is the risk represented by the relevant market as a
        whole. This systematic risk is reflected in an equity risk premium; and the equity risk
        premium is in its turn multiplied by a factor, beta, which measures the risk represented
        by a particular investment relative to the risk of the market as a whole. A further factor
        which may be added is a size premium, reflecting the possibility that equity investors
        will require a higher expected return from small companies to compensate for the
        greater risk associated with them. Each of these factors has the effect of increasing the
        discount rate and consequently decreasing the value; but because beta is used to
        multiply one of the factors, rather than being added as a separate factor, small changes
        to it are capable of having large effects on the discount rate, and consequently on the
        value. I take as an example of the operation of a CAPM Mr. Inglis's initial report, in
        which he proposed a discount rate of 10.24% derived from a CAPM made up as
        follows: 2.27% as the risk-free rate, equal to the yield on 10-year US government
        bonds; plus 6.00%, being (a) an equity market risk premium of 6.00% as the expected
        rate of return of the market in excess of the risk-free rate, multiplied by (b) 1.00, his
        estimate of Shanda's equity beta, based on the betas of Chinese games companies listed
        on the NASDAQ; plus a small stock risk premium of 1.07%; plus 0.90% as a country

risk premium for perceived additional economic, financial, or political risk associated with investment in China. The values given by Professor Jarrell to the various factors were different; but the most significant difference was his use of a beta of 1.78 as opposed to Mr. Inglis's 1.00, a difference which is said on its own to have had the effect of reducing the value of each of Shanda's ADSs by US$9.06.

63.    Predicting future cash flows typically involves estimating cash flow in two, or sometimes three, periods: a finite future period, at the end of which the company will ordinarily be expected to have achieved a steady state or maturity; perhaps a transitional period, designed to iron out possible future volatility in the cash flows; and a terminal period. Cash flows in the first period, and to some extent in the transitional period, will be based on, or at least have regard to, the company's past performance and its own estimates of its likely future earnings; whereas cash flows in the terminal period will usually be derived from a formula designed to project indefinitely into the future as a constant the rate of growth identified at the conclusion of the prior stage or stages, by which time the rate of increase or reduction in cash flow will have stabilised.

64.    In the present case, the judge had to resolve disputes between the experts relating to whether cash flows should be estimated in two stages or three; as to whether cash flows in the first period should be based on the Company's own management projections or on figures derived from the performance of similar companies; as to how certain elements of the Company's business, in particular the likely performance of one of its Internet games, should be reflected in the cash flow estimates; and as to how the discount rate should be ascertained. Only three of his conclusions on valuation methodology are now disputed, all of them by the Dissenting Shareholders.    The first two concern the judge's assessment of beta ("**the beta point**") and the small stock risk premium ("**the SSRP point**") in the ascertainment of the discount rate; the third of them arises out of his decision to adopt a three-stage approach to the assessment of cash flows ("**the transitional period point**").

*The beta point*

65.    As I have said, beta is a measure of the risk of a particular investment relative to the systematic risk of the market as a whole. Because it focuses on the special risk attaching

to a particular investment, it requires identification and assessment of particular elements of risk associated with that investment. In this case, the notional investment was Shanda's business, and the exercise involved identifying and valuing risk factors associated with that business.  At paragraph 147 of his judgment, the judge identified six differences of approach to this topic between the experts as follows:

(a).    *should Shanda's beta estimate be based solely on data relating to the period (and has Mr Inglis established that Professor Jarrell's beta estimate is unreliable because of his use of a measurement period) that ended prior to the public announcement of the First Buyer Group's proposal on 27 January 2014 (is Professor Jarrell's beta estimate out of date) (the staleness point)?*

(b).    *should Shanda's beta estimate ignore (and has Professor Jarrell established that it is appropriate to use) data relating to the period of the China effect in U.S. markets occurring from early 2011 to late 2013 (the China effect point)?*

(c).    *should Shanda's beta estimate be based only on directly measured betas or only on indirectly measured betas and if indirect betas can be used is the peer group selected by Mr Inglis sufficiently comparable so that they can be used in the estimate of Shanda's beta (the direct/indirect betas point)?*

(d).    *what should the measurement period be – should it be 4.3 years or two years (the measurement period point)?*

(e).    *should weekly or monthly returns be used (the weekly/monthly returns point)?*

(f).    *if monthly returns are otherwise preferable, should Shanda's beta be estimated using monthly returns measured from month end to month end (the month end measurement point)?*

66.    The judge considered these points in turn and expressed a conclusion on each of them as follows:

The staleness point: "*It seems to me this issue is finely balanced. Mr Inglis has raised a serious doubt as to the reliability of Professor Jarrell's use of and sole reliance on the pre-deal announcement data. Professor Jarrell's response does provide some evidence that Shanda's beta is unlikely to have*

*changed in the period between that announcement and the Valuation Date
but that is not conclusive or completely convincing for the reasons given by
Mr Inglis. The gap between the date of the observations and the Valuation
Date and the failure to use any more recent data does in my view raise doubts
about the reliability of Professor Jarrell's beta estimation. While it would be
possible to show that there was no problem if there was sufficient evidence
to demonstrate that Shanda's beta had or was likely to have remained
constant (and I agree that the peer companies otherwise relied on by Mr
Inglis to support his estimate of Shanda's beta are a good guide for doing
so), Professor Jarrell's analysis, and the results of his comparison with the
betas of the peer companies, did not seem conclusive or clear-cut".*
(Paragraph 149(e))

The China effect point: *"Once again the evidence is finely balanced. But I
am satisfied that there is sufficient evidence of the problem identified by Mr
Inglis to raise material concerns that the data derived during the relevant
period has been subject to exceptional and distorting effects such that it
might be unreliable and result in an error in the beta estimate".* (Paragraph
150(f))

The direct/indirect betas point: *"In my view NetEase Inc (despite the revenue
differences highlighted by Professor Jarrell) is sufficiently comparable with
Shanda to be a useful and reliable peer company for the purpose of
calculating Shanda's beta. Changyou also has a significant number of points
in common and on balance I am satisfied that it is appropriate to use it in
the estimate of Shanda's beta. I find it more difficult to assess, on the
evidence, how close the comparison is with the U.S. companies but I have
not been convinced by the evidence of Professor Jarrell that Mr Inglis's
opinion is unreasonable and that they are of no assistance and therefore to
be ignored."* (Paragraph 151(q))

The measurement period point: *"As with so many issues that arise in relation
to the estimate of a company's beta, there are trade-offs between different
approaches and it is necessary to make a judgment about which approach is
most appropriate on the facts of the particular case. In this case Mr Inglis's
use of the shorter two year period has been driven by his view that the data*

*relating to a longer period is tainted. As I have already noted, it seems to me that this is not an unreasonable view in the circumstances. The question then becomes whether a two year period is too short to be reliable and it seems to me to be clear from the cited textbooks and literature that it is not. The further question then arises as to whether the use of a 4.3 year period (ending with the public announcement in January 2014) is clearly preferable. I do not think it is, but neither is two year period clearly preferable either. While the longer period offers the benefits noted in the extract from Professor Damodaran's book quoted in paragraph 152(c) above, and is clearly a measurement period which can be reliable and consistent with the literature, it is in this case subject to the risks of error that Mr Inglis has identified and which I have found to be credible and incapable of being dismissed."* (Paragraph 152(d))

The weekly/monthly returns point: *"in the present case the R-squareds [one of two statistical bases for assessing the reliability of a beta estimate, the other being standard error] for the monthly betas were significantly higher than those for the weekly betas. This means that they support the view that the monthly betas* [used by Professor Jarrell] *capture more of the Shanda specific risk and are therefore more reliable. However the monthly betas have a higher standard error than the daily and weekly betas that* [Mr Inglis] *presents and therefore can be considered to be less reliable (since this weekly and daily data is likely to be closer to Shanda's true beta). I see that both these statistical measures are helpful in making the comparison between weekly and monthly measurement period but it seems to me that in this case neither is determinative. R-squared is focussing on how much risk comes from the company rather than the market; standard error focusses on how far away from the true beta the estimated beta could be. The monthly betas are strong on one measure and weaker on the other. However, that does not, in my view, mean that the application of the statistical measures entitles the Court to conclude that one is clearly to be preferred and more reliable than the other."* (Paragraph 153(d))

The month end measurement point: *"I have quoted the extract from Professor Jarrell's answer at length because it seems to me to involve a candid admission that he has been unable to dismiss or find a convincing*

*solution to Mr Inglis's challenge to his use of month end observations, which*
*he agrees is "troubling" and which suggests that there is an arbitrary*
*element in the estimate of beta on such a basis. It appears that this is not an*
*issue that has yet been adequately addressed in the literature or seriously*
*been raised before. The Court is not in a position to resolve the dispute but*
*must assume that there is a material doubt over this approach to calculating*
*betas. It is, on the other hand, correct to say, as Professor Jarrell does, that*
*reliance on monthly betas calculated by reference to month end observations*
*is a frequent and perhaps standard practice but that does not, to my mind,*
*remove the risk that Professor Jarrell's methodology is subject to error."*
(paragraph 154(b))

67.    At paragraphs 155 to 160, the judge set out his conclusions on the beta point.  It is
       sufficient to quote paragraphs 155 and 160, omitting at this stage a discussion of two
       Delaware cases (including a decision of Chancellor Bouchard in *In re Appraisal of*
       *DFC Global Corp* (2016) WL 3753123 (Del. Ch.):

           "*155.    I have carefully considered the opinions of both experts, their*
                    *respective challenges to the reliability of each other's beta*
                    *measurement and the extensive arguments and submissions made by*
                    *Mr Meeson and Mr Levy and reached the following conclusions:*

                    *(a)    it seems to me that both experts have adopted methodologies*
                           *which are consistent with accepted practice and the literature*
                           *and to that extent each is, prima facie, reliable. But each of*
                           *their estimates is subject to certain risks and problems which*
                           *the Court is unable to ignore or completely dismiss,*

                    *(b)    as I have explained, in my view there are risks of error*
                           *associated with a beta estimate for Shanda based solely on*
                           *the use of (i) data gathered in the period before the*
                           *announcement of the First Buyer Group proposal in January*
                           *2014; (ii) data gathered during the period between 2011 and*
                           *2013 affected by the US market undervaluation of the shares*
                           *in Chinese companies and (iii) monthly betas based on month*
                           *end observations. There are also risks of error associated*
                           *with a beta estimate based solely on (i) a small peer group,*
                           *some of whose members are only just comparable with*
                           *Shanda and where there remains some room for argument as*

> *to the extent of their compatibility since there are a number of points of difference between members of the group and Shanda and (ii) weekly betas measured over a two year period where on some statistical measures the weekly betas are clearly less reliable that the monthly betas.*
>
> *(c)   it therefore seems to me that in such circumstances it is not safe to rely on just one estimate on its own but preferable (as a way of reducing the risk of error and to take the widest sample available) to use and rely on both estimates. The right course is for the Court to use and combine both estimates and use the average of the two for its beta. It does seem to me to be more reliable in this case to blend and use both the directly and the indirectly measured betas. ...*

160.   *In the present case, because the issues and uncertainties affecting each expert's calculation of beta relate not just to the use of direct or indirect beta I consider that the preferable approach is to use an average of Mr. Inglis's beta of 1 and Professor Jarrell's beta of 1.78; that is 1.39. Had I used the blending approach applied by Chancellor Bouchard and simply added Professor Jarrell's directly measured beta to the seven peer companies identified by Mr Inglis the result would have been 1.2925. The difference in this case will no doubt have a not immaterial effect on the amount payable to the Dissenting Shareholders but for the reasons I have given I prefer and will adopt the former approach."*

68.   Before I come to the Dissenting Shareholders' complaints about the judge's decision on the beta point, I think it desirable to point out some of the key features of the passage I have just quoted. First, as appears from paragraph 155(a), the judge took the view that both experts had adopted methodologies that were prima facie reliable, but the estimates of both were nevertheless subject to risks and problems that could not be ignored or completely dismissed. Secondly, paragraph 155(b) falls into two parts: the first part, from the beginning to the words "*month end observations*", identifies problems with views expounded by Professor Jarrell; the second part, from the words "*There are also risks of error*" to the end, does the same with views expounded by Mr. Inglis. Thirdly, the opening words of paragraph 160 make explicit that there were issues and uncertainties affecting the calculation of beta put forward by both experts. All of this is consistent with the phraseology used by the judge when setting out his

conclusions on the six differences of approach. In essence, the judge's position was that there was something to be said for the methodology and outcome adopted by each expert, but neither of them was immune from criticism. As he put it in paragraph 158:

> "Of course, I have not concluded on the beta issue that each approach is realistic and without risk. Instead, I have taken the view that both approaches are essentially or prima facie reasonable but because of risks identified in relation to each the best approach, which minimises the risk involved, is to use and combine both estimates."

69.    The Dissenting Shareholders contended that the judge was wrong to arrive at his figure for beta by averaging the beta figures put forward by the two experts. He should instead have disregarded Professor Jarrell's beta in its entirety and simply adopted Mr. Ingles' figure; but, if there was a basis for taking account of Professor Jarrell's beta figure, the judge should either have adopted the blending approach suggested by the Delaware jurisprudence or averaged the share values resulting from using each figure for beta. What he had in fact done had unduly favoured Shanda, since averaging the betas did not achieve an equal split in the ultimate value.

70.    The foundation for the first part of the complaint, namely that the judge was wrong to place any reliance on Professor Jarrell's beta methodology or outcome, was the assertion that there was no credible support for Professor Jarrell's beta, whereas there was no criticism or identified error in Mr. Inglis's analysis. Professor Jarrell's evidence was described by the judge as "not conclusive or completely convincing", as not seeming "conclusive or clear cut", and on the month end measurement point as involving "a candid admission that he has been unable to dismiss or find a convincing solution" and as being unable to "remove the risk that [his] methodology was subject to error".

71.    Whilst it is the case that these remarks were made by the judge about Professor Jarrell's evidence, their selection fails to give anything like the full picture. It is simply impossible to claim that the judge concluded all of the points of difference in favour of Mr. Inglis. The true position, as I have identified in paragraph 68, was that the judge had found the issues finely balanced, with appropriate methodologies adopted by both

experts but with both - not just Professor Jarrell - open to some criticism. Although I accept that the overall impression given by the judgment is that Professor Jarrell came off rather worse than did Mr. Inglis (an impression fortified by the attitude taken by Shanda on the reopen application), in relation to the assessment of beta honours were broadly even. In my judgment, the judge was in those circumstances entitled to approach the assessment of the appropriate beta figure by balancing the proposals put forward by the two experts.

72. The question then becomes whether he chose the correct method of balancing the opposing views. The Dissenting Shareholders contended that, because of the impact the choice of beta can have on the outcome of a DCF analysis, averaging the two figures unduly favoured Shanda – a result that, even on the basis that there was overall nothing to choose between the experts, could not have been the judge's intention. The first alternative proposed by the Dissenting Shareholders was a blending approach. This method, which involved blending the company's beta with that derived from a peer group, was adopted in *DFC*, and was explained as follows in a passage quoted by the judge:

> *"I agree that using DFC's beta in isolation would expose the discounted cash flow model to measurement error. At the same time, the most comparable company to DFC is DFC itself, and in my view it is appropriate to factor DFC's beta into the analysis, a proposition that Dages supports and Beaulne did not rebut. The simplest way to do so is by adding it as a seventh beta in the peer analysis. Although commentary on this approach is somewhat sparse, constructing a beta that blends the company's beta with a peer group's betas finds some support in financial literature and this Court's precedent.*
>
> *In the Golden Telecom case, this Court supported the theory in two ways. First, the Court used as a peer group an index of NASDAQ-traded telecommunications companies, which the Court noted included the subject company itself. Second, and more importantly, the Court's final beta was a blend of the Company's observed beta, weighted 2/3, and the industry peer group's beta, weighted 1/3. By adding DFC as a seventh "peer" in the beta calculation, I am essentially performing the same exercise, albeit with a*

> *smaller peer group and a more modest weight applied to the subject*
> *company than in Golden Telecom, to arrive at a final beta weighted 14%*
> *(1/7) to DFC's beta and 86% (6/7) to the peer group's beta. Because DFC's*
> *own observed beta is a meaningful input alongside the betas of its peers, I*
> *consider this weighting preferable to the 0% weighting DFC would receive*
> *in the peer-only analysis. I therefore use DFC and its six peers to estimate*
> *DFC's beta."*

73.    The judge's reason for rejecting this balancing method, given in paragraph 160, was
that "*the issues and uncertainties affecting each expert's calculation of beta relate not*
*just to the use of direct or indirect beta*".  As a matter of fact, the judge was plainly
right about that: the direct/indirect beta point was one of the six differences between
the experts, and it was only one element in their overall estimates of Shanda's beta.
Using the blending method by adding Professor Jarrell's direct beta to the betas derived
from Mr. Inglis's peer group would have meant that one component of the calculation
was treated as determinative of the entire beta, and in my view the judge was entitled
to take the view that some other method of resolving the overall difference between the
experts would be preferable.

74.    The Dissenting Shareholders' alternative suggestion, that the ultimate values put on the
shares by the experts should have been averaged, also suffers from the defect that it
places the focus too narrowly.  Although the value attributed to beta has a significant
effect on a DCF analysis, it is far from being the only element in the analysis.  To
average the outcome of the entire analysis to reflect an inability to resolve differences
affecting one element of it lacks logic.  Moreover, the experts had dealt with the
components of the valuation on a step-by-step basis, and the judge had no sensible
option but to resolve the differences arising at each step.  Even so, it was important that
he should keep a general eye on the likely effect, individual and cumulative, of his
decisions; but it is apparent from paragraph 160 that he was aware of the potential
impact of his decision to average beta, since he said that the difference between the
result of averaging and the result of blending would no doubt have a not immaterial
effect on the amount payable to the Dissenting Shareholders.

75.     In the circumstances, it appears to me that the judge was entitled to take the view that
        he could not fairly distinguish between the beta figures suggested by the two experts
        and that in the absence of a more nuanced solution to the dilemma the most appropriate
        method of resolution was by averaging the two figures.  Accordingly, I would dismiss
        the Dissenting Shareholders' appeal so far as it relates to the beta point.

The SSRP point

76.     As I have indicated, a small stock risk premium reflects the greater risk perceived to be
        associated with investment in smaller companies.   It is ordinarily calculated by
        reference to Ibbotson tables, now called Duff & Phelps tables.  These tables divide
        companies into categories and ascribe a size premium to each category.  There were
        originally three broad categories; but the tables now also have ten equally-populated
        portfolios, or deciles, based on the market capitalisation of listed equity securities from
        1926 to 2014. There was no dispute between Professor Jarrell and Mr. Inglis that the
        tables should be used, but they differed in how to use them in two respects: what value
        to attribute to Shanda, and whether to place it within the broad categories or within the
        deciles.  Professor Jarrell took the view that Shanda's value should be derived from its
        last market price before the price was affected by the merger, and that the resulting
        value should be placed in the appropriate decile.  On that basis, he proposed a SSRP of
        1.71.  Mr. Inglis's position was that Shanda's value should be the value resulting from
        his DCF analysis, that value being placed in the appropriate broad category.  That
        resulted in a SSRP of 1.07.

77.     The judge accepted Professor Jarrell's figure.  He quoted extracts from a further
        Delaware authority, *Merion Capital LP v 3M Cogent, Inc* 2013 WL 3793896 (Del. Ch.
        July 8, 2013), a decision of Parsons VC that points out that the Ibbotson tables look at
        the statistical relationship between market capitalisation and equity size premium and
        assume knowledge or estimation of a company's market capitalisation, which
        determines which decile the company falls into.  At paragraph [175], he expressed his
        conclusion as follows:

            *"Vice Chancellor Parson's analysis and the commentary from the other*
            *Delaware cases seem to me to provide a convincing explanation of the basis*
            *of the Ibbotson tables and support Professor Jarrell's view that their*

> *application must be based on the use of market capitalisation established*
> *before calculating and without reference to the expert's DCF."*

78.     The Dissenting Shareholders contended that the judge had misunderstood Professor
        Jarrell's evidence, which was in fact that use of an appraised value resulting from a DCF
        calculation was an acceptable option. He had also misunderstood the effect of the
        Delaware authorities, and had failed to take into account the changes to Shanda's
        business occurring during the nearly 2 years between the last market valuation
        unaffected by the merger and the valuation date.

79.     In his first report, Professor Jarrell explained his approach as follows:

> *"Because Duff & Phelps' empirical study of size premiums is based entirely*
> *on a ranking of market capitalizations calculated from publicly-traded stock*
> *prices, I generally believe it to be most appropriate to rely on the unaffected*
> *market value of a subject-company when choosing a size premium, so that I*
> *am using exactly the same "apples-to-apples" basis that Duff & Phelps uses*
> *in the construction of those size premiums."*

80.     Having seen what Mr. Inglis said in his own first report, Professor Jarrell said this in
        paragraphs 71 to 73 of his supplemental report:

> *"71. In my opinion, when performing a valuation of a publicly-traded*
> *company such as Shanda, the first step in determining the appropriate decile*
> *size classification is to use the unaffected stock price of that company to*
> *obtain a market-based measure for the overall market capitalization of that*
> *firm's equity. As stated in the Jarrell Report, this is critically important*
> *because Duff & Phelps' empirical study of size premiums is based entirely*
> *on a ranking of market capitalizations calculated from publicly-traded stock*
> *prices. Duff & Phelps does not perform separate DCF valuations for the*
> *thousands of companies in its study. Instead, it simply uses the market*
> *capitalizations indicated by publicly traded "unaffected" stock prices.*
> *72. If the Duff & Phelps' size classifications were somehow based on DCF-*
> *implied fair values, instead of on market trading prices of all publicly-*

*traded companies, then the boundaries of the size classifications would need to be elevated above what is reported by Duff & Phelps. Using Shanda's DCF-implied fair value to determine a size category that is based on trading prices of publicly-traded companies, as Mr. Inglis does, does not result in an apples-to-apples comparison. Mr. Inglis's mismatched comparison renders his selected size premium unreliable.*

*73. By using Shanda's unaffected stock price for the determination of its appropriate size premium, I am using exactly the same "apples-to-apples" basis that Duff & Phelps uses in the construction of those size premiums. In my opinion, this is a much more scientifically valid selection process for a publicly-traded firm than performing "circular" valuations."*

81.   Notwithstanding these apparently clear statements, the Dissenting Shareholders suggested that Professor Jarrell had changed his position in cross-examination so as to accept that Mr Inglis's use of the fair value derived from his own DCF valuation was permissible. The relevant passage is as follows:

*"Q. Yes, there are three possibilities aren't there. There's market cap 22 months before the valuation date.*

*A. Yes.*

*Q. Then there is merger price -- and that, we say, is bad because nobody contends that that is actually the correct value of the company as at the valuation date.*

*A. Well, at least it is an objective measure of value.*

*Q. It is a measure, I agree with that.*

*A. But I agree with you.*

*Q. It is an objective measure but it is 22 months old and no one says that is the actual value as at the valuation date.*

*A. True.*

*Q. Then you have the merger price. Nobody says that's the actual value at the valuation date?*

*A. Correct.*

*Q. It is a measure but everyone says it is wrong.*

*A. Right.*

> *Q. Then you can have -- the third alternative, it seems to me, is to use the*
> *appraised price as at the valuation date. So the court actually works out*
> *what is the value of the company at that date and to use that number to*
> *determine the size premium. Those are the only three alternatives, aren't*
> *they?*
> *A. Sounds reasonable.*
> *Q. It is a matter for his Lordship, I do not think we need spend a great deal*
> *of time --*
> *A. All of this is a matter for his Lordship.*
> *Q. I agree, but his Lordship can choose one of those three or he may come*
> *up with a fourth; it is his job to determine it.*
> *A. Correct".*

82.     I do not consider that this passage bears the weight the Dissenting Shareholders wish
        to place on it. To start with, it is confused: it is unclear whether the first six exchanges
        relate to the unaffected market price or to the merger price. The answer *"sounds*
        *reasonable"* is hardly a wholehearted acceptance of the proposition being put; and it is
        unclear whether the final answer, *"Correct"*, relates to the whole proposition or merely
        to the suggestion that it is for the judge to determine matters. Moreover, nothing in the
        passage I have quoted or in Professor Jarrell's cross-examination taken as a whole
        suggests that he was intending in this apparently casual way to abandon his central
        thesis that only use of the unaffected market price was consistent with the way in which
        the Duff & Phelps tables were compiled.

83.     Professor Jarrell had in fact identified precisely what was wrong with Mr. Inglis's
        proposal when he spoke in his supplemental report of circular valuations: what Mr.
        Inglis was doing was relying on the outcome of a DCF analysis in order to determine
        what small stock risk premium should be used in the course of the same DCF analysis.
        Mr. Inglis was asked about this in the following passage from his cross-examination:

> *"Q. On the other hand, your DCF approach involves the illogicality of using*
> *your output to size one of your inputs.*
> *A. I accept there is a theoretical issue there but in fact, and I have checked*
> *this, were I to apply Professor Jarrell's small company stock premium as*

*opposed to my own, I would still be in the same range and still have the same small company stock premium. So while it is a theoretical issue, in this particular case, it is not an actual issue.*

*Q. But isn't the reason for that that you are using the three broad categories of stock rather than the ten deciles?*

*A. Yes, well, although funnily enough I have checked the ten decile one, and in fact it is the same conclusion and I would in fact have a slightly smaller company stock premium were I to use the ten decile one."*

84.  This exchange was said to show that there was no circularity in fact. The argument was that, if Professor Jarrell's SSRP of 1.71 were substituted in Mr. Inglis's DCF calculation for Mr. Inglis's own 1.07, the outcome of the analysis would value Shanda in the same category or decile as Mr. Inglis had chosen in the first place. It was said that another way of demonstrating the point was to assume that the judge had taken Mr. Inglis's SSRP instead of Professor Jarrell's, the effect being to increase Shanda's appraised value from US$4.6 billion to US$4.9 billion without affecting the category or decile in which a company of that size fell. In my view, this is merely sleight of hand. In both cases, what is happening is that the ultimate result of the discounted cash flow analysis – whether that carried out by Mr. Inglis or that decided on by the judge – is being used to determine one of the factors in the analysis. That is where the circularity lies; and that it does make a difference in fact is demonstrated by the difference between the US$4.6 billion that Shanda was valued at on the basis of the judge's decision to adopt Professor Jarrell's SSRP and the US$4.9 billion that would have been the consequence of adoption of Mr. Inglis's SSRP. The judge approached the DCF analysis on a step-by-step basis, as did the experts, and he was entitled to resolve disputes at each step. He was well aware that the last unaffected quoted price for Shanda's ADSs was arguably out of date, since that was the thrust of the staleness point; but he had held that point to be finely balanced, with evidence going either way on the reliability of the market price; and I do not consider that he can be criticised for taking the view, which was supported by the Delaware authorities he cited, that the way in which the Duff & Phelps tables were compiled meant that the market capitalisation was the appropriate measure of Shanda's size and that the unaffected share price was sufficiently reliable to be used for the purpose of ascertaining the SSRP.

85.     Accordingly, I would dismiss the Dissenting Shareholders' appeal on the SSRP point.

The transitional period point

86.     I have explained the context of the transitional period point in paragraph 63 above. The judge adopted a three-stage estimation of future cash flows, as Mr. Inglis had proposed, and that approach is not in itself controversial; but the Dissenting Shareholders complain that the judge's failure to adopt Mr. Inglis's proposal in its entirety, in particular so far as concerns the length of the transitional period, has meant that the overall cash flow figures have been illegitimately understated.

87.     The judge's reasons for adopting a three-stage approach were stated in paragraph 136 of his judgment as follows:

> "*As I have noted, the experts agree that a transitional period should be used when the projected revenue growth in the last year of the forecast period is much greater than the constant growth rate assumed for all years thereafter into perpetuity. In the present case, Shanda's forecast assumes growth of 18.5% in 2019 but since Shanda assumes that its business would enter steady state growth thereafter Shanda estimates a range of constant growth rates from 1% to 2%. The implicit drop in growth rate is dramatic and not credible. It seems to me that it is reasonable to treat the last year of the forecasts as being 2019 and to compare the projected growth rate for that year with the constant rates assumed for the perpetuity period. When that is done in the present case it is clear that the difference is large and therefore that the usual justification for a transitional period is satisfied*".

88.     Having considered Professor Jarrell's and Mr. Inglis's respective proposals (two or three years in Professor Jarrell's case, if a transitional period were to be adopted at all, and ten years in Mr. Inglis's case) and the methodologies underlying them, the judge concluded at paragraph 140 that the preferable approach was to follow Mr. Inglis's basic methodology but to reduce the transitional period to five years. He did not, however, say anything about what impact, if any, this ruling would have on the rate of growth to be adopted in the terminal period – as to which Professor Jarrell had suggested a rate of 5.4% from 2020, Mr. Inglis a rate of 4.5% from 2029.

89.   Following circulation of the judge's draft ruling, the parties corresponded with the court about the value to be attributed to the shares in the light of the judge's decisions as to the principles to be applied. Ultimately, the only issue on which they could not agree was as to the growth rate in the terminal period, and it is accordingly necessary only to set out what was said about that issue.

A.   The correspondence started with a letter dated 28 March 2017 from Maples and Calder (for the Dissenting Shareholders), which included the following statement:

*"Inglis's Terminal Growth Rate of 4.5% related to a period in time running from after 2029 into perpetuity; Jarrell's Terminal Growth Rate of 5.4% related to a period of time running from after 2019/2020 into perpetuity; the terminal period following a 5 year transition period runs from after 2024 into perpetuity. Inglis has therefore taken the midpoint between his previous Terminal Growth rate and Professor Jarrell's terminal growth rate."* Attached to the letter were a letter and worksheet prepared by Mr. Inglis, in the former of which he explained that *"Because the terminal period (after 2024) is between mine (after 2029) and Professor Jarrell's (after 2019/2020), I use the midpoint of our terminal growth rates of 4.95%".*

B.   Harneys (for Shanda) dealt with these materials in a letter dated 6 April 2017, enclosing an amended worksheet, and stating:

*"From a review of Mr Inglis's worksheet, it would appear that Mr Inglis applied an average of his own and Professor Jarrell's long-term growth rate, presumably as it resulted in a higher-growth rate and, as a consequence, a higher ADS per share. The long-term growth rate has been amended to 4.5% which is consistent with the contents of his Lordship's draft judgment ".*

C.   On 12 April 2017 Maples and Calder responded as follows:

*"That leaves a single issue between us, which per point 1 of your letter is the terminal growth rate ("TGR"). This accounts for the remaining different US$0.47 per ADS. Mr Inglis has used a TGR of 4.95% which is the midpoint between his own TGR at trial of 4.5% and Professor Jarrell's TGR of 5.4%. This is not, as you unfairly "presumed", because it resulted in a higher growth rate and so a higher fair value. Rather, Mr*

> *Inglis has very clearly explained why he adopted that approach. To reiterate, Mr Inglis's TGR at trial related to a terminal period running from 2029 (i.e. using a 10 year terminal period), whereas Professor Jarrell's evidence at trial supporting a 5.4% TGR related to a period running from 2019/2020. However, in the draft judgment, Segal J has rejected Mr Inglis's contention for a 10 year terminal period, and has instead found that it is appropriate to "reduce the terminal period to five years", such that the terminal period runs from after 2024 (see paragraph 140). You are therefore incorrect when you assert that the TGR of 4.5%, which was self-evidently tied to the rejected 10 year terminal period, is "consistent with its Lordship's draft judgment". To the contrary, that amounts to an attempt on your client's part to take the "good" without the "bad". In light of the above, we invite your client either to accept this change, or to explain clearly why it is not accepted."*

D.   Harneys replied on 19 April 2017, saying this:

> *"As for your clients' approach to the terminal growth rate (TGR), our client does not agree that this is correct. It appears that your clients/Mr Inglis are conflating the terminal period and the applicable TGR. Paragraph 140 of the draft judgment reads as follows:*
>
>> *"In these circumstances it seems to me that the preferable approach is to follow Mr Inglis's basic methodology and to reduce the terminal period to five years as calculated by Mr Inglis".*
>
> *In order to give effect to this paragraph, Mr Inglis's methodology must be applied (i.e. the TGR of 4.5%) to the reduced terminal period of five years. At no point in the draft judgment is there a suggestion that the difference in TGR be split and a mid-point applied when calculating the TGR."*

E.   Also on 19 April 2017, Maples and Calder wrote to the Court, attaching and summarising the relevant correspondence and saying this:

> *"This morning, 19 April, we received a belated response from Harneys to our 12 April letter, which suggested that our clients and Mr Inglis had conflated the issue of the terminal and applicable TGR. To the extent this brief letter adds anything of substance to the discussion, it misses the point. The length of the terminal/transitional period and therefore the*

> start date of the period covered by the TGR are inextricably linked. The
> 4.5% number that Mr Inglis had previously used was based on a period
> of time starting after the end of a 10 year transitional/terminal growth
> period. The Honourable Judge has not accepted Mr Inglis's 10 year
> transitional/terminal growth period, but has instead applied a
> transitional/terminal period of 5 years. As Mr Inglis has explained (and
> as it set out in the above-mentioned correspondence), that finding then
> has an impact on the TGR as it now begins 5 years earlier than the period
> for which his 4.5% TGR relates. As Mr Inglis has explained he has
> applied a TGR of 4.95% in the calculation being the midpoint of his TGR
> which related to a period of time starting after a 10 year transitional
> period and Professor Jarrell's TGR which began after no transitional
> period. The Petitioner and its advisors have wholly failed to address that
> point, such that they must now be taken to have no further answer to it."

90.    The judge dealt with this issue in his Note dated 6 May 2017, and upheld Harneys'
       contentions. In paragraph 3 of the Note, he said this:

> "My conclusion was that there should be a transitional period of 5 years (to
> 2024) with the terminal period starting thereafter and that Mr Inglis's
> methodology and calculations (as presented in his evidence at trial) as to
> the revenue during the transitional period and the growth rate during the
> terminal period should be applied. That results in a growth rate of 4.5%
> during the terminal period. I have held that Shanda enters a steady state
> after 2024 and it seems to me that the growth rate that Mr Inglis had used
> at trial for Shanda during that period (i.e. in a steady state) still should be
> applied. This is 4.5%. Therefore the fair value is US$16.68 per ADS. I did
> not intend that, as a result of my decision that the transitional period be
> reduced to 5 from 10 years, there should, nor do I consider it to be necessary
> for there to, be a revision to Mr Inglis's evidence and opinion on the growth
> rate for the terminal period. It seems to me once a date is established on
> which Shanda enters a steady state (earlier on my view than on Mr Inglis's
> approach) the projected growth rate for the terminal period can then be

> applied and it is appropriate to use Mr Inglis's estimate as given in his
> evidence at trial".

91.    The Dissenting Shareholders complained that in reaching this conclusion the judge had
       failed to have proper regard to, or properly to apply, the evidence in relation to the
       growth rate. The only evidence as to the appropriate terminal growth rate in a
       transitional period of five years was that provided by Mr. Inglis in the post-hearing
       correspondence; and in the absence of contrary evidence from Professor Jarrell (or Mr.
       d'Almeida) the judge was bound to accept Mr. Inglis's view.

92.    I do not accept that the judge was wrong on this aspect of the matter. The express
       foundation for his view was the evidence given by Mr. Inglis at trial. That evidence was
       directed to a terminal period starting after a transitional period of 10 years, but nowhere
       in his evidence did Mr. Inglis suggest that the growth rate he proposed would be
       different if the transitional period were shorter. The material he supplied after
       circulation of the draft judgment cannot sensibly be described as evidence: although it
       may no doubt be inferred that he thought that the growth rate of 4.95% was appropriate,
       that rate was no more than the product of a mechanical exercise of averaging the rates
       that he and Professor Jarrell had originally proposed. In their reply skeleton, the
       Dissenting Shareholders sought to provide a more reasoned basis for the 4.95% figure.
       They pointed out that both Mr. Inglis and Prof Jarrell had arrived at their original figures
       by using the OECD long-term projections of GDP for China (and, in Prof Jarrell's case,
       for Korea), and suggested that – since China's GDP was projected to decline gradually
       over time – the earlier the starting point for the terminal period the higher the growth
       rate. That was because basing the growth rate on a 10 year terminal period took into
       account declining performance in the latter years of that period, whereas the adoption
       of a five-year period automatically included only the superior performance in the earlier
       years and excluded the later declining performance. However, this material was not
       available to the judge; and, even before us, was not evidence but submission. In
       circumstances where the only material capable of informing the judge's decision was
       Mr. Inglis's evidence at trial (which cast no doubt on the validity of a growth rate of
       4.5% in a terminal period starting after five years of transition) and his subsequent
       adoption without stated reasons of an average of the experts' original proposals, I
       consider that the judge was entitled to reach the conclusion he did.

93.    Accordingly, I would dismiss the Dissenting Shareholders' appeal so far as it relates to the transitional period point.

*Disposition*

94.    We have already dealt with the reopen application by refusing leave or, if leave was not required, by dismissing it.

95.    . As to Shanda's substantive appeal, I would allow it so far as concerns the minority shareholding point but dismiss it so far as it relates to interest.

96.    I would dismiss the Dissenting Shareholders' appeal.

GOLDRING P:

I agree.

MORRISON JA:

I agree.

