# EXHIBIT 13

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO. FSD 235 OF 2017 (IKJ)

IN THE MATTER OF SECTION 238 OF THE COMPANIES LAW (2016 REVISION)
AND IN THE MATTER OF NORD ANGLIA EDUCATION, INC

IN CHAMBERS

| | |
|---|---|
| **Appearances:** | Mr Malachi Sweetman, Maples and Calder, on behalf of Nord Anglia Education, Inc. ("**the Company**") |
| | Mr Christopher Harlowe, Mourant Ozannes, on behalf of the Mourant Dissenters |
| **Before:** | The Hon. Justice Kawaley |
| **Heard:** | On the papers |
| **Submissions filed:** | 30 January /7 March 2019 |
| **Draft Ruling Circulated:** | 25 March 2019 |
| **Ruling Delivered:** | 18 April 2019 |



### HEADNOTE

*Costs of Dissenters Summonses for Directions-section 238 of the Companies Law–whether costs should follow the event-whether successful party acted unreasonably-need for timetable fixed by Grand Court to address the filing of section 1782 applications before the US courts*

## COSTS RULING ON THE PAPERS

**Introduction**

1. On December 6, 2018, I heard the Mourant Dissenters' Data Room Summons dated October 25, 2018 and the Company's Notice seeking general case management directions. My Ruling on the issues raised was delivered on December 21, 2018.

2. My provisional views on costs were set out as follows:

   > "*28. The Mourant Dissenters have achieved substantial success on their firmly contested Summons, but exploited the fortuitous functionality problems thrown up by the Company's improvisational approach to e-discovery to obtain tactical benefits through extending the duration of the inspection process. I do not think the Dissenters should be awarded their costs in any event.*
   >
   > *29. The option of accepting the offer to provide experts only with access to native format could have been accepted without prejudice to the pursuit of the present application as a matter of principle. Not only would the trial preparations have been further advanced (it is, after all, <u>primarily</u> for the Experts to carry out the inspection process). The scope of argument could have been narrowed so as to focus not on the functionality issues, but on the principles and practice governing e-discovery. Unless any party applies within 28 days by letter to the Registrar to be heard as to costs, the costs of this Summons shall be the Dissenters' costs in the cause.*
   >
   > *30. The separate costs relating to those portions of the Company's Notice which did not relate to the inspection controversy are probably de minimis. Some of the relief was agreed (the timetable), some of the relief was refused (the section [1782] applications) and some relief was substantially granted (fixing a trial date) However those were quintessentially pre-trial general case management issues. Unless any party applies within 28 days by letter to the Registrar to be heard as to those costs, those costs shall be in the cause.*"



3. On January 30, 2019, Mourant filed written submissions and authorities in support of the Mourant Dissenters' application for costs in relation to the Mourant Dissenters' Data Room Summons. There was some delay in serving these documents on the Company's attorneys. On March 7, 2019 Maples forwarded its written submissions under cover of a letter which requested that the costs application should be dealt with

on the papers. By an email dated March 11, 2019, Mourant confirmed that they were also content for the matter to be dealt with on the papers.

4. The Appleby Dissenters and the Campbells Dissenters did not formally seek to persuade me to depart from the provisional views I expressed as to costs, which was (a) Dissenters' costs in the cause (Mourant Dissenters' Data Room Summons), (b) costs in the cause (Company Notice in relation to general pre-trial case management issues). However, that view assumed equality of treatment for all participating Dissenters, so in principle any more generous award secured by the Mourant Dissenters should logically accrue to the benefit of their comrades in arms as well. This principle must have regard to the context on which the present costs application was made, however. As the Company's position was that my provisional view should be sustained and the other Dissenters raised no challenge to that provisional view, the appropriate costs outcome was implicitly agreed between them.

**The Merits of the Mourant Dissenters' Data Room Summons**

5. The central complaints were that (a) the Company had adopted a form of watermarking for non-HSD documents without express Court approval or Dissenter consent, and that (b) as a result the documents could not be properly inspected. The following findings were made on this issue:

> *"20. In my judgment it is clear that there is a starting presumption in favour of the provision of documents in their native format and, in the present section 238 context, it was incumbent on the Company to justify a departure from this general rule. It is important for the governing principles not to be clouded by the peculiar circumstances of the present case. The Company, vexed by an apparently unusually large number of potential Data Room Users and (in my view) genuinely anxious about confidentiality concerns, sought to introduce additional security protections for non-HSDs which it considered would be uncontroversial. Having created a 'bespoke' e-discovery system, the Company's central preoccupation by the time the present application was heard had in my judgment by default become an essentially defensive one. The Company sought to justify its system by reference to logistical arguments untethered to any discernible legal principle.*
>
> *21. I find the Company has failed to make out a case for providing only the limited class of Users entitled to view unredacted versions of HSDs with*



190418 In the matter of Nord Anglia Education, Inc – FSD 235 of 2017 (IKJ) – Costs Ruling

3

> *native format documents, because providing documents in such a format forms part of the Company's basic discovery obligations. It was not for the Dissenters to demonstrate any practical need for production in this form.*
>
> *22. The Company has, nonetheless, established that the watermarking of native format non-HSDs (as described in the First Hanna Affidavit at paragraph 31), is justified in the unique circumstances of the present case. Although the matter should ideally have been addressed at the hearing of the Summons for Directions, the Dissenters cannot (and did not in correspondence before the present Summons was issued) object to the principle of watermarking. This assumes that 'watermarking' takes the form of an unobtrusive added layer of protection which will help to prevent accidental or intentional breaches of confidence. Indeed, the evidence of the Dissenters' own 'expert' in my judgment supports the view that static watermarking by way of Bates number is standard e-discovery practice, and that the word 'confidential' has also been added under direction of the courts."*

6.  The Data Room Summons clearly resulted in the Mourant Dissenters (supported by the other Dissenters) achieving substantial success thus triggering a *prima facie* entitlement to their costs applying the usual costs follow the event rule.

7.  The only question is whether my provisional view, that the Dissenters' conduct in declining an offer from the Company which would have advanced the trial preparation process combined with the overseas discovery applications was unreasonable, is sustainable in light of the contrary arguments advanced by the Mourant Dissenters in the present application for their costs.

**The respective submissions**

8.  The Mourant Dissenters' submissions may be summarised as follows:

    (a)   where a party provides deficient e-discovery, the Court can and should compensate the party who wastes costs in dealing with the defective discovery: Wheater & Raffin '*Electronic Discovery*', 1st edition (paragraphs 1.82(9), 4-179-180), *West African Gas Pipeline Co Ltd.-v-Willbros Global Holdings Inc* [2012] EWHC 396 (TCC), (Ramsay J, at



    paragraphs 50, 65, 68, 70, 71, 92, 93), *Vector Investments-v-Williams* [2009] EWHC 3601 (TCC) (Ramsay J, paragraphs 15, 22, 84ff, 92-95), *Earles-v-Barclays Bank Plc* [2009] EWHC 2500 (QB) (Simon Brown J, paragraphs [71], [75], [77];

 (b) the usual rule should apply as regards the costs of the Summons: *Merck KGaA-v-Merck Sharp & Dohme Corp and Others* [2014] EWHC 3290 (Ch) (Nugee J, at paragraph 6), *Sagicor General Insurance (Cayman) Limited-v-Crawford Adjusters (Cayman) Limited* [2011] (2) CILR 471 (Henderson J, at [29]), *Re Wimbledon Fund SPC*, FSD 111 of 2017 (RPJ), Judgment dated November 19, 2018 (unreported) (Parker J at paragraphs 5-6);

 (c) the Dissenters' commercial motives or purpose in buying their shares is irrelevant: *Re Zhaopin Limited* FSD 260 of 2017 (RMJ), Judgment dated June 22, 2018 (unreported), (McMillan J at [48]), *RFG Private Equity Limited Partnership No 1B-v- Value Creation Inc*, 2016 ABQB 391(Romaine J, paragraph [279]), *Solomon Bros Inc.-v-Interstate Bakeries Corp* 576A. 2d 650 (Del. Ch. 1989) 652-653;

 (d) there was no need for this Court to pre-approve the US section 1782 applications so the Court's provisional view that the Dissenters had acted unreasonably in not seeking prior approval was unwarranted: *Lyxor Asset Management S.A.-v- Phoenix Meridien Equity Limited* [2009] CILR 553 (CICA), (Chadwick P, paragraph 57). Moreover, it would be wrong for the Court to penalize the Dissenters in costs in relation to an asserted collateral purpose unsupported by evidence.

9. The Company submitted that the Court should adhere to its provisional view that the Dissenters' costs should be in the cause. It was submitted that a distinction was to be drawn between a failure to comply with the content of e-discovery obligations (the concern of the cases upon which the Mourant Dissenters' relied) and what transpired here: a defective security mechanism.

10. As regards the irrelevance of the commercial motives of investors (*Re Zhaopin*), the case relied upon was not concerned with the question of costs, it was submitted. The Company further argued that there was ample evidence before the Court of a collateral purpose behind the delayed manner in which the Mourant Dissenters advanced their Summons. Although not all of the Mourant and Appleby Dissenters had made section 1782 applications, for costs purposes all Dissenters should stand or fall together.

11. As regards the claim for wasted costs, the Company submitted that no claim for any separate head of costs had originally been made. In any event, once the Mourant



Dissenters decided to challenge the Company's disclosure, it was clear that all efforts had been devoted to preparing for the Data Room Summons.

**Findings: costs wasted in dealing with defective discovery**

12. I accept the Mourant Dissenters' submission that this Court has the jurisdiction to compensate a litigant who has wasted costs in attempting to deal with defective discovery by an appropriate costs order: *West African Gas Pipeline Co Ltd.-v- Willbros Global Holdings Inc* [2012] EWHC 396 (TCC); *Vector Investments-v-Williams* [2009] EWHC 3601 (TCC); *Earles-v-Barclays Bank Plc* [2009] EWHC 2500 (QB). Wheater & Raffin '*Electronic Discovery*', 1st edition, upon which reliance was also placed, states (at paragraph 1.79):

> "…the court is entitled to take a party's conduct into account when assessing whether to make an order for costs and what costs order to make. Examples of cases in which the court has taken parties' conduct into account in eDisclosure matters include, for example, lateness of disclosure, precipitous applications, over-disclosure, failing to comply with the duty to carry out a reasonable search, and lack of cooperation."

13. In my judgment the threshold question of legal principle is not whether or not the defect in question goes to the content of discovery as opposed merely to its form, as the Company contended. The question is whether the disclosing part is guilty of a serious failure to comply with their discovery obligations. The Company's unilateral decision to institute its own document security protections without seeking the agreement of the Dissenters or the approval of the Court potentially qualifies for a sanction in terms of costs. What sanction is appropriate depends on the circumstances of each case.

14. The costs sanction sought by the Mourant Dissenters as against the Company presupposes that the Company's conduct has caused their opponent to waste a significant period of time and effort which might otherwise have been avoided. While the detail would be a matter for taxation, the cases relied upon by the Mourant Dissenters demonstrate that this form of wasted costs order is only appropriate where it is clear prior to the taxation phase that a significant degree of effort has been wasted. In my judgment the Company is correct to argue that the evidence strongly points to the conclusion that the Mourant Dissenters devoted most of their effort towards making out the case that ultimately prevailed, namely that the watermarking system deployed was inappropriate and/or ineffective. These costs fall within the ambit of the costs of the Data Room Summons.



15. In the exercise of my discretion, I find that no additional costs sanctions are warranted in relation to costs thrown away by virtue of the Company's failure to comply with its fundamental discovery obligation to make electronic documents available in native format.

**Findings: the costs of the Mourant Dissenters' Data Room Summons**

16. Should the Mourant Dissenters be deprived of the usual costs order because they acted unreasonably in relation to their conduct of the Summons? My provisional view was that (a) they had been motivated by the collateral purpose of seeking to obtain a delay to facilitate the pursuit of discovery applications in the United States, which applications ought to have been integrated into the timetable fixed in the present proceedings, and (b) they acted unreasonably in failing to progress the discovery process by accepting the offer for their expert to inspect documents without the impugned watermarks.

17. The Mourant Dissenters submissions do not in my judgment advance any satisfactory answer to the second limb of my provisional unreasonable conduct finding. They do however fairly point out that before the hearing of their Summons the Company agreed to adjust the timetable in any event. My provisional views on this costs segment were expressed on December 21, 2018. They were subliminally influenced by the fact that in my Ruling on Costs of Dissenter Discovery Application dated October 24, 2018, I had expressed strong views about what might loosely be described as 'tactical non-cooperation', views which it seemed to me had been ignored. In fact, the events which concern the present application largely occurred before those views had in fact been expressed[1]. Nonetheless this was conduct which potentially qualifies for some costs consequences, subject to a fair evaluation of its seriousness and impact on the proceedings.

18. In my judgment it <u>was</u> unreasonable to spurn the offer to allow the Dissenters' expert to progress the inspection process while the dispute about wider access was worked out. Nonetheless, it is impossible to fairly find that this conduct was, standing by itself in light of the way events unfolded, so unreasonable as to justify displacing the usual rule that costs should follow the event. Or, to put it another way, it has neither been established nor is it self-evident that there was any causative link between the spurning of the offers which were made and subsequent course of the discovery process. Going forward the parties are on notice that failures to comply with their obligation to assist

---

[1] The Company's Skeleton for the Data Room Summons referenced the following correspondence in footnote 58 on page 27: "*Letters from Maples to Mourant of 17 August 2018 [ZH-1, pages 352-353], 20 September 2018 [ZH-1, 401-411], 9 November 2018 [RCB-4, pages 22-25] and 21 November 2018 [RCB-4, page 48A]. The offer was rejected by Mourant in its letters of 19 August 2018 [ZH-1, pages 354-357], 18 September 2018 [ZH-1, pages 383-386], 23 October 2018 [Exhibit RCB-4, page 16A] and 23 November 2018 [RCB-4, page 48B]*".

the Court to achieve the overriding objective will be subject to more rigorous scrutiny by this Court.

19. More serious was my provisional finding that it was unreasonable to use the Mourant Dissenters' Data Room Summons for the collateral purpose of advancing the section 1782 US discovery applications, rather than seeking to accommodate those applications in the trial timetable in the present proceedings. I regarded it as "*obvious that the Mourant Dissenters' application has in part been motivated by a tactical desire to extend the timetable*" (December 21, 2018 Ruling, paragraph 5). That was not a wholehearted acceptance of the Company's submissions on this issue, but it signified that I felt it was open to me to draw such an inference from the correspondence and what appeared to me to be largely uncontested background facts. I tacitly rejected the plea by Mr Levy QC in his oral reply that in the absence of supporting evidence his clients were not fairly able to respond to the collateral purpose complaints.

20. More significantly, however, the Mourant Dissenters contend that the Cayman Islands Court of Appeal has ruled that this Court is not competent to restrain the conduct of section 1782 applications in the United States. *Lyxor Asset Management S.A.-v-Phoenix Meridien Equity Limited* [2009] CILR 553 does establish that "*prima facie a party who can invoke the jurisdiction of the United States District Court under §1782 may choose to do*" (Chadwick P, at paragraph 57). Smellie CJ's decision to refuse an anti-suit injunction was upheld. However, for present purposes the critical finding was not that the pursuit of section 1782 applications could never be complained of in Caymanian proceedings. On the contrary, the finding in the circumstances of that case was that:

> "*58. In the particular circumstances of this case… Phoenix has taken the view that its interests are best served by seeking to obtain the information which it needs by taking oral depositions in New York - a relatively summary process - rather than by proceeding by way of further and better particulars and interrogatories in the Grand Court - with the potential for procrastination and delay inherent in that process. It cannot be said that, in making that choice, it is acting oppressively or unconscionably or that its choice amounts to an abuse of the process of the Cayman courts.*"

21. It is accordingly competent for this Court to find that a party has acted unreasonably or abused the process of this Court by pursuing section 1782 proceedings in a manner which disrupts primary proceedings before this Court. On the other hand, the only authority cited which addresses the interaction between section 1782 applications and proceedings in the Grand Court supports the general proposition that parties are free in appropriate circumstances to pursue such applications in the US courts. In considering the propriety of the applications, it is relevant to note that:



    (a)    the Company has <u>not</u> contended that the applications (against third parties) are wholly unnecessary and are seeking information which could be obtained through applications against the Company before this Court; and

    (b)    the Company has essentially contended that the Dissenters have exaggerated their discovery complaints and manipulated them with a view to aligning the timetable in this action to that in the US proceedings.

22.    I accept that the Mourant Dissenters' approach to the present application has in part been motivated by a desire to elongate the timetable with one eye on the section 1782 applications[2]. However, the extension of the timetable was ultimately agreed before the Mourant Dissenters' Data Room Summons came on for hearing and that summons succeeded on its merits. I am unable to find that the section 1782 applications are themselves abusive or oppressive. *Lyxor* (see paragraphs 42-45) suggests that the US courts will usually be best placed to make such a determination. This Court had imposed no prior constraints on the Dissenters as regards when section 1782 applications should be made. It is difficult in these circumstances to justify a finding that the Mourant Dissenters' collateral motives had such a materially adverse impact on the course of the present proceedings to result in a penalty in costs. I reach this conclusion mindful of the fact that the Company is right to point out that my provisionally proposed penalty was not the most severe one, because if they succeeded at trial the Dissenters would ultimately recover their costs.

23.    However, the experience of this case strongly suggests that when this Court fixes a timetable on a Summons for Directions in section 238 cases, the parties have a duty under the Overriding Objective to explicitly address the possibility of section 1782 applications, unless it is common ground that the need to do so does not arise. While this Court cannot in general terms restrain the parties from making such applications (unless they are unconscionable), suitable standard directions should be able to avoid parallel proceedings being commenced within a timeframe which adversely affecting the timetable fixed by this Court.

24.    In the present case the Mourant Dissenters exploited a loophole in the Directions Order and a serious misstep by the Company and, on balance, have not acted so unreasonably so as to justify depriving them of the costs of their successful summons in any event.



---

[2] I express no view on their motives in purchasing their shares.

**Costs of the Company's Notice**

25. The Company's attorneys on November 28, 2018 served a Notice of Draft Orders and Directions under GCR O.25 rule 7(1) which proposed:

    (a) that the Mourant Dissenters' application for the documents uploaded to the Data Room to be capable of being downloaded in native format and with an ability to copy and paste from them, and further for the Company to be required on request to produce the documents without any watermark, should be refused;

    (b) that the Mourant Dissenters' application for (i) the ability to print the documents to be enabled and for (ii) the inclusion of specified metadata fields, should be granted by consent;

    (c) that the Mourant Dissenters' application to be able to view the documents in native and image format should be granted: (i) as regards the Experts and the Dissenters' attorneys, (ii) in respect of such documents as they might reasonably request, and (iii) provided that a further confidentiality confirmation was signed in the form set out in Appendix 2 to the notice;

    (d) that the timetable should be modified in accordance with Appendix 3 to the notice;

    (e) that the Petition be fixed for trial on the first open date after September 2, 2019;

    (f) that any further applications by Dissenters pursuant to s1782 of USC or any similar overseas third party discovery legislation should be made by December 20, 2018.

26. Of the six proposed directions, (a), (b) and (c) overlapped with the Mourant Dissenters' Data Room Summons and so no discrete costs claims properly arise. On the other hand, (d), (e) and (f) were general trial management issues which can be fairly regarded as falling within the ambit of the usual costs in the cause rule. On balance I find that any (probably minimal) costs which can fairly be attributed to these general trial management issues should, consistently with my provisional view, be costs in the cause.



**Conclusion**

27. For the above reasons I find that the Mourant Dissenters should have their costs of the Data Room Summons (and the Mourant Dissenters are awarded the costs of the present costs application) in any event, to be taxed if not agreed on the standard basis. The Company's costs attributable solely to the trial management aspects of the Company's Order 25 rule 7(1) Notice (as itemized in paragraph 26 above) shall be in the cause.

_____

**THE HONOURABLE MR. JUSTICE IAN RC KAWALEY**

**JUDGE OF THE GRAND COURT**